IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KLIPSCH GROUP, INC,<br><br>    Plaintiff,<br><br> v.<br><br>BIG BOX STORE, LIMITED dba<br>BIXBOXSTORE.COM *et al*.<br>Defendants. | Case No. 12-CV-6283 (AJN)<br><br>**SUPPLEMENTAL DECLARATION OF DANIEL CHOW** |

  DANIEL CHOW, under penalty of perjury, declares and says:

  1. I am the Chief Executive Officer for ePRO Systems, Ltd. ("ePRO Systems") and have held this position since 2006. I know the following from my own personal knowledge or because I made appropriate inquiries of others to inform myself in order to make this declaration. I can and will testify competently to this information if called as a witness.

  2. I submit this supplemental declaration in further support of the opposition to Plaintiff Klipsch Group, Inc.'s ("Klipsch") *ex parte* Application for a Temporary Restraining Order, Seizure Order, Order to Disable Certain Websites, Asset Restraining Order, Expediting Discovery Order and Order to Show Cause for Preliminary Injunction ("Plaintiff's Application") as against Dealextreme.com and further to this Court's Order of September 14, 2012 setting forth a schedule for additional submissions.

  3. As a result of my experience and responsibilities, I am knowledgeable about the business of ePRO Systems and its subsidiaries, including ePRO e-Commerce Limited ("ePRO e-Commerce," and together with ePRO Systems, collectively "ePRO").

1

### **SALES OF KLIPSCH-BRANDED PRODUCTS**

4. As I testified in my previous declaration, no ePRO-related websites other than Dealextreme.com and DX.com have ever listed any Klipsch-branded products. In ePRO's operations, we have tailor-made IT systems. The first is called Shop, in which we keep all the product information in a structured format, including products being taken down from the ePRO e-Commerce marketplace. Our core business support system is our Order Management System that keeps all individual order details from start to finish so that we can insure that the orders are fulfilled, customers are charged properly and suppliers are paid properly. In order to facilitate our relationships with suppliers, we also have a web-based Supplier Relationship Management System. These systems collectively keep extensive records of the sales of goods through ePRO, including the SKU, price, purchaser, supplier and other information, and we are able to search the systems to find all sales by SKU, suppliers of each SKU, product titles and descriptions, among others.

5. As I testified in my previous declaration, I examined Dealextreme's sales records for sales of Klipsch-branded goods. ePRO has a structured database that maintains product information (we log each product by Stock Keeping Unit or "SKU") and we can search the database for all the SKUs with the word "Klipsch" in the title or product description. In order to comply with HK Law, HK stock exchange requirements and audit requirements, we never delete any SKU information. Through these searches, I determined that two SKUs of "Klipsch" branded products were sold between June 5, 2011 and March 29, 2012. The two items were provided by two different suppliers. Exhibit A to this Declaration is a true copy of a spreadsheet of sales for all Klipsch-branded items ever sold through Dealextreme to customers in the United

States, derived by the search process described above.  Only 22 units of Klipsch-branded goods were sold to customers in the United States, and gross revenues from such sales were $661.80.  My earlier declaration mistakenly indicated that revenues were $691.70, but this total erroneously reflected a fraudulent order detected by ePRO's databases, for which no revenues were received nor product shipped.  In addition, as reflected in Exhibit A, we refunded $34.10 to an unsatisfied customer, and so we retained only $6.  Our systems store information in addition to that shown on Exhibit A; we have provided to Klipsch's counsel spreadsheets including names and addresses of purchasers, but have not made those part of the public record.

6. Based on searches of all ePRO E-Commerce websites, no Klipsch-branded goods have been sold through Dealextreme or any other ePRO E-Commerce website since March 29, 2012.  Again, the global results identified in this paragraph were obtained by searching ePRO's various IT systems for all SKUs including the word "Klipsch" in the title or product description.

7. As a publically-listed company, we comply with Hong Kong laws, Hong Kong stock exchange requirements, and audit requirements.  We preserve all transaction details for seven years.  We searched our system databases for all "Klipsch" branded products to find the sales records identified in this and my previous Declaration, and we confirmed that there have been no other sales of Klipsch-branded products.

8. Based upon my review of the Declaration of Tamara D. Tarbutton in Further Support of Plaintiff's Application for an Asset Restraining Order and Order to Show Cause for Preliminary Injunction ("Supplemental Tarbutton Declaration") and ePRO's records, the SKU of the item purchased by Plaintiff's investigator that Plaintiff contends is counterfeit is 71512.  Based upon ePRO's records, kept as described above, this SKU was listed as Klipsch S4, white in color, without microphone.  The supplier of this product was 腾辉科技有限公司, which is

3

pronounced as "Teng Hui Technology Limited" ("Teng Hui").  ePRO e-Commerce's supplier code for Teng-Hui is FAX-LS-TH.  The selling price for SKU 71512 was $29.90 per unit.  ePRO e-Commerce remitted $24.10 (RMB 150 using a conversion rate 6.2 RMB/$) of the selling price to Teng Hui for each unit of SKU 71512 shipped.  ePRO e-Commerce has long since remitted to Teng Hui the amounts due to Teng Hui for all of the units of SKU 71512 shipped to the United States or elsewhere in the world.  Thus, ePRO e-Commerce's gross profits (revenues less cost of goods sold) on the sales of this SKU were $5.80 per unit, or a total of $81.20 for all units sold into the United States.

9.      Exhibit B is a true copy of ePRO e-Commerce's supplier agreement with Teng Hui with highlighting to show the portion of the agreement that indicates that the products to be listed do not infringe any rights (including Intellectual Property rights) of another party.

10.     Based upon my review of ePRO's records, the only other SKU of Klipsch-branded merchandise sold through ePRO is 73113.  This SKU was listed as Klipsch S4i, black in color, with microphone and iPhone button control.  The supplier of this product was 洪创电子, which is pronounced as "Hung Chuang Electronics" ("Hung Chuang").  ePRO e-Commerce's supplier code for Hung Chuang is FAX-TX-KM.  The selling price for SKU 73113 was $30.40 per unit.  ePRO e-Commerce remitted $25 (RMB 155 using a conversion rate 6.2 RMB/$) of the selling price to Hung Chuang for each unit of SKU 73113 shipped.  Thus, ePRO e-Commerce's gross profits (revenues less cost of goods sold) on the sales of this SKU were $5.40 per unit, or a total of $43.20 for all units sold into the United States.

11.     Exhibit C is a true copy of ePRO e-Commerce's supplier agreement with Hung Chuang.

12. Thus, ePRO's business records show gross profits for all Klipsch-branded items ever sold into the United States of $124.40.

13. Exhibit D is a true copy of a spreadsheet showing all non-U.S. sales of Klipsch-branded items through ePRO. As shown in Exhibit D, non-U.S. sales through ePRO totaled $5082.60, including revenues that were refunded. There were an additional 8 cancelled orders included in the original total; ePRO received no revenues for those sales. ePRO received $5744.40 in revenues on global sales of Klipsch-branded items. Upon reviewing the spreadsheets of all orders to the United States and outside the United States and inquiring of the IT personnel who performed the original searches, I have learned that the $6,346.40 figure for global sales was erroneously inflated by including in that total the fraudulent order identified in Exhibit A and cancelled orders for which ePRO received no revenue, and by using order totals from a number of orders that included both Klipsch-branded products and non-Klipsch-branded products

### NO OR MINIMAL PROCEEDS FROM THE SALE OF KLIPSCH-BRANDED PRODUCTS REMAIN IN ePRO'S ACCOUNTS

14. ePRO e-Commerce makes sure that products ordered from our suppliers ship to the customer within 60 days of the order or we initiate a refund. We pay our suppliers within 30 days of product shipment.

15. ePRO e-Commerce previously made all payments to Teng Hui and Hung Chuang for all the Klipsch-branded items. Thus, no more than $124.40 in revenues from United States sales of the Klipsch-branded items could remain in ePRO's accounts.

16. Exhibit E is a true copy of records of ePRO e-Commerce's payments to its suppliers for the Klipsch-branded items sold through ePRO. There are two separate spreadsheets because ePRO is running both an old and a new order management system while it transitions to

the new system. The payments are not duplicated on the two spreadsheets, so the total payments are the sum of those reflected on the spreadsheets, or a total of RMB 30,240, or approximately $4877.42 at the converstion rate of 6.2RMB/$ (the ¥ symbol on the spreadsheets is for the Chinese yuan or RMB, not Japanese yen). The gross profits globally on Klipsch-branded goods are thus $866.98 before accounting for refunds to customers.

      17. Thus, as shown on the documents identified above, the PayPal accounts (and all other ePRO accounts combined) could contain, at a maximum, less than $1000 that could be considered to be derived from the sale of allegedly-counterfeit Klipsch-branded products worldwide, and less than $125 that could be considered to be derived from the sale of allegedly-counterfeit Klipsch-branded products in the United States.

## **FREEZING A LARGE SUM OF ASSETS CAUSES ePRO SUBSTANTIAL HARM**

      18. ePRO e-Commerce is doing business in a difficult economic environment. It has a large number of competitors advertising the sale of similar items. It is facing increasing cases of fraud by customers over the past six months, including illegal use of credit card information and unauthorized use of PayPal accounts. These issues have eaten up ePRO e-Commerce's margins. In addition, the business model we have as a marketplace requires ePRO e-Commerce to pay suppliers in a very short period of time (usually within 30 days of shipment), as our orders are scattered and small. We have no bargaining power over many suppliers with each having only a relatively small trading volume.

      19. The hold on $2 million in our PayPal accounts requires us to delay payments to our suppliers. However, I do not anticipate that our suppliers will tolerate an extension of payment terms for long, as our suppliers need to pay wages and rent as we do. If the situation

cannot be improved, we may have no choice but to scale down our operations, and our customer service and business operations will be significantly affected.

### EXPEDITED DISCOVERY WILL CAUSE HARDSHIP TO ePRO

20. ePRO has no office and no employees in the United States. ePRO does not have in-house counsel, and responding to discovery requests is a new and burdensome process for ePRO. Before this case, ePRO has never been subject to a lawsuit or court order in the United States.

### ePRO'S BUSINESS

21. As I stated in my prior declaration, ePRO operates several diverse business lines, including systems integration, IT service, outsourcing services, and e-commerce. The company reported gross revenues for the first 9 months of fiscal year 2012 of approximately $130 million.

22. As indicated in our public financial reports, ePRO has minimal inventory, which involves reselling hardware from our System Integration business. As shown on page 4 of ePRO's most recent interim report, ePRO's inventory was only HKD 354,000 (approximately U.S. $46,000). A true copy of the English version of ePRO's 2011/2012 Interim Report is attached as Exhibit F.[1] The inventory listed is from ePRO's IT systems resale business and was largely related to sales to Ikea, which has been an ePRO customer for some time. Exhibit G is a true copy of an invoice to ePRO Systems subsidiary ePRO Computer Systems (Beijing) Co. Ltd. for the systems inventory sold to Ikea by ePRO. ePRO does not keep any inventory whatsoever in its e-Commerce business, of which Dealextreme is a part. ePRO e-Commerce's business model is simple and requires no inventory: suppliers contact ePRO e-Commerce to list products, ePRO e-Commerce inspects a sample of the product and then approves and posts the listings,

---

[1] The interim report also can be found at
http://gem.ednews.hk/listedco/listconews/GEM/2012/0214/GLN2012021428.pdf.

7

takes orders from customers, then places the orders to the relevant supplier. The supplier then delivers the products ordered to an independent logistics service provider, MadeinChina Limited, while ePRO e-Commerce oversees inspection of the packing of the product in the logistics provider's warehouse, and the logistics provider ships the product to the customer. A true copy of ePRO e-Commerce's agreement with MadeinChina Limited is attached as Exhibit H. MadeinChina Limited is not affiliated with madeinchina.com, a website owned by ePRO e-Commerce, nor otherwise with ePRO except through a contractual relationship.

23. For Dealextreme, ePRO e-Commerce's staff is responsible mainly for the platform maintenance, customer service and marketing. As stated in section 4.2 of Dealextreme's terms and policy, http://www.dealextreme.com/Iframe/TermsAndPolicy.aspx, (appended to the Declaration of Tamara D. Tarbutton in Further Support of Plaintiff's Application for an Asset Restraining Order and Order to Show Cause for Preliminary Injunction ("Supplemental Tarbutton Declaration") as Exhibit F), "The sales contract is entered in to between the Buyer and the Supplier."

24. Section 4.3 clarifies that "Dealextreme.com cannot control and is not liable to or responsible for the availability of the products or services offered for sale displayed on the Site."

25. Section 4.4 indicates that Dealextreme takes responsibility for "Transaction Risks" associated with purchases through the site "provided always that such User shall entrust Dealextreme the full power of attorney to seek indemnification from the relevant Suppliers instead."

26. Section 5.2 statest that "Dealextreme will request each Seller to ensure that listing of counterfeits . . . is strictly prohibited." Section 5.3 includes potential sanctions for violation of IP rights, and plainly refers to third-party sellers of the listed products.

8

27.     I have reviewed and am familiar with the allegations in Plaintiff's papers that a potential supplier would not know how to have products listed on Dealextreme. However, the papers appended to the Supplemental Tarbutton Declaration show otherwise. Section 4.1 of Dealextreme's Terms of Use Agreement, attached as Exhibit F to the Supplemental Tarbutton Declaration, indicates that "Any Sellers who are interested in listing their products on Site are encouraged to contact our promotion agent according to the following contact: sellondx@gmail.com."

28.     In our main page www.dealextreme.com, we have a link for sellers and prospective sellers. To register as a seller, the supplier must be a company and must sign an agreement guaranteeing the products they will list are genuine before their SKUs can be shown on the dealextreme.com marketplace. Figure 1 below is a true screenshot of the bottom of dealextreme.com's main page with an arrow superimposed to show where a prospective seller would click through to go to the Dealextreme supplier page (the Chinese characters).



9

Figure 1 -- bottom of dealextreme.com main page.

29. On the Dealextreme supplier page that can be reached from the dealextreme.com main page, a prospective supplier can register as a supplier. Any registered supplier can submit new products and pricing. Figure 2 below is a true screenshot of Supplier Relationship Management System entry screen.



Figure 2 – Supplier Relationship Management Screen

30. The USA warehouse described on various pages of dealextreme.com is a new, experimental business model under which ePRO e-Commerce was working with few specific suppliers. Those suppliers agreed to place their products in a vendor-managed warehouse on a consignment basis. ePRO e-Commerce's contract counterparty, BFE Corporation Limited ("BFE") arranged for the warehouse space in the United States. ePRO has no ownership or leasehold interest in any warehouse in the United States. When customers order the goods held on consignment in the warehouse, ePRO e-Commerce instructs BFE to ship those products from

the warehouse in the United States. The purpose of having goods in the United States is to shorten the shipment time to customers and allow for shipment of heavier items such as furniture. The terms of the agreement with the suppliers otherwise remain unchanged, and ePRO never takes title to the goods. As with other orders, ePRO pays the supplier only after the product has been shipped. Unsold products are returned to the suppliers. ePRO used this same model with the Australia and UK warehouses. Due to unsuccessful implementation and high operations costs, ePRO has shut down the Australia warehouse and now in the middle of shutting down the U.S. warehouse as well.

31. As I testified in my previous declaration, Dealextreme, has a mechanism to report infringing products through the "Contact Us" link on the website at http://help.dx.com/Contact%20Us.ashx. ePRO accepts IP rights reports by either email or regular mail to our physical address identified on the "Contact Us" page. We have a dedicated staff of approximately 5 employees looking into such matters every day, and who respond to parties alleging IP rights violations, usually within few days. Once an item is confirmed as an IPR violation, we take it down from the marketplace immediately.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September 21, 2012

_____
Daniel Chow