UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: OCT 2 4 2012

------------------------------------------------------------X

Klipsch Group, Inc.,

                 Plaintiff,

      -v-

Big Box Store Ltd. d/b/a BigBoxStore.com and
BigBoxSave.com, *et al.*,
                 Defendants.

------------------------------------------------------------X

12 Civ. 6283 (AJN)

OPINION

ALISON J. NATHAN, District Judge:

On October 11, 2012, the Court ordered a reduction, from $2 million to $20,000, in the

amount of Defendant Dealextreme.com's ("DealExtreme") assets that Plaintiff, Klipsch, Inc.

("Klipsch"), may restrain as part of a preliminary injunction.  (Docket # 67).  In light of

Plaintiff's October 16, 2012 request for a stay of that reduction pending Plaintiff's interlocutory

appeal, the Court issues this Opinion expanding upon the reasons for its October 11, 2012 Order

and, in doing so, responds to the additional merits arguments presented by plaintiff in its papers

seeking a stay.  The Court will issue a separate order considering Plaintiff's application for a stay

pending appeal.

## I.      BACKGROUND

###      A.    Plaintiff Investigates Counterfeiting Activity

Plaintiff manufactures headphones and related devices under the brand name "Klipsch."

Plaintiff's investigator, Tamara Tarbutton, purchased one Klipsch-branded item through

Defendant DealExtreme's website on December 21, 2011, and that item was delivered on

1

January 27, 2012. (Docket # 20 Ex. F). Ms. Tarbutton later determined that the Klipsch-branded item purchased through DealExtreme's website was a counterfeit. (*Id.* ¶¶ 12–13).

Following receipt of this single counterfeit device from DealExtreme, Plaintiff went on to purchase an additional 10 Klipsch-branded devices from 10 separate websites not associated with DealExtreme. (Docket # 20 Ex. F). This process lasted through mid-July of 2012. (*Id.*). Plaintiff purchased approximately one or two such devices each month, although no devices were purchased from mid-March through mid-May of 2012. (*Id.*).

        B.    <u>Plaintiff Commenced the Present Action</u>

Plaintiff did not commence the present action until August 15, 2012. The action named twenty individual defendants, whom, based on its investigation, Plaintiff alleged to be sellers of counterfeit Klipsch-branded goods. (Docket # 15). This Court, presiding during that week in Part I, granted Plaintiff's request to file the Complaint under seal (Docket # 13) so that Plaintiff could obtain certain *ex parte* remedies as provided by the Lanham Act without providing the defendants, alleged to be counterfeiters, with an opportunity to destroy any infringing goods or abscond with any ill-gotten profits.

        C.    <u>A Temporary Restraining Order was Granted</u>

On August 16, 2012, Plaintiff returned to the Court and requested an *ex parte* Temporary Restraining Order ("TRO") enjoining all Defendants from shipping, delivering, or passing off counterfeit Klipsch-branded products, operating websites enabling the sale of counterfeit Klipsch-branded goods, and requiring Defendants to preserve evidence. (Docket # 48). The proposed TRO also required that Defendants show cause at a hearing to be held on a later date why a preliminary injunction should not be entered. (*Id.*).

The proposed TRO also contained a broad asset restraint provision. Specifically, the proposed TRO provided that banks, merchant account providers, payment processors and providers, credit card associations, and other financial institutions that receive or process payments or hold assets on the Defendants' behalf "shall immediately locate all accounts connected to Defendants . . . and that such accounts be temporarily restrained and enjoined from transferring or disposing of any money or other of Defendants' asses, not allowing such funds. (Docket # 48 at 12–13). The proposed TRO did not place a limit on the size of the assets belonging to the twenty defendants that Plaintiff was authorized to restrain.[1]

Based on the showing before it at the time, the Court granted Plaintiff's request and the TRO was entered on August 16, 2012. (Docket # 48). Thus, the Court granted Plaintiff's *ex parte* request to restrain all of the Defendants' assets. On August 30, 2012, DealExtreme stipulated to an extension of the TRO until a preliminary injunction hearing could be held on September 14, 2012, approximately one month after the TRO was entered. (Docket # 12).

>    D.    Defendants Object to Entry of a Preliminary Injunction

Prior to the preliminary injunction hearing, several of the twenty named defendants stipulated to the entry of preliminary injunctions or settled the claims against them. (Docket #'s

---

[1] In support of this proposed asset restraint, Plaintiff's Memorandum of Law cited numerous instances in which other judges in this District signed orders granting *ex parte* restraints on assets in Lanham Act cases, many of which involved essentially identical TROs. (Docket # 18 at 14); *see also Rolex Watch U.S.A., Inc. v. City Styles 313, et al.*, No. 12-CV-4754 (S.D.N.Y. June 26, 2012), Docket # 11 at 11–12 (listing twenty instances since late 2010 where TROs containing nearly identical asset restraints were authorized by judges in this District). Although not cited by Plaintiff, the Court has located at least one such order in which the presiding judge crossed out such broad asset restraint language. Temporary Restraining Order, *Coach v. Maneau, et al.*, No. 11-CV-305 (S.D.N.Y. Jan. 31, 2011) (Kaplan, J.), Docket # 14 at 11.

34, 46). A majority of the defendants have never appeared in this action. Two Defendants, DealExtreme and Pandawill.com ("Pandawill"), opposed the entry of a preliminary injunction.[2]

DealExtreme, the subsidiary of a publicly-traded Hong Kong company, submitted its brief in opposition to entry of a preliminary injunction shortly after it appeared in the case. (Docket # 31). DealExtreme reported that Plaintiff had seized $2 million in one of its PayPal accounts. (*Id.*). At that time, Plaintiff's documentary evidence demonstrating a likelihood of success in having DealExtreme found liable for infringement consisted of the sale of a single infringing good through DealExtreme's website. (Docket # 20 Ex. F). Nonetheless, the CEO of DealExtreme's parent, ePRO, Daniel Chow, submitted a Declaration voluntarily disclosing that, upon learning that the Klipsch-branded goods sold through his website were counterfeit, he conducted an examination of his company's records and discovered that his company had sold $691.70 worth of counterfeit Klipsch-branded goods into the United States and $6,346.40 worldwide. (Docket # 32 ¶ 11).[3] Mr. Chow informed the Court that his company generated just under $1,000 in net profits from the worldwide sale of Klipsch-branded goods (Docket #'s 32, 54). Mr. Chow described his company as an eBay-like service, matching buyers and sellers and not directly selling any goods. (Docket # 32 ¶¶ 13–15).

      E.    A Preliminary Injunction Hearing was Held

---

[2] Pandawill reported that Plaintiff had restrained $500,000 of its assets even though it had only sold $224.91 of infringing goods into the United States. (Docket # 33 at 3–4). Prior to the preliminary injunction, Pandawill agreed to stop selling Klipsch-branded goods and consented to an asset freeze of $50,000, which would represent a figure 200 times as large as the value of the infringing goods that it indicated it sold into the United States. (*Id.* at 6–9). Yet these concessions were apparently insufficient to convince Plaintiff to reduce the $500,000 in assets that were under restraint. (*Id.*). At the commencement of the preliminary injunction hearing, Pandawill informed the Court that it had reached a settlement with Plaintiff and ultimately a consent judgment was docketed. (Docket # 62).

[3] In a later declaration, after taking into account returned goods, DealExtreme revised its estimates and represented that its gross worldwide sales of Klipsch-br/anded goods was only $5,744.40. (Docket # 54, ¶¶ 5, 13).

The Court held a preliminary injunction hearing on September 14, 2012.  Prior to the preliminary injunction hearing, Plaintiff apparently obtained some of DealExtreme's financial records by serving an *ex parte* subpoena on non-party PayPal (10/22/12 Tr. at 13:20–22), as authorized by the TRO (Docket # 48 at 10–11).  Plaintiff never complained to the Court that it had been provided with insufficient discovery to demonstrate its case at the preliminary injunction hearing.

Following written submissions and argument at the hearing, the Court converted the TRO into a preliminary injunction.  (*Id.*).  Although DealExtreme represented that it was an eBay-like entity, and that Plaintiff had therefore submitted insufficient evidence to demonstrate a likelihood of success on the merits in light of the Second Circuit's decision in *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010), the Court was not persuaded.  For the reasons stated on the record, the Court found sufficient evidence to conclude that Plaintiff had demonstrated a likelihood of success on the merits and irreparable harm.  (9/14/12 Tr. at 45:16–46:23).  At base, that conclusion was founded on the existence of a single sale of an infringing Klipsch-branded item, and some evidence documenting that DealExtreme was a direct seller of that good.  (*Id.*).

With regards to the $2 million that remained frozen, the Court expressed skepticism that, in light of the showing made, such a large sum was appropriate.  (9/14/12 Tr. at 16:23–17:19).  Additionally, the Court did not see a significant risk that the assets frozen would dissipate rendering enforcement of a judgment impossible.  The Court found that "if plaintiff were to obtain a judgment against DealExtreme at the end of litigation . . . it appears there would be cash flow passing through DealExterme's accounts for plaintiff to seize as a judgment [creditor] should DealExtreme fail to pay an award for damages.  The evidence before [the Court] does not

lead to a conclusion [that] there is a risk of DealExtreme disappearing with all of its money in the event that plaintiff should prevail in this case." (9/14/12 Tr. at 51:21-52:3).

Consistent with Plaintiff's counsel's urging that the Court adopt the approach employed by Judge Berman in *NorthFace Apparel Corp. v. TC Fashions, Inc*, 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006), the Court granted DealExtreme one week to come forward with additional documentary evidence demonstrating that the majority of the assets under freeze are unrelated to the sale of counterfeit Klipsch-branded goods. (9/14/12 Tr. at 49:20–51:1). The Court informed the parties that it would not ask them to return for an additional court appearance following their supplemental submissions "unless anyone wants to ask for an evidentiary hearing." (*Id.* at 55:14–15). Neither party made such a request.

On September 21, 2012, DealExtreme submitted a supplemental declaration from Mr. Chow, (Docket # 54), as well as a supplemental opposition brief. (Docket # 55). Plaintiff submitted a response on September 26, 2012, (Docket #'s 57–60), and the parties submitted letters through September 28, 2012. (Docket #'s 63–65).

F.   The Court Ordered a Reduction in the Asset Freeze

On October 11, 2012, the Court issued an order reducing the assets frozen from $2 million to $20,000. (Docket # 67). The Court credited Mr. Chow's Declarations regarding the volume of Klipsch sales, and noted that even though Plaintiff only presented evidence of the sale of a single counterfeit good, DealExtreme had subsequently come forward and voluntarily disclosed substantially more sales. (*Id.*). Surveying case law from within this district, the Court noted that asset freezes have consistently been confined to preserving the equitable remedy of an accounting for *profits*. (*Id.* at 2). The Court further observed that freezing assets to preserve an award of monetary damages would appear to contradict the Supreme Court's holding in *Grupo*

6

*Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), which disallows

a prejudgment asset freeze in claims brought in law solely to preserve money to satisfy a future

judgment. (*Id.* at 2).

G.      Plaintiff Seeks a Stay of the Reduction

On the afternoon of October 16, 2012, Plaintiff came to the Court with a proposed show

cause order and requested that the reduction in the asset freeze be stayed pending appeal or, in

the alternative, that it be stayed pending an application to the Second Circuit. Plaintiff's

memorandum of law in support of a stay argued that the Court erred as a matter of law by (1)

concluding that the evidence submitted by DealExtreme was sufficient to demonstrate that the

majority of the $2 million restrained is unrelated to the sale of Klipsch-branded goods and (2)

confining the asset freeze to money constituting the profits from DealExtreme's sale of

counterfeit goods. (Docket # 77 at 8). Plaintiff argued that the Court erred as a matter of law

because statutory damages are an equitable remedy and that the Court therefore has the authority

to freeze them even under *Grupo Mexicano*. (*Id.* at 10–12). Plaintiff also argued that the

balance of hardships favored the granting of a stay. (*Id.*).

The Court stayed the reduction in the asset freeze until there was an opportunity for

briefing and a proceeding on Monday, October 22, 2012. (Docket # 73). DealExtreme

submitted an opposition to the proposed stay on October 19, 2012 (Docket # 80), and Plaintiff

submitted a reply on October 21, 2012 (Docket # 82). In that reply, Plaintiff articulated an

additional merits argument that, even in light of the Supreme Court's decision in *Grupo

Mexicano*, the inclusion of a prayer for equitable relief in Plaintiff's complaint confers upon the

Court authority to freeze other assets in order to preserve Plaintiff's ability to obtain a potential

legal remedy. (*Id.* 9–11).

The Court has considered Plaintiff's arguments carefully.  As discussed below, and consistent with the October 11 Order, the Court concludes that (1) Plaintiff is entitled to an asset freeze to preserve its right to equitable accounting, (2) the scope of the assets to be frozen for purposes of preserving this right should not extend beyond profits likely derived from the sale of counterfeit goods, (3) the Supreme Court's decision in *Grupo Mexicano* precludes the Court from freezing additional assets solely to preserve a possible later award of statutory damages to Plaintiff in this case, (4)  the procedure employed by the Court to determine the size of the freeze was proper, and (5) an asset restraint in excess of $20,000 would not be equitable given the facts currently in the rcord.

## II.    DISCUSSION

### A.   The Court May Restrain Assets to Preserve an Equitable Accounting for Profits

As discussed in the Court's October 11, 2012 Order (Docket # 67 at 2), the Court unquestionably has authority to freeze assets to preserve an equitable accounting of profits, a remedy provided to counterfeiting victims by 15 U.S.C. § 1117(a).  *See, e.g., Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 71–72 (2d Cir. 1998) ("A district court faced with a Lanham Act violation possesses some degree of discretion in shaping [the] relief according to the principles of equity and the individual circumstances of each case" within the parameters of allowing an accounting for profits); *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992); *Tiffany (NJ) LLC v. Forbse*, 2012 WL 1918866, at *12 (S.D.N.Y. May 23, 2012) (Buchwald, J.).

However, contrary to Plaintiff's assertion that it may seek to have the Defendant "account for damages" (Docket # 77 at 7), case law in the Second Circuit confines the accounting to which 15 U.S.C. § 1117(a) entitles a Lanham Act plaintiff to a defendant's *profits. See, e.g., Int'l Star,*

8

146 F.3d at 71–72; *Basch*, 968 F.2d at 1537–39; *Oral-B Labs., Inc. v. Mi-Lor Corp.*, 810 F.2d 20, 25 (2d Cir. 1987) (superseded on other grounds); *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 771–72 (2d Cir. 1984); *Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 354 (2d Cir. 1983); *Tiffany*, 2012 WL 1918866, at *12; *Gucci Am. v. Weixing Li*, 2011 WL 6156936, at *4 (S.D.N.Y. Aug. 23, 2011) (Sullivan, J.); *Belenciaga Am. v. Dollinger*, 2010 WL 3952850, at *7 (S.D.N.Y. Oct. 8, 2010) (Swain, J.); *North Face Apparel Corp. v. TC Fashions, Inc.*, 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006) (Berman, J.).  Beyond this Circuit, seminal cases on the subject similarly speak to an accounting for *profits*.  *See, e.g., Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 560 (9th Cir. 1992) (an injunction "designed to preserve the possibility of an effective accounting of . . . profits and the return of profits fraudulently obtained . . . is permissible and within the power of the district court.");[4] *cf. Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995).

The requirement that an accounting be connected to the defendant's profits was emphasized by the Second Circuit's opinion in *Basch*, in which the Court of Appeals described "three categorically distinct rationales" for awarding an accounting in a trademark infringement case. *Basch*, 968 F.2d at 1537–39. These three categories are unjust enrichment, use of profits as a proxy for a plaintiff's damages, and deterrence. *Basch*, 968 F.2d at 1537–39. As *Basch* describes in detail, an accounting based on any of these rationales relates to a defendant's *profits*. *Id.* Consistent with this case law, Plaintiff's Complaint is explicit that it seeks an accounting for "*profits* realized by Defendants." (Compl. "Prayer for Relief" ¶ 6) (emphasis added).

In short, while the Court agrees with  Plaintiff that it has the power to freeze assets to preserve a later award of an equitable accounting, such a freeze should  be confined in scope to

---

[4] The Court addresses Plaintiff's reliance on *Reebok* in more detail in Section "II.B.4" below.

the likely *profits* of counterfeiting activity. As discussed in Section "II.C.3" below, a freeze of

$20,000 is, based on the record before the Court, sufficient to preserve assets for such a purpose

in this case.

### B. The Asset Freeze May Not Be Used to Preserve Funds that May Be Necessary at a Later Time to Satisfy an Award of Statutory Damages

Plaintiff argues that Defendant's accounts should also be frozen to preserve funds that

may later be used to satisfy an award of statutory damages. (Docket # 77 at 5–6). Plaintiff does

not contest that the Supreme Court's holding in *Grupo Mexicano* precludes the Court from

exercising equitable authority to issue injunctions in aid of a potential judgment for purely legal

relief when acting pursuant to Rule 65.[5]  Plaintiff attempts to circumvent this limitation by

arguing that (1) all Lanham Act remedies are equitable, (2) the statutory damages provision in

the Lanham Act is an equitable remedy, (3) the inclusion of some equitable claims in a complaint

allows the Court to exercise its equitable power to preserve potential future legal remedies in a

manner that would be disallowed by *Grupo Mexicano* in a complaint seeking purely legal relief,

and (4) the Ninth Circuit's opinion in *Reebok v. Marnatech* authorizes a freeze of all assets that

are within the scope of the proceeding even in light of *Grupo Mexicano*. For the reasons

discussed below, the Court is not persuaded by any of these arguments.

### 1. The Lanham Act encompasses legal, in addition to equitable, remedies

Plaintiff first argues that "all Lanham Act remedies are equitable in nature." (Docket #

77 at 10) (quoting *Masters v. UHS of Del., Inc.*, 631 F.3d 464, 471 (8th Cir. 2011)).

However, the broad proposition that "all Lanham Act remedies are equitable in nature" is

at odds with the Supreme Court's holding in *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962).

---

[5] Plaintiff did not move for a pre-judgment attachment pursuant to Rule 64 and the New York Civil Procedure Law.

In *Dairy Queen*, the Supreme Court held that a trademark claim for money damages "is a claim wholly legal in its nature" and that the petitioner therefore had a right to a jury trial. *Id.* at 477. The Second Circuit followed suit. *Lee Pharms. v. Mishler*, 526 F.2d 1115 (2d Cir. 1975) (counterclaim seeking monetary damages for Lanham Act trademark infringement necessitates a jury trial). Thus, under *Dairy Queen* and *Lee*, there is no question that some Lanham Act remedies are legal, not equitable.[6]

> 2. The Supreme Court's decision in *Feltner v. Columbia* requires the conclusion that statutory damages under the Lanham Act are a legal remedy

Title 15, Section 1117(c) provides that a "plaintiff may elect, at any time before judgment is rendered . . . to recover, instead of actual damages and profits . . . an award of statutory damages," which are to be assessed within a specified dollar range per type of counterfeit good or service sold "as the court considers just." Plaintiff argues that the statute's command that the damages be assessed "as the court considers just" indicates an equitable remedy. (Docket # 77 at 12).

However, in *Feltner, Jr. v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355 (1998), the Supreme Court, addressing the statutory damages provision in the Copyright Act containing the same language permitting an award of damages "as the court considers just," held that "the Seventh Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages . . . including the amount itself." In reaching this conclusion, the Supreme Court relied on two reasons—a historical analysis and an assessment of the nature of the damage

---

[6] In its reply brief on the motion for a stay, Plaintiff retreated somewhat from this argument, but still asserted that remedies under the Lanham Act have an "equitable thrust." (Docket # 82 at 12). This argument does not persuade the Court to find that all Lanham Act remedies are equitable given the Supreme Court's holding in *Dairy Queen* and the Second Circuit's holding in *Lee*.

award—both of which weigh in favor of a finding that the Seventh Amendment requires that the statutory damages provision of the Lanham Act be construed as a legal remedy.

First, the Supreme Court conducted a substantial review of the history of copyright law and concluded that "[a]ctions seeking damages for infringement of common-law copyright, like actions seeking damages for invasions of other property rights, were tried in courts of law in actions on the case" and that "[t]he practice of trying copyright damages actions at law before juries was followed in this country." *Id.* at 348–52. Similarly, at least one court has expressed the view, albeit in *dicta*, that trademark infringement was "likely analogous to a common-law cause of action." *See GoPets Ltd. v. Hise*, 657 F.3d 1024, 1034 (9th Cir. 2011). Moreover, even absent an analogous historical record between trademark and copyright law, statutory damages under the Lanham Act still constitute legal damages based on *Feltner's* second stated rationale: the "general rule" that "monetary relief is legal and an award of statutory damages may serve purposes traditionally associated with legal relief, such as compensation and punishment." *Feltner*, 523 U.S. at 352 (internal citation omitted); *see also Porter v. Warner Holding Co.*, 328 U.S. 395, 402 (1946) (distinguishing between an equitable remedy and "statutory damages").

Subsequent to *Feltner*, every decision of which the Court is aware has concluded that statutory damages under the Lanham Act are a remedy at law, not one at equity. *See, e.g., 3M Co. v. Mohan*, 2012 WL 1949033, at *3 (Fed. Cir. May 29, 2012); *Microsoft v. MBC Enters.*, 120 F. App'x 234, 240 n.1 (10th Cir. Dec. 29, 2004); *Bar-Meir v. North Am. Die Casting Assoc.*, 55 F. App'x 389, 390–91 (8th Cir. 2003); *Yurman Design, Inc. v. PAJ, Inc.*, 93 F. Supp. 2d 449, 462 n.5 (S.D.N.Y. 2000) (Sweet, J.), *rev'd on other grounds*, 262 F.3d 101 (2d Cir. 2001); *see also Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 2010 WL 5598337, at *12–13 (N.D. Cal. Mar. 19, 2010), *vacated and remanded on other grounds*, 658 F.3d 936 (9th Cir. 2011); *cf.*

*GoPets*, 657 F.3d at 1034; *Fancaster, Inc. v. Comcast Corp.*, 2012 WL 815124, at *11 (D.N.J. Mar. 9, 2012). Plaintiff has not brought the Court's attention to any cases to the contrary.[7]

Given the similarities between the statutory damages provisions in the Lanham Act and the Copyright Act, and given the broad and unanimous precedent, the Court concludes that statutory damages under the Lanham Act are a remedy at law.

> 3. The inclusion of a prayer for equitable relief in Plaintiff's Complaint does not permit the Court to freeze assets to preserve possible legal damages

Plaintiff argues that despite *Grupo Mexicano*, the Court may freeze assets to preserve an award of statutory damages in this action because a "court may freeze the defendants' assets so long as the plaintiff merely seeks the equitable remedy in the alternative in its complaint." (Docket # 82 at 10). To support this proposition, Plaintiff cites the Seventh Circuit's decision in *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988 (7th Cir. 2002). However, what *CSC* actually holds is that "[s]ince the assets in question here were profits the [defendants] made by unlawfully stealing [the plaintiff's] services, the freeze was appropriate and may remain in place pending final disposition of the case." *Id.* at 996. In other words, *CSC* holds no more than that a district court may freeze assets in which an "equitable interest is claimed," *III Fin. Ltd. v. Aegis Consumer Funding Grp., Inc.*, 1999 WL 461808, at *4 n.1 (S.D.N.Y. July 2, 1999); *JSC Foreign Econ. Ass'n Technostroyexpoert v. Int'l Dev. And Trade Servs., Inc.*, 295 F. Supp. 2d 366, 389 (S.D.N.Y. 2003), a proposition with which the Court fully agrees.[8]

---

[7] Plaintiff observes that these cases discuss whether a remedy is equitable or legal in the context of determining the necessity of a jury trial rather than the propriety of an injunction. But Plaintiff does not explain why this distinction is significant.

[8] Plaintiff also relies on the Fourth Circuit's decision in *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489 (4th Cir. 1999). But *Rahman* does not resolve the question of whether assets in that case were preserved

In short, Plaintiff has not presented any authority to persuade the Court to freeze assets in which Plaintiff claims no equitable interest simply because Plaintiff has included equitable claims in its complaint.[9]

### 4.  Plaintiff's reliance on *Reebok v. Marnatech* is mispalced

Plaintiff additionally argues that the Ninth Circuit's decision in *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552 (9th Cir. 1992) provides it with authority to obtain a freeze on $2 million in assets to preserve an award of statutory damages in spite of *Grupo Mexicano.* (*See, e.g.*, 10/22/12 Tr. at 17:9–18:12).  But Plaintiff's reliance on *Reebok* is misplaced for two crucial reasons: (1) *Reebok* explicitly refrained from deciding the proper *scope* of an asset freeze in a Lanham Act case and (2) the Supreme Court's decision in *Grupo Mexicano*, which was decided after *Reebok*, places limits on the scope of an asset restraint enforced through Rule 65 that was not discussed in *Reebok*.

### a.  Reebok never reached the question of the proper scope of an asset freeze

While *Reebok* employs sweeping language to confer broad authority on a district court to freeze a Defendant's assets in a Lanham Act case, *Reebok* did not reach the question of the proper *scope* of such an injunction because the defendant had not properly preserved the issue for the appeal. *Id.* at 561 n.11 ("[W]e do not decide the . . . authority of the district court to freeze *each* of the assets the transfer of which is limited by the injunction because [the defendant] has not raised that issue on appeal.") (emphasis in original).  Indeed, Judge

---

solely to satisfy the equitable claims or whether there was a broader freeze.  Nothing in *Rahman* persuades the Court to freeze assets beyond those in which Plaintiff claims an equitable interest.

[9] Plaintiff's claim is especially dubious given that under 15 U.S.C. § 1117, a plaintiff is only entitled to statutory damages if it elects them "instead of actual damages and profits."  15 U.S.C. § 1117(c).

Fernandez's concurrence in *Reebok* expressed the opinion that all *Reebok* holds is that "in this kind of a case a district court can in some instances issue a freeze of some assets for some period of time." *Id.* at 564.[10]  Thus, *Reebok* does not help inform the Court's analysis regarding the proper scope of an injunction, which is the issue in this case.

b.  Developments subsequent to the <em>Reebok</em> decision

Even if *Reebok* standing alone might suggest that statutory damages ought to be included in an asset freeze,[11] the Court cannot come to such a conclusion without deciding whether such an inclusion would run afoul of the Supreme Court's holding in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), which was also decided subsequent to the Ninth Circuit's *Reebok* decision.[12]  Under *Grupo Mexicano*, the question of whether the Court may issue an injunction or any other equitable remedy turns on whether the "relief requested was traditionally accorded by courts of equity." *Id.*; *see also S.E.C. v. Cavanagh*, 445 F.3d 105, 118 (2d Cir. 2006) (under *Grupo Mexicano* "the question here [of] whether the District Court acted beyond its equitable powers requires an inquiry into whether the remedies available at chancery in 1789 included" the remedy sought in the case at bar).

Because the Court has determined that statutory damages would not have been a remedy available in courts of equity, *Grupo Mexicano* therefore precludes a freeze of assets for the purpose of preserving an award of statutory damages. *Reebok* actually emphasizes this point,

---

[10] Judge Fernandez also commented on the expansive nature of *Reebok's* language, noting that "it is sweeping, general, and very broad.  It is the kind of order that could drive an opponent to the wall regardless of the ultimate merits of the action.  It is a frightening example of the court's injunctive power . . . ." *Reebok*, 970 F.2d at 563.

[11] Such a conclusion is unlikely considering that statutory damages were not added to the Lanham Act until four years after *Reebok* was decided. Pub. L. 104-153, § 7, 110 Stat. 1386.

[12] Indeed, some district courts within the Ninth Circuit have noted the limitation imposed by *Grupo Mexicano* when addressing asset seizures under *Reebok*. *See, e.g.*, *Allstate Ins. Co. v. Baglioni*, 2011 WL 5402487, at *1 (C.D. Cal. Nov. 8, 2011).

opining that, "the authority to freeze assets by a preliminary injunction must rest upon the authority to give a form of final relief to which the asset freeze is an appropriate provisional remedy." *Reebok*, 970 F.2d at 560 (quoting *F.T.C. v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982)). Because, pursuant to *Grupo Mexicano*, statutory damages do not constitute a form of final relief for which an asset freeze is an appropriate provisional remedy, a preliminary injunction freezing $2 million of DealExtreme's money to preserve a possible award of statutory damages is not permissible.

## C.   The Court Properly Determined the Size of the Injunction

To determine the proper size of an injunction necessary to preserve Plaintiff's right to an equitable award of profits, the Court adopted the approach taken by Judge Berman in *North Face Apparel Corp. v. TC Fashions, Inc.*, 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006). Applying this approach, a court "may exempt any particular assets from the freeze on the ground that they [are] not linked to the profits of allegedly illegal activity." *Id.* (alteration in original) (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995)). "The burden is on the party seeking relief to 'present documentary proof that particular assets [are] not the proceeds of counterfeiting activities.'" *Id.* (alteration in original) (quoting *Cartier Int'l B.V. v. Liu*, 2003 WL 1900852, at *1 (S.D.N.Y. Apr. 17, 2003) (Griesa, J.)). Plaintiff challenges the Court's application of this approach and the Court's ultimate conclusion on the appropriate scope of the injunction. The Court addresses each of these arguments in turn.

### 1.   The Court adhered to the *North Face* framework

Plaintiff argues that the Court misapplied the procedures outlined in *North Face*. Plaintiff argues that under *North Face*, DealExtreme should have been made to present documentary evidence "sufficient to show the source of the Restrained Assets were not the

proceeds of" counterfeiting. (Docket # 82 at 5). *North Face* does appear to have required the defendant to show that the money in a particular bank account constituted proceeds from the sale of securities, rather than proceeds from the sale of counterfeit goods. *North Face*, 2006 WL 838993, at *4 n.6. However, in *North Face*, the defendant admitted to possessing in its bank account over $200,000 in profits derived from the operation of a vast counterfeiting enterprise. *Id.* at *4. The plaintiff in *North Face* presented credible arguments that even more than $200,000 of the money in the account constituted the proceeds from sales of counterfeit goods. *Id.*

The present case is distinguishable. The PayPal account here is one where funds flow in and out daily and the captured funds appear to represent the proceeds of DealExtreme's myriad worldwide sales during the week that the asset restraint was imposed. Plaintiff's argument that all of this money is "related to the profits" of counterfeiting and is fair game for an asset freeze because some potentially modest proceeds from the sale of counterfeit goods passed through that account at a prior time, (Docket # 77 at 9), is not supported by *North Face*. Moreover, by crediting the Declarations of Mr. Chow, which states that DealExtreme earned less than $6,000 in gross profits from the sale of counterfeit Klipsch-branded goods, the Court necessarily concluded that, based on the record before it, the remainder of the previously restrained assets did *not* derive from the sale of such counterfeit goods.

2.    Plaintiff had ample opportunity to present its preliminary case

Plaintiff's counsel has complained the proceeding was not fair because the Court did not give it an adequate opportunity to obtain discovery to challenge DealExtreme's showing. (Docket # 77 at 10; 10/22/12 Tr. at 11:20–12:6). The Court disagrees.

The Court provided Plaintiff adequate opportunity to challenge DealExtreme's submission and present its own evidence. For example, the TRO contained an order of expedited discovery. But Plaintiff's counsel never complained that it had been provided with insufficient discovery prior to the preliminary injunction hearing. Indeed, Plaintiff's counsel apparently obtained *ex parte* discovery related to DealExtreme's financial records from a subpoena that it served on PayPal. (Docket # 45 Ex. Z; 10/22/12 Tr. at 13:20–22). Additionally, the Court informed the parties it would hold an evidentiary hearing if requested. (9/14/12 Tr. at 55:14–15). But Plaintiff never asked for a hearing or a chance to cross examine Mr. Chow.

3.   The Court's conclusion that $20,000 is the appropriate amount of the asset freeze was correct in light of the record created

The Court considered the entire record and the proceedings in coming to a decision on the proper size of the freeze. Based on the minimal evidentiary showing by Plaintiff, especially in light of DealExtreme's showing, the Court concluded that $20,000 is sufficient to preserve Plaintiff's remedy of an equitable award of profits should it ultimately succeed on the merits of this action.

As discussed in the Court's October 11, 2012 Order, the Court was not persuaded to discredit Mr. Chow's Declarations on the basis that they relied on data generated for purposes of these proceedings. (Docket # 67 at 3). Moreover, the Court has carefully considered all of Plaintiff's submissions that purport to detract from Mr. Chow's credibility, including representations in an affidavit from an attorney at Plaintiff's counsel's law firm stating that the shape of the stamps in what DealExtreme presents as it supplier agreements indicates a forgery (Docket # 58) and a YouTube video complaining about the purchase of a counterfeit product through DealExtreme's site (Docket # 45 Ex. J). The Court was not persuaded that these submissions required a conclusion that the sworn declaration submitted by Mr. Chow was false.

18

Furthermore, nothing that Plaintiff has presented refutes DealExtreme's evidence or suggests profits from the sale of Klipsch-branded goods are likely to be greater than $20,000. Particularly unconvincing is Plaintiff's new factual contention in its reply that DealExtreme continued to sell items at the same price that it sold Klipsch-branded headsets in the months after DealExtreme claims it ceased such sales.  (Docket # 81; Docket # 82 at 9).[13]  In fact, DealExtreme presently sells dozens of items at that price, and thousands of combinations of items that come to that price.  (Docket # 83 & Ex. 1).  Under such circumstances, it is difficult to discern the inference that Plaintiff would have the Court draw.  Indeed, the weakness of this argument only underscores the lack of any showing that Plaintiff has made indicating that DealExtreme generated more than $20,000 in profits from the sale of Klipsch-branded goods.

Finally, the Court considered that in the eight months after Plaintiff allegedly purchased a single infringing item from Defendant's website, Plaintiff did not obtain any other evidence to present to the Court to demonstrate widespread counterfeiting.  In that eight month period, Plaintiff did not collect screenshots from Plaintiff's website illustrating the widespread sale of counterfeit Klipsch-branded goods.  Nor did Plaintiff purchase additional counterfeit Klipsch-branded products through DealExtreme's website to demonstrate a pattern or create an inference of a large volume of sales.  Given the delay in bringing the action, and the over 60 days that have elapsed since the TRO was signed, Plaintiff has had ample time to investigate DealExtreme and make a more persuasive showing regarding the possibility that DealExtreme is likely to have generated more than $20,000 in profits from the sale of Klipsch-branded goods.  Plaintiff has failed to do so.  Indeed, the affirmative showing made by DealExtreme suggests less.

---

[13] Plaintiff premises this argument on records obtained from PayPal pursuant to an *ex parte* subpoena allowed by the TRO.

### C.   RESTRAINING ASSETS IN EXCESS OF $20,000 WOULD NOT EQUITABLE

Even if the Court has the authority to freeze assets beyond the scope of what was necessary to accomplish the accounting for profits as discussed in Section "II.A" above, the Court still would not allow a freeze in excess of $20,000 because the Court, balancing the hardships, continues to conclude that under the facts of this case, it would not be equitable to restrain assets greater than that.  (Docket # 67 at 2 ("[T]he Court finds that the present $2 million asset freeze is well in excess of what is appropriate.")).[14]

The Court's determination that the balance of hardships tips against a freeze in excess of $20,000 is grounded in the Court's determination that, should Plaintiff obtain a judgment for the disgorgement of profits in excess of $20,000, Plaintiff has not demonstrated any impediment to satisfying that judgment.  (*Id.*).  Plaintiff concedes that for just one of DealExtreme's PayPal accounts, "nearly $14 million of funds have flowed into the account in each of the past three months."  (Docket # 77 at 16).  Plaintiff's observation only buttresses the Court's earlier conclusion at the preliminary injunction hearing that "if plaintiff were to obtain a judgment against DealExtreme at the end of litigation . . . it appears there would be cash flow passing through DealExtreme's accounts for plaintiff to seize as a judgment [creditor] should DealExtreme fail to pay an award for damages.  The evidence before [the Court] does not lead to a conclusion [that] there is a risk of DealExtreme disappearing with all of its money in the event that plaintiff should prevail in this case."  (9/14/12 Tr. at 51:21-52:3).

---

[14] Even within the Ninth Circuit, where *Reebok* governs, courts cannot enforce an asset freeze without showing a "likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted."  *Allstate Ins.*, 2011 WL 5402487, at *2 (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009)).

Plaintiff has made no particularized showing to suggest that DealExtreme would alter its business practices to avoid satisfying a judgment in this case.  Plaintiff argues that that even though it appears that $14 million a month flows through DealExtreme's PayPal Accounts, if DealExtreme were to prevail, it might switch payment methods  and asserts that "it is likely that enforcement against a defendant making use of these alternative services would prove more difficult and frustrating than with PayPal." (Docket # 57 at 21).  Plaintiff offers Amazon Payments, Google CheckOut, and ING Direct Person2Person, among others, as examples of PayPal alternatives, and offers no evidence that it would be unable to attach assets passing through those payment processors.  (*Id.* at 20–21).  The Court is not persuaded that there is a risk of DealExtreme ceasing its United States operations or radically altering its payment processing system for worldwide sales in its $130 million a year business solely to avoid paying a judgment in this case.

In short, DealExtreme does an adequate volume of business and has sufficient funds flowing through United States-based payment processors for Plaintiff to seize as a judgment creditor should DealExtreme fail to pay money owed.  DealExtreme, on the other hand, faces continuing hardship in having a substantial amount of assets frozen, putting a strain on its cash flow.  Under these circumstances, a restraint in excess of $20,000, a sum that the Court has concluded is in excess of the amount necessary to preserve Plaintiff's entitlement to an award of profits, would not be equitable.

## CONCLUSION

The Court is cognizant of the severe problems with counterfeiters and, in particular, the difficulties faced when counterfeiting occurs overseas.  Aggrieved United States-based parties have trouble gaining jurisdiction and satisfying judgments.  And the law, including the Lanham

Act, provides strong tools to help trademark victims enforce their rights. Indeed, using those tools, this Court granted an *ex parte* TRO that froze millions of dollars in assets, provided for expedited discovery and authorized the disabling of websites. But that does not mean that with documentary evidence demonstrating only a very limited sale of counterfeit items by a retailer that a plaintiff may obtain a $2 million asset freeze. This is especially true when the freeze is to preserve an award of statutory damages, which is not an equitable remedy, and is based only on a non-particularized showing of inability to satisfy a potential judgment.

For the foregoing reasons, as well as the reasons stated in the October 11, 2012 Order, the amount of assets frozen shall be reduced to $20,000.


Dated: October **24**, 2012
New York, New York

_____
ALISON J. NATHAN
United States District Judge