UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                             :

KLIPSCH GROUP, INC.,              :
                             :

                  Plaintiff,   :

                             :

           -v-                :

                             :

BIG BOX STORE LTD. *et al.*,   :
                             :

                Defendants. :
                             :
--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __11/2/2015__

12-CV-6283 (VSB)

**MEMORANDUM & ORDER**

Appearances:

Charles Albert LeGrand
G. Roxanne Elings
George Pearson Wukoson
Davis Wright Tremaine LLP
New York, NY 10019
*Counsel for Plaintiff*

Douglas Michael Tween
John Albert Basinger
Laura Rose Zimmerman
Baker & McKenzie LLP
New York, NY

Hugh Hu Mo
Pedro Medina, Jr
The Law Firm of Hugh H. Mo, P.C.
New York, NY
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

        Before me is the motion, initially filed *ex parte*, of Plaintiff Klipsch Group, Inc.

("Klipsch") for:  (1) an asset restraining order of $5 to $12 million; (2) an asset attachment order

of $12 million; (3) an order to show cause for default judgment as sanction for spoliation of

evidence by ePRO E-Commerce Limited ("ePRO" or "Company"); and (4) recovery of costs and

attorneys' fees as sanction for ePRO's spoliation of evidence.  I held an evidentiary hearing on this motion from January 5-8, 2015 ("Hearing").

Based upon the extensive submissions of the parties and the evidence presented during the Hearing, I find the following:

(1) Klipsch failed to demonstrate that ePRO destroyed relevant electronically stored information ("ESI"), including sales data from various databases ("Structured ESI") in an effort to conceal sales of counterfeit headphones.  Consequently, Klipsch's motion for default judgment is hereby DENIED and the asset restraining order is reduced from $5 million to $25,000;

(2) Because, based upon the record from the submissions of the parties and the Hearing, it is likely that actual profits can be determined to a reasonable certainty, Klipsch has not demonstrated its likelihood of success on the merits with regards to its request for statutory damages under Section 1117(c)(2) of the Lanham Act.  Therefore, Klipsch's request for an asset attachment order of $12 million is hereby DENIED;

(3) Klipsch demonstrated that ePRO willfully spoliated relevant ESI stored on employees' computers and ePRO's corporate email accounts ("Unstructured ESI"), which has prejudiced Klipsch's litigation of this matter.  Because ePRO did not rebut the presumption that it destroyed documents relevant to the willfulness of its counterfeiting activities, I impose the following sanctions:  (a) in any trial of this matter the jury will be instructed that, as a matter of law, ePRO destroyed relevant Unstructured ESI after its duty to preserve such materials arose; (b) the jury will also be instructed that it may presume, if it so chooses, that destroyed relevant ESI would have been favorable to Klipsch; and (c) Klipsch is awarded reasonable costs and

attorneys' fees associated with this motion beginning with the second round of depositions that took place in Hong Kong in November 2013.

I.   **Background**

A.   *The Parties and Pre-Suit Investigation*

Klipsch is a corporation, organized and existing under the laws of Indiana, and is the owner of the federally registered trademarks, including house mark KLIPSCH®, IMAGE® and S4® (the "KLIPSCH Marks") that are used in connection with headphones and phone headsets. (Am. Comp. ¶ 25.)[1]  Sixty-five years ago Klipsch began manufacturing and selling loudspeakers. (*Id.* ¶ 27.)  Today, Klipsch sells numerous consumer electronic products, including headphones and phone headsets.  (*See id.*)  ePRO is a corporation located in China engaged in e-commerce around the world, and is a wholly-owned subsidiary of a publicly-traded company listed on the Hong Kong stock exchange.  (TRO Opp. 2-3.)[2]  ePRO lists products for sale on websites, (*id.* at 3), and owns and operates the domain names and associated websites of www.dealextreme.com and www.dx.com ("DealExtreme"), among others, (*see* 9/7 Chow Decl. ¶ 5.)[3]

Prior to initiating this action, Klipsch retained the services of Vaudra, Ltd. ("Vaudra"), a North Carolina-based investigation company, to investigate the sale of counterfeit Klipsch products on the internet.  (Tarbutton Decl. ¶¶ 1, 6.)[4]  Klipsch hired Vaudra to, among other

---

[1] "Am. Comp." refers to the Amended Complaint filed by Klipsch on December 3, 2013.  (Doc. 152.)  Klipsch filed its Amended Complaint on December 3, 2013, substituting certain defendants and amending the caption.  (Doc. 151.)

[2] "TRO Opp." refers to Defendant ePRO E-Commerce Limited's Memorandum of Law in Opposition to Plaintiff's *Ex Parte* Motion for an Asset Restraining Order, Asset Attachment Order and Order to Show Cause for Default Judgment and Recovery of Costs and Attorneys' Fees.  (Doc. 243.)

[3] "9/7 Chow Decl." refers to the Declaration of Daniel Chow filed September 7, 2012.  (Doc. 32.)  Chow is the Chief Executive Officer of ePRO Systems, Ltd.  (*Id.*)  ePRO E-Commerce Limited is owned by ePRO Systems, Ltd.  (9/7 Chow Decl. ¶ 5.)

[4] "Tarbutton Decl." refers to the Declaration of Tamara D. Tarbutton in Support of Plaintiff's *Ex Parte* Application for Temporary Restraining Order, Seizure Order, Order to Disable Certain Websites, Asset Restraining Order, Expedited Discovery Order and Order to Show Cause for Preliminary Injunction.  (Doc. 20.)

things, "actively police Internet commerce sites for infringing goods."  (Tarbutton Supp. Decl.

¶ 5.)[5]  During Vaudra's investigation it identified each of the defendants named in the Amended

Complaint as selling counterfeit Klipsch products either on fully interactive web sites and/or on

third party selling platforms.  (Tarbutton Decl. ¶ 6.)  Specifically, between December 2011 and

July 2012, Vaudra identified at least sixteen sellers of counterfeit Klipsch headphones and

purchased at least seventeen samples of the counterfeit headphones.  (Tarbutton Supp. Decl. ¶ 6.)

In approximately 2011, while policing the Internet on behalf of Klipsch, Vaudra identified the

DealExtreme websites that were offering Klipsch branded in-ear headphones ("Earbuds").  (*Id*.

¶ 7.)  On December 21, 2011, Vaudra purchased a pair of these Earbuds from DealExtreme. (*Id.*)

Vaudra received the Earbuds on January 27, 2012, and Klipsch subsequently determined that

they were counterfeit.  (*Id*.)

On August 15, 2012, Klipsch commenced this action by filing a complaint under seal

against ePRO and other defendants for:  (1) trademark counterfeiting; (2) trademark

infringement; (3) unfair competition; (4) false designation of origin; and (5) unlawful deceptive

practices.[6]  (Docs. 2, 15.)  Defendants operated websites from China that sold products,

including Earbuds with counterfeits of the KLIPSCH Marks, into the United States, and

throughout the world.[7]  (Pl.'s Br. ¶ 1.)[8]  At the same time that Klipsch filed its complaint under

seal it filed an *ex parte* motion seeking a temporary restraining order, seizure order, order to

disable certain websites, asset restraining order, expedited discovery order and order to show

---

[5] "Tarbutton Supp. Decl." refers to the Declaration of Tamara D. Tarbutton in Further Support of Plaintiff's Application for an Asset Restraining Order and Order to Show Cause for Preliminary Injunction.  (Doc. 45.)

[6] The case was initially assigned to Judge Paul A. Engelmayer, and was reassigned to Judge Alison J. Nathan on August 20, 2012.  (Doc. 3.)  It was then reassigned to me on January 30, 2014.  (Doc. Entry Jan. 30, 2014.)

[7] All defendants other than ePRO have either settled or defaulted in this action.  (Pl.'s Br. ¶ 2.)

[8] "Pl.'s Br." refers to the Proposed Findings of Fact and Conclusions of Law filed by Klipsch.  (Doc. 284.)

cause for preliminary injunction.  (Doc. 17.)

### B.   *The Initial TRO and Judge Nathan's Decision*

On August 16, 2012, Judge Nathan granted a Temporary Restraining Order, Seizure

Order, Order to Disable Certain Websites, Asset Restraining Order, Expedited Discovery Order

and Order to Show Cause for Preliminary Injunction (the "TRO") enjoining Defendants from,

among other things:

> (b)  Moving, destroying, or otherwise disposing of any items, merchandise or documents relating to the Counterfeit Goods, Defendants' Infringing Websites . . . and/or Defendants' assets and operations; and

> (c) Removing, destroying or otherwise disposing of any computer files, electronic files, business records, or documents relating to Defendants' Infringing Websites, Defendants' Infringing Selling Pages, Defendants' assets and operations or relating in any way to the manufacture, acquisition, purchase, distribution or sale of Counterfeit Goods or any reproduction, counterfeit, copy or  colorable imitation of the KLIPSC ® Marks . . . .

(TRO 6.)[9]  Pursuant to the TRO, Klipsch obtained a freeze of $2 million belonging to ePRO.

(*Id.*)

After the parties briefed the TRO, Judge Nathan held a show cause hearing on September

14, 2012.  Judge Nathan then converted the TRO into a Preliminary Injunction Order.  (PI.)[10]

However, because of the documentary evidence initially presented by ePRO that indicated that it

had only generated gross revenues of $6,346.40 from global sales of Klipsch-branded goods—of

that only $691.70 from sales into the United States—Judge Nathan was concerned about

maintaining a freeze on $2 million of DealExtreme's assets.  (*See* Doc. 57 at 1.)  Therefore, she

granted ePRO leave to submit evidence demonstrating that the $2 million in frozen assets were

---

[9] "TRO" refers to the Temporary Restraining Order, Seizure Order, Order to Disable Certain Websites, Asset Restraining Order, Expedited Discovery Order and Order to Show Cause for Preliminary Injunction.  (Doc. 48 at 3-16.)

[10] "PI" refers to the Preliminary Injunction Order.  (Doc. 18 at 1-3.)

not the proceeds of counterfeiting activities.  (*Id.*)  On September 21, 2012, ePRO submitted the

sworn declaration of ePRO Systems, Ltd. ("ePRO Systems") CEO, Mr. Daniel Chow, averring

that ePRO earned $5,744.40 in gross sales, $124.40 in profits from sales into the United States,

and $866.98 in profits worldwide from the sale of Klipsch-branded goods.  (Doc. 54 ¶¶ 13, 16.)

Judge Nathan found this evidence compelling, stating:

> The CEO of DealExtreme's parent, ePRO, a publicly-traded Hong Kong company,
> has submitted two sworn declarations testifying to the veracity of financial records
> reflecting these sales.  The records produced by DealExtreme include the zip codes
> of all of its customers in the United States who purchased Klipsch-branded
> products, the amount billed, the shipping dates, and any refunds for returned
> products.  DealExtreme also provided a list of each one of its worldwide sales of
> Klipsch-branded goods.  DealExtreme further provided information regarding the
> amounts that it paid its suppliers for Klipsch-branded goods and the names of the
> suppliers. The Court finds this showing to be persuasive.

(Doc. 67 at 3.)[11]  Based upon the evidence submitted by ePRO, including the declaration of

Chow, Judge Nathan determined that a freeze greater than $20,000 was not necessary to preserve

Klipsch's right to an accounting and to the return of profits from the sale of counterfeit goods.

(*See* Doc. 67 at 4 ("Yet given that Plaintiff, to obtain its ex parte Temporary Restraining Order,

produced evidence that only a single counterfeit Klipsch-branded product was sold through

DealExtreme's website, and that DealExtreme subsequently voluntarily disclosed that $5,744.40

worth of such counterfeit products were sold through its website, the Court does not see any

indication that a freeze greater than $20,000 is necessary to preserve Plaintiffs right to an

accounting and to the return of profits from the sale of counterfeit goods through Defendant's

website.").)  Judge Nathan noted that ePRO did not contest that counterfeit Klipsch goods were

sold through its website (the "Counterfeit Products"), but declined to reconsider her ruling on the

---

[11] The citations to the page numbers correspond with the page numbers designated on the Electronic Case Filing
System ("ECF").

preliminary injunction, and denied the request by Klipsch for additional expedited discovery. (*Id.*)

Klipsch moved by way of an order to show cause on January 4, 2013, to have ePRO held in contempt of court for violating the September 14, 2012 PI. (Doc. 95.) On February 19, 2013, Judge Nathan referred this case to Magistrate Judge Dolinger for general pretrial purposes. (Doc. 110.) Judge Nathan also referred the order to show cause for contempt to Magistrate Judge Dolinger on February 22, 2013. (Doc. 112.)

With regard to the contempt motion, Klipsch claimed that ePRO continued to sell, directly and through third-party affiliate websites, a counterfeit version of Klipsch's IMAGE S4® headphones ("Counterfeit S4 headphones"). (Contempt R&R 5.)[12] Specifically, Klipsch purchased several Counterfeit S4 headphones from ePRO and third-party affiliate websites after the entry of the September PI. (*Id.*) ePRO claims that as soon as it received notice of potential infringement it immediately removed the Counterfeit S4 headphones from its website, and implemented compliance measures to screen out products with the "S4" and "IMAGE" marks. (*Id.* at 14.) Magistrate Judge Dolinger determined that the evidence clearly and convincingly demonstrated that ePRO violated the terms of the PI. (*Id.* at 16.) However, Magistrate Judge Dolinger recommended that the motion for contempt be denied because Klipsch failed to sustain its burden of showing by clear and convincing evidence that ePRO's efforts to comply with the September PI were less than reasonably diligent. (*Id.* at 18, 22.) In reaching this conclusion Magistrate Judge Dolinger noted that Klipsch "provided no specific evidence to suggest that [ePRO] has actively attempted to circumvent [the September PI], has dragged its feet in

---

[12] "Contempt R&R" refers to the Report and Recommendation issued on June 24, 2013 by Magistrate Judge Michael H. Dolinger resolving Klipsch's motion for an order of contempt. (Doc. 126.)

remedying instances of non-compliance once they have been identified, or has otherwise acted in

bad faith." (*Id*. at 19.)  On August 9, 2013, Judge Nathan adopted Magistrate Judge Dolinger's

report and recommendation and denied the motion for contempt.  (Doc. 132.)

        **C.**      ***Magistrate Judge Dolinger's Spoliation Decision***

On December 9, 2013, Klipsch moved for discovery sanctions under Federal Rule of

Civil Procedure 37 ("Rule 37") against ePRO for spoliation of documents and other discovery

misconduct, asserting that:  (1) ePRO did not issue a document retention notice at the time the

lawsuit was commenced; (2) seven months after the lawsuit was commenced ePRO issued an

ineffective oral hold that was limited to documents of the four stock keeping units ("SKUs") that

ePRO claims relate to infringing sales; (3) large quantities of documents were destroyed; and (4)

Klipsch believed that ePRO hid or destroyed transactional documents that would reflect a larger

volume of sales of infringing products than ePRO reported.  (Spoliation M&O 2.)[13]  As remedy

or sanction, Klipsch sought "either summary judgment, preclusion of any evidence by defendants

pertaining to the volume of their infringing sales or their profits, or, alternatively, a mandatory

adverse-inference jury instruction."  (*Id*.)  ePRO denied any wrongdoing and opposed the

motion.  (*Id*.)

    On March 4, 2014, Magistrate Judge Dolinger—after engaging in a thorough review of

the arguments presented by the parties and voluminous written submissions—determined that

some spoliation of evidence had occurred.  Specifically, Magistrate Judge Dolinger found that up

to the point of his decision ePRO's document retention and production efforts were materially

flawed.  (*Id*. at 10.)  With regard to issuance of a document litigation hold, ePRO "failed to

---

[13] "Spoliation M&O" refers to the Memorandum and Order issued on March 4, 2013 by Magistrate Judge Michael
H. Dolinger resolving the motion by Klipsch for discovery sanctions.  (Doc. 196.)

comply with their obligations to ensure the preservation of potentially relevant materials once the lawsuit was filed." (*Id.*) Magistrate Judge Dolinger held that ePRO "simply imposed no hold at all." (*Id.*) And even when ePRO finally got around to issuing oral document hold instructions seven months after the lawsuit was initiated, such instructions "were inadequate both in form and content." (*Id.*) According to Magistrate Judge Dolinger, the oral document hold was not only flawed and insufficient because it was oral but also "because it was limited to documents directly pertinent to a handful of SKUs rather [than] to all of the issues raised by" the lawsuit, including ePRO's state of mind. (*Id.* at 11.) These flaws in procedure and process were accompanied by other problems with ePRO's "discovery performance," including ePRO's: (1) misleading initial representations that it had no transactional documents other than spreadsheets that had been created for the litigation;[14] (2) "halting efforts to collect substantial quantities of documents until after [Klipsch] had conducted depositions in Hong Kong;" and (3) limiting the efforts of its own expert, FTI,[15] to inspect computers. (*Id.*)

Notably, despite all of these discovery deficiencies Magistrate Judge Dolinger concluded that Klipsch had not demonstrated that ePRO had hidden or destroyed transactional documents

---

[14] Magistrate Judge Dolinger also noted the practical impact of ePRO's actions with regard to the transactional documents, stating:

> It also bears noting that defendants' failure to produce transactional documents on a timely basis and their denial that they existed ultimately required plaintiff to conduct two rounds of depositions in Hong Kong and thus to incur substantial additional expense. The first set, July 2013, were scheduled and conducted after defendants had repeatedly insisted that they had no independent transactional documents and could only proffer the spreadsheets produced early in the case. At those depositions, plaintiff learned that this was not the case, triggering a belated (and incomplete) search of defendants' computers by FTI, which had been hired by defendants. The resulting late production in turn led the court to authorize a second round of depositions, which took place in November 2013.

(Spoliation M&O 13) (citations omitted).

[15] "FTI" refers to FTI Consulting, Inc. ("FTI"), engaged by ePRO to, among other things, perform the email collection in Hong Kong and China.

that would have demonstrated more infringing sales and substantial profits.

> All of this said, plaintiff has not as yet unearthed evidence that directly contradicts the defendants' narrative that they made only a handful of infringing sales, which yielded them profits in the three-figure range. Specifically, the documents now produced, as well as the spreadsheets earlier created, are consistent in reflecting a very small quantity of sales.  Nonetheless, given the discovery history -- including a trail of false and misleading representations by defendants -- there is evident uncertainty about the plausibility, as well as the accuracy, of the defendants' current factual assertions about the scope of infringing sales and resultant profits.

(*Id.* at 14.)  Given these circumstances, Magistrate Judge Dolinger held that neither terminating sanctions nor an adverse inference jury instruction was warranted on the record as it stood.  (*Id.* at 14-15.)  Instead, Magistrate Judge Dolinger found that Klipsch was entitled to undertake a forensic investigation of ePRO's computer systems; noting that this remedy "is among the mildest of available remedies – amounting in effect to authorization to the discovering party of leave to pursue additional discovery."  (*Id.* at 16.)  In so doing, Magistrate Judge Dolinger reserved decision on additional sanctions, noting that the search may shed light on the degree of prejudice suffered by Klipsch as a result of ePRO's discovery misconduct.  (*See id.* at 17-18 & n.3.)  Magistrate Judge Dolinger further issued a Forensic Examination Protocol governing Klipsch's forensic search of ePRO's ESI and requiring ePRO to "promptly make available for inspection – including but not limited to forensic imaging, analysis and data recovery by the Expert – any and all sources of potentially relevant ESI (the "ESI Sources"), including ePRO's CSM and Go databases and/or ESI created, manipulated, transmitted, or held by [named] custodians."  (Forensic Protocol ¶ 4.)[16]

### D.    *Present Motion*

On August 8, 2014, after Klipsch completed its forensic search, it filed an ex parte

---

[16] "Forensic Protocol" refers to the Forensic Examination Protocol.  (Doc. 200.)

motion for:  (1) an upward modification of assets restrained from $20,000 to a sum of $5 to $12 million; (2) an asset attachment order; and (3) an Order to Show Cause for additional discovery sanctions in the form of recovery of costs and fees expended by Klipsch relating to its forensic expert and efforts to compel discovery as well as a default judgment.  (Pl.'s Mem.)[17]  In support of its request, Klipsch submitted the findings of its forensic examination expert, Mr. Daniel L. Regard of iDiscovery Solutions ("iDS").  (8/8 Regard Report.)[18]  That same day, based upon the submissions by Klipsch, I increased the amount of ePRO's assets restrained from $20,000 to $5 million and ordered ePRO to show cause as to why Klipsch is not entitled to additional discovery sanctions.  (Doc. 213.)

ePRO filed its opposition to Klipsch's motion, (Def.'s Opp.)[19], along with the rebuttal expert report of Mr. Erik Hammerquist, (12/8 Hammerquist Report)[20], the expert report of Mr. Michael Jelen, (Jelen Report),[21] the rebuttal expert report of Jelen, (Jelen Rebuttal Report),[22] and the declaration of Mr. Danny Qiu, (Qiu Decl.),[23] on December 8, 2014.  On December 19, 2014, Klipsch then filed its reply, (Pl.'s Reply)[24], along with a declaration of Mr. Kenneth Shuart,

---

[17] "Pl.'s Mem." refers to the Memorandum of Law in Support of Plaintiff Klipsch Group Inc.'s *Ex Parte* Motion for an Asset Restraining Order, Asset Attachment Order and Order to Show Cause for Default Judgment and Recovery of Costs and Attorneys' Fees.  (Doc. 250.)

[18] "8/8 Regard Report" refers to the Expert Report of Daniel L. Regard II.  (Doc. 251.)

[19] "Def.'s Opp." refers to Defendant ePRO E-Commerce Limited's Memorandum of Law in Opposition to Plaintiff's *Ex Parte* Motion for an Asset Restraining Order, Asset Attachment Order and Order to Show Cause for Default Judgment and Recovery of Costs and Attorneys' Fees.  (Doc. 243.)

[20] "12/8 Hammerquist Report" refers to the Declaration of Erik Hammerquist.  (Doc. 235.)

[21] "Jelen Report" refers to the Expert Report of Michael Jelen.  (Doc. 236-1.)

[22] "Jelen Rebuttal Report" refers to the Expert Report of Michael Jelen Response to the Expert Report of Daniel L. Regard II, August 8, 2014.  (Docs. 236-2-3.)

[23] "Qui Decl." refers to the Declaration of Danny Qiu.  (Doc. 237.)

[24] "Pl.'s Reply" refers to Reply Memorandum of Law in Support of Plaintiff Klipsch Group Inc.'s *Ex Parte* Motion for an Asset Restraining Order, Asset Attachment Order and Order to Show Cause for Default Judgment and Recovery of Costs and Attorneys' Fees.  (Doc. 253.)

(12/19 Shuart Decl.)[25], declaration of Regard, (12/19 Regard Report)[26], and declaration of Mr. George P. Wukoson, (Docs. 252, 254)[27], in further support of its request.  I held the Hearing on the motion from January 5-8, 2015.  At the Hearing, both parties presented witness testimony by their respective forensic experts:  for Klipsch—Regard; for ePRO—Jelen and Hammerquist.  No employees from ePRO testified during the Hearing.

Hammerquist submitted his second expert report on February 4, 2015.  (2/4 Hammerquist Report).[28]  Regard provided his third expert report on February 5, 2015, responding to Hammerquist's February 4th report.  (2/5 Regard Report.)[29]  Both parties submitted their proposed findings of fact and conclusions of law for my review on February 5, 2015.  (Pl.'s Br.[30]; Def.'s Br. [31])  And on February 11, 2015, I heard closing arguments from each party.

## II.   Factual Findings

Both parties used two overlapping periods as reference points in their briefing and during the Hearing:  (1) the period of sales of the four SKUs of Counterfeit Products, from May 26,

---

[25] "12/19 Shuart Decl." refers to the Declaration of Kenneth Shuart in Support of Plaintiff Klipsch Group Inc.'s *Ex Parte* Motion for an Asset Restraining Order, Asset Attachment Order and Order to Show Cause for Default Judgment and Recovery of Costs and Attorneys' Fees.  (Doc. 255.)

[26] "12/19 Regard Report" refers to the Declaration of Daniel L. Regard, II in Support of Plaintiff Klipsch Group Inc.'s *Ex Parte* Motion for an Asset Restraining Order, Asset Attachment Order and Order to Show Cause for Default Judgment and Recovery of Costs and Attorneys' Fees.  (Doc. 256.)

[27] "Wukoson Decl." refers to the Declaration of George P. Wukoson in Support of Plaintiff Klipsch Group Inc.'s *Ex Parte* Motion for an Asset Restraining Order, Asset Attachment Order and Order to Show Cause for Default Judgment and Recovery of Costs and Attorneys' Fees.  (Doc. 252.)  "Wukoson Supp. Decl." refers to the Supplemental Declaration of George P. Wukoson in Further Support of Plaintiff Klipsch Group Inc.'s *Ex Parte Motion* for an Asset Restraining Order, Asset Attachment Order and Order to Show Cause for Default Judgment and Recovery of Costs and Attorneys' Fees.  (Doc. 254.)

[28] "2/4 Hammerquist Report" refers to the Declaration of Erik Hammerquist dated February 4, 2015.  (Doc. 290.)

[29] "2/5 Regard Report" refers to the Declaration of Daniel L. Regard, II in Support of Plaintiff Klipsch Group Inc.'s *Ex Parte* Motion for an Asset Restraining Order, Asset Attachment Order and Order to Show Cause for Default Judgment and Recovery of Costs and Attorneys' Fees dated February 5, 2015.  (Doc. 282.)

[30] "Pl.'s Br." refers to the Proposed Findings of Fact and Conclusions of Law.  (Doc. 284.)

[31] "Def.'s Br." refers to Defendant ePRO E-Commerce Limited's Proposed Findings of Fact and Conclusions of Law in Opposition to Plaintiff's Ex Parte Motion for an Asset Restraining Order, Asset Attachment Order and Order to Show Cause for Default Judgment and Recovery of Costs and Attorneys' Fees.  (Doc. 283.)

2011 through December 21, 2012 (the "Active Period"); and the litigation period from August

15, 2012 to the present (the "Litigation Period").  (8/8 Regard Report ¶ 3; Def.'s Opp. 12, 25.)  A

third relevant period is the timeframe during which iDS conducted its forensic review at ePRO's

offices in China—April 15, 2014 until July 1, 2014.  (*See* Pl.'s Br. 31; 8/8 Regard Report ¶ 9.)

  With regard to Unstructured ESI, based on my assessment of the record—consisting of

the extensive submissions of the parties, live testimony and documentary evidence—I find that

ePRO engaged in spoliation in connection with this litigation by engaging in conduct that

resulted in the willful destruction of ESI.

  With regard to the Structured ESI based on my assessment of the record—consisting of

the extensive submissions of the parties, live testimony and documentary evidence—I find that

Klipsch has not met its burden to establish ePRO spoliated sales data in an effort to hide sales of

Counterfeit Products.  In other words, Klipsch still has not "unearthed evidence that directly

contradicts [ePRO's] narrative that [it] made only a handful of infringing sales, which yielded

[it] profits in the three-figure range."  (Spoliation M&O 14.)

### A. *Unstructured ESI*

  With regard to the Unstructured ESI, ePRO does not start from a clean slate.  In his well-

reasoned and thorough Spoliation M&O, Magistrate Judge Dolinger concluded that a substantial

amount of non-transactional documents were not preserved or not produced by ePRO.  (*See*

Spoliation M&O 10-11.)  Therefore, the forensic examination was necessary to determine the

scope of the failure to preserve, whether or not such documents were relevant and would have

been favorable to Klipsch, and to further assess the willfulness of the spoliation of the non-

transactional documents.  (*See* Spoliation M&O 9, 16, 19.)  Here, there is evidence that ePRO

spoliated, hid or prevented access to ESI in at least five ways:  (1) manual deletion of files and

emails; (2) deletion of files and emails using sanitization software; (3) deletion of historic information regarding computer usage through the reinstallation of ePRO custodian's Windows operating systems; (4) failure to retain the corporate email accounts for certain employees; and (5) refusal to supply credentials for other locations of ESI.

### 1.   Manually Deleted Files

Regard's forensic analysis revealed that 4,596 responsive files and emails were manually deleted on or after August 15, 2012.[32]  (*See generally* 12/19 Regard Report ¶¶ 18-24.)  However, these files were recovered by iDS, produced to ePro for privacy and privilege review, and eventually produced to Klipsch.  (*Id.*)  These responsive files were extracted and recovered by iDS using EnCase, an industry-standard forensic examination software that logs deleted files. (*Id.* ¶¶ 19-20.)  Regard stated that the:

> method for identification of deleted files based on the path information relies on the behavior of EnCase when it recovers deleted files from the hard drive.  During recovery of deleted files EnCase places the files into special directories. These directories have names like 'LOST FILES', which is reflected in the path, for files have been hard-deleted but then recovered by EnCase.  Soft-Deleted files recovered from the Windows' Recycle Bin are found in the 'RECYCLE' directory, and soft-deleted emails are found in the 'TRASH' and 'DELETED ITEMS' directories.

(*Id.* ¶ 19.)  Of the 4,596 files deleted and recovered, 1,980 were recovered files and 2,616 were recovered emails.  (*Id.* ¶ 23.)  Of the 1,980 recovered files, 377 were soft-deleted—in a recycle bin and recovered—and 1,603 were hard-deleted—deleted from the recycle bin and recovered using forensic tools.  (*Id.*)  ePRO does not dispute that these files were deleted.  (*See* Def.'s Br. 39.)  I therefore conclude that ePRO custodians deleted 4,596 files and emails from their computers during the Litigation Period.

---

[32] Regard determined that the files were responsive to search terms.

## 2.   Data-Wiping Programs

Regard found evidence that data-wiping programs were used by ePRO custodians to delete ESI from their computers.  The following is a list of custodians whose computers showed evidence of one or more data-wiping programs being used:

(1)  Chen Sicheng (computer "A0004") – CCleaner;

(2)  Liu Fen (computer "A0006") – CCleaner;

(3)  Tina Zhang (computer "A0012") – KCleaner;

(4)  Yun Zhu (computer "A0021") – FileShredder;

(5)  Keith Lee (computer "A0030") – IObit Advanced System Care ("IObit AS");

(6)  Roger Luo (computer "A0035") – IObit AS, KCleaner, and Disk Cleaner Portable; [33] and

(7)  Jiangming Zhong (computer "A0037") – CCleaner.

(12/19 Regard Report ¶¶ 12-18.)

These programs have the ability to delete the remnants of any files the user previously deleted to prevent their recovery, a function that the parties refer to as "wiping free space."  (*See* 8/8 Regard Report 5-6; Tr. 271:5-8[34]; PortableAppx, "Disk Cleaner Portable," http://portableapps.com/apps/utilities/disk_cleaner_portable (last accessed Sept. 29, 2015).)[35]

---

[33] Regard discovered KCleaner and Disk Cleaner Portable on this computer after his initial report.  During the Hearing counsel for ePRO objected to this evidence.  Regard testified that it did not change his initial opinion but that the presence of this additional software added more weight to his opinion.  (Doc. 269 at 20.)  In light of the objection, I do not consider the presence of KCleaner and Disk Cleaner Portable on this computer in reaching my finding with regard to the use of data-wiping programs by certain of ePRO's custodians.

[34] "Tr." refers to the transcript of the proceedings held before me on January 5-8, 2015 and February 11, 2015.  (Docs. 269, 271, 273, 275, 291.)

[35] I may take judicial notice of a company's description of its product on its website.  *See United States v. Akinrosotu*, 637 F.3d 165, 168 (2d Cir. 2011) (taking judicial notice of information listed on website); *see also Taylor v. Mitre Corp.*, No. 11-CV-01247, 2012 WL 5473715, at *2 n.7 (E.D. Va. Sept. 10, 2012) (taking judicial notice of description of CCleaner on CCleaner website)), *report and recommendation adopted*, No. 11-CV-1247, 2012 WL 5473573 (E.D. Va. Nov. 8, 2012).

IObit AS, FileShredder, and CCleaner also have the ability to target and delete specific files that were not previously deleted, (8/8 Regard Report App. 1, at 5; Piriform, "Command-line parameters," https://www.piriform.com/docs/ccleaner/advanced-usage/command-line-parameters (last accessed Sept. 29, 2015).)  Finally, CCleaner, IObit AS, and KCleaner have separate functions related to system optimization and privacy protection.  (Tr. 19:10-16, 161:6-14, 242:1-3.)

The parties do not dispute that these programs were installed on ePRO custodian computers.  Rather, ePRO claims that the forensic evidence does not demonstrate that the programs were used to wipe user files from any of the devices, or in some cases run at all.  (Def.'s Opp. 14.)  However, both experts agree that the use of data-wiping software close in time to an event related to the monitoring of a computer, in this case iDS's forensic examination, is suggestive that the data-wiping software was utilized for an anti-forensic purpose.  (*See* Tr. 36:6-14; 329:24-330:9.)  I therefore initially direct my analysis to determine if a preponderance of the evidence establishes if and when these programs were run.  *See Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 412 (S.D.N.Y. 2010).

**a.**    <u>When Were Data-Wiping Programs Run?</u>

According to Regard, a Windows operating system maintains a database of information, known as a registry, to allow the operating system to run more efficiently.  Although the registry is sometimes spoken of as if it is a singular thing, it is actually several different files and databases that work together.  (Tr. 25-26.)  A registry contains different areas that may contain evidence regarding when a program was run, including:  (1) the "pre-fetch" folder; (2) the "Shell Bag"; and (3) the "Shim Cache."

A computer generates a registry file each time a program is run so that previously-run programs can be accessed more quickly; the registry files are stored in a "pre-fetch" folder. (Tr. 26:15-27:1.) There are situations, however, where a data-wiping program may be installed and/or run without a corresponding registry file in the computer's pre-fetch folder at the time the forensic examination is performed. Those situations may include when: (1) the program was not recently run, (*id.* at 353:3-6); (2) the user disabled the computer operating system's pre-fetch function, (*id.* at 256:19-257:1; 8/8 Regard Report 4); or (3) the program was run from a network share or attached device, (Tr. 266:1-25).[36]  In addition, a computer's operating system tracks what files and/or folders the user accesses in the "Shell Bag" of a computer's registry.[37] (8/8 Regard Report 4 n.2; Tr. 29:10-31:1; Tr. 213:13-24). Finally, a computer's operating system tracks when, and for what programs, the operating system makes adjustments to run in the "Shim Cache" of the computer's registry. (Tr. 170:13-23, 304:19-22.) I will address each custodian and his or her device in turn.

### i.     *Yun Zhu – A0021*

It is uncontested that FileShredder was run on A0021 on April 15, 2014. (8/8 Regard Report App. 2, at 21; 12/19 Regard Report ¶ 16; 12/8 Hammerquist Report 31.) Since the parties are in agreement, I find that FileShredder was run on A0021 on April 15, 2014; that same day iDS arrived at ePRO's offices to begin its forensic review.

---

[36] Regard testified that these data-wiping programs have the ability to erase evidence that the program itself was run, (Tr. 27:20-24). In contrast, Hammerquist testified that these data-wiping programs leave the same type of registry files showing their use in pre-fetch folders as do other types of programs. (*Id.* at 282:3-6.) Given that Regard found evidence of data-wiping programs in the pre-fetch folders of A0004, (8/8 Regard Report App. 2, at 5), A0012, (12/19 Regard Report 8 n.4), and A0021, (*id.* at 21), I do not need to resolve this dispute between the experts.

[37] A file's created, accessed, and modified dates are evidence that a user visited a particular software and therefore indicia that a program was run. (Tr. 30:21-31:1.)

### ii. *Tina Zhang – A0012.*

Regard found evidence that K-Cleaner was run on April 7, 2014 in A0012's pre-fetch folder. (12/19 Regard Report 8 n.4.) Hammerquist had the opportunity to review A0012's underlying registry files after the close of the Hearing and did not dispute this particular finding in his February 4, 2015 report. (*See* 2/4 Hammerquist Report.) Therefore, based upon the evidence presented, I find that K-Cleaner was run as recently as April 7, 2014 on device A0012; eight days prior to the arrival of iDS at ePRO's offices.

### iii. *Roger Luo – A0035*

Although A0035 did not contain evidence of data-wiping programs in its pre-fetch folder, Regard discovered evidence of IObit AS in A0035's Shim Cache, (Tr. 216:18-25), and IObit AS, Disk Cleaner Portable, and KCleaner in A0035's Shell Bag, all of which had a date stamp of April 17, 2014, (Tr. 219:17-220:13). Hammerquist concurred that IObit AS was run on A0035, (Tr. 300:14-19), but disputes Regard's finding that the program was last run on April 17, 2014, (Tr. 301:1-6), because: (1) evidence of the IObit link file contains the same date and time for the last accessed and created date, which only indicates that the shortcut file was created but not that the program was actually run; (2) Regard failed to describe the IObit artifacts found in the system's Shell Bag; (3) Shell Bag artifacts do not indicate when a program was run; and (4) there was evidence of data commingling between A0030 and A0035. (12/8 Hammerquist Report 29-30.) Even though Hammerquist determined that data-wiping software was run on A0035 he did not follow-up to attempt to determine when the data-wiping software was run because his objective was merely to "identify and evaluate" Regard's findings. In response to my questions related to the running of IObit AS on A0035, Hammerquist stated:

> THE COURT: And I apologize, this may be in the record, but what date did you conclude that the program was run?

18

THE WITNESS:  I did not come to a conclusion as to when the program was run. My objective was to identify and evaluate Regard's statements.

THE COURT:  Do you have an opinion as to what the potential dates are when the program was run?

THE WITNESS:  I do not.

THE COURT:  Did you attempt to determine when the program was run?

THE WITNESS:  I did not.

THE COURT:  Is that because that was not part of your charge, in other words, what you were retained to do?

THE WITNESS:  That's correct.

(Tr. 300:20-301:9.)  And, although iDS provided Hammerquist with A0035's underlying registry data, Hammerquist did not comment on Regard's conclusion that Disk Cleaner Portable and KCleaner were also run on A0035.

Given the agreement between the experts that IObit AS was run on A0035 and Hammerquist's failure to follow-up on his own finding that A0035 displayed evidence that data-wiping software was run, I do not find Hammerquist's opinion persuasive and credit Regard's conclusion that these programs were run on April 17, 2014; two days after the arrival of iDS at ePRO's offices and on the very day this computer was imaged.  (2/5 Regard Report ¶ 14.)

### iv.    *Chen Sicheng – A0004*

The parties agree that CCleaner was accessed on A0004 on February 26, 2014.  (8/8 Regard Report App. 2, at 5; 12/8 Hammerquist Report at 16-17.)  However, Hammerquist disputes Regard's finding that CCleaner was again run on A0004's C:\ drive on April 14, 2014. (12/8 Hammerquist Report at 16-17.)  Hammerquist reviewed A0004's underlying registry files and was unable to locate any files related to CCleaner with a date stamp of April 14, 2014.  (2/4 Hammerquist Report ¶ 4.)  However, Regard provided evidence showing that A0004's Shell Bag

contained an encrypted entry related to CCleaner with a last written time-stamp of April 14, 2014.  (2/5 Regard Report App. A.)

Hammerquist also opined that the evidence demonstrates that CCleaner was merely reinstalled or upgraded as of March 28, 2014 but not actually run.  (*Id.*)  But Hammerquist did not comment on the evidence that CCleaner was run from A0004's F:\ drive with the setting "WipeFreeSpaceDrives."  (PX 3-04-F.)[38]  And although Hammerquist testified that the use of data-wiping software on multiple drives is a sophisticated wiping technique, (Tr. 266:10-25), he did not address the evidence showing that CCleaner was run from at least two separate drives shortly before the arrival of iDS to conduct their forensic review.  Although Hammerquist commented that using data-wiping software using multiple drives was a sophisticated technique, there is nothing in the record to suggest that Chen Sicheng or someone else at ePRO did not have this level of sophistication.

I therefore credit Regard's findings and conclude that the sophisticated use of data-wiping software occurred on A0004 as recently as April 14, 2014; one day prior to the arrival of iDS at ePRO's offices.

                    **v.**      *Keith Lee – A0030*

Hammerquist contends that he reviewed A0030's underlying registry data and did not find Shim Cache data "matching the reports previously produced by iDS."  (2/4 Hammerquist Report ¶ 10.)  Regard claims that A0030's Shim Cache contains evidence in encoded form that IObit AS was executed on October 25, 2013.  (Tr. 170:24-171:2; 2/5 Regard Report ¶ 8.)  Unlike with device A0004, Regard did not provide back-up or primary source evidence to support his opinion that IObit AS was present in encoded form.  (*See e.g.*, 2/5 Regard Report Ex. A.)

---

[38] "PX" refers to Klipsch's exhibits entered into evidence during the proceedings.

However, Regard also points out that A0030's pre-fetch folder was entirely empty. When data-wiping software is run it erases the files from the operating system's pre-fetch folder. (Tr. 27:20-28:1.)  An empty pre-fetch folder is highly unusual and inconsistent with normal computer use because pre-fetch files enable a computer to run faster and more efficiently.  (Tr. 27:20-28:1, 28:20-29:7.)  Hammerquist does not opine as to the significance of A0030's empty pre-fetch folder, (12/8 Hammerquist Report at 21), or provide an alternative explanation as to why A0030's pre-fetch folder was empty.

Given Hammerquist's limited charge to merely comment on Regard's reports/opinions, (Tr. 300:20-301:9), and his failure to address evidence that suggests data-wiping software was run on A0030, I credit Regard's conclusion that IObit AS was run on A0030.

<strong>vi.</strong>   <em>Liu Fen – A0006</em>

ePRO concedes that CCleaner was run on A0006 on July 2, 2013, but disputes that the program was again run on March 28, 2014.  (2/4 Hammerquist Report ¶ 6.)  Regard testified that A0006's operating system contained a registry entry related to CCleaner with a date stamp of March 28, 2014.  (Tr. 221:5-10.)  Prior to the Hearing, Hammerquist opined that the RegRipper report related to A0006 reflected a commingling of data with other devices and therefore could not be used to verify Regard's finding.  (12/8 Hammerquist Report at 19-20.)  After reviewing A0006's underlying registry files Hammerquist confirmed his opinion that CCleaner was not run on March 28, 2014.  (*See* 2/4 Hammerquist Report ¶ 6.)

Hammerquist also opined that A0006's pre-fetch was likely empty because the pre-fetch function was disabled.  (12/8 Hammerquist Report at 21.)  However, Hammerquist did not actually take the time to review A0006's pre-fetch function to confirm this theory.  (Tr. 255:17-25.)  Given that A0006's pre-fetch was in fact enabled at the time of iDS's review, (2/5 Regard

Report ¶ 6), and in light of the limitations placed on Hammerquist's inquiry, he did not investigate evidence that a forensic expert would find curious.  Hammerquist's testimony with respect to A0006 therefore deserves little weight.  Klipsch has carried its burden of showing that CCleaner was more likely than not run on A0006 on March 28, 2014—less than a month before iDS began its forensic review at ePRO.

**vii.**  *Jiangming Zhong – A0037*

Regard testified that he concluded CCleaner was run on A0037 on March 28, 2014 by looking at the RegRipper report relating to the operating system's "most recently used" files. (Tr. 226:2-24.)  The operating system's "most recently used" files track when the system opens a dialogue box, which is indicative that a program has been accessed.  (*Id.*)  Here, among A0037's most recently used files as of April 17, 2014 was a file for CCleaner.  (Tr. 226:19-227:7.) Regard also determined that the RegRipper report indicated that CCleaner had a last "write time" of March 28, 2014, which Regard utilized to determine that A0037 ran CCleaner on that date. (Tr. 226:25-227:4; PX 3, at 3-37A.)

In Hammerquist's December 8, 2014 Report he claimed that A0037's RegRipper report commingled data from A0004, A0006, and A0021.  Hammerquist then reviewed A0037's underlying registry data and determined that the registry files did not contain the presence of the CCleaner key attributed to this device in the original system report.  (2/4 Hammerquist Report ¶ 8.)

Regard contends that the RegRipper reports reference evidence that the CCleaner key had been created in the past but that the key itself had been removed.  (2/5 Regard Report ¶ 7.) Regard did not provide testimony explaining the significance of this technical distinction.  In addition, A0037's pre-fetch folder contained 28 files suggesting that data-wiping software had

not been recently run.  (12/8 Hammerquist Report at 23.)  In weighing the apparent conflicts in the evidence provided and in the opinions of the experts with regard to A0037, I find that Klipsch has not demonstrated by a preponderance of the evidence that CCleaner was run on A0037 on March 28, 2014.

**b.**   Was Data-Wiping Software Utilized to Delete Information?

Hammerquist opines that because only 31 deleted files were unrecoverable the data-wiping programs were more likely used for system optimization rather than for an anti-forensic purpose.  (12/8 Hammerquist Report at 2, 7-9, 19, 22, 24, 27, 31, 33.)  Regard initially determined that 3,489 responsive files were deleted and unrecovered.[39]  (Tr. 139:8-14.) However, Regard later withdrew this finding because he determined that the method used to identify these files as unrecoverable was over-inclusive.  (12/19 Regard Report ¶ 17.)

Even so, the parties agree that at least 31 files were in fact deleted and not recovered. And IObit AS, FileShredder, and CCleaner have the ability to target and delete specific files (as opposed to wiping evidence of previous deletion activity), which would not render the files unrecoverable.  (*See* 8/8 Regard Report App. 1, at 5; Piriform, "Command-line parameters," https://www.piriform.com/docs/ccleaner/advanced-usage/command-line-parameters; Tr. 35:23-25 ("Some of the tools can be used to delete individual files; some can be used to wipe the computer from all previous deletion activity.")  I find that this evidence demonstrates that ePRO custodians more likely than not utilized data-wiping software to delete information during the Litigation Period.

---

[39] These 3,489 files relate to a different data set than the 4,596 files Regard determined were manually deleted and recovered by iDS.  (Tr. 139:8-14.)

In any event, the fact that ePRO—a sophisticated subsidiary of a publicly traded company—apparently permitted its employees to use data-wiping software on their computers without any centralized control of the use of such software is indicative of a lack of controls with regard to ESI.  For purpose of my analysis, ePRO's general ESI policies are not specifically relevant; however, the fact that there is no evidence in the record that ePRO attempted to stop its employees from utilizing this software in light of the pending litigation and Judge Dolinger's Spoliation M&O is circumstantial evidence of ePRO's bad faith.

### 3.    Operating System Reinstallation

Regard's report indicates that the operating systems ("OS") of eighteen e-PRO custodian computers were replaced or reinstalled after August 15, 2012.[40]  (8/8 Regard Report ¶¶ 34.)  Among those ePRO custodians are the following members of ePRO's senior staff:  Keith Lee, Chief Financial Officer ("CFO") – OS installation July 29, 2013, (8/8 Regard Report, App. 2, at 30); Qing Fang, Vice-Director – OS installation September 30, 2013, (*id.* at 23); Peng Li, Vice-Director – OS installation August 15, 2013, (*id.* at 24); Alex Huang, Director of the Supplier Services Department – OS installation September 4, 2013, (*id.* at 33); and Leslie Tang, Director of the Quality Control Department – OS installation September 2, 2013, (*id.* at 35).  Although reinstallation of a computer's operating system will not obscure user files, Klipsch and ePRO agree that the process erases the computer's registry containing historical information of the computer's program usage, which significantly hinders the forensic examination of a computer. (*See* Tr. 45:7-19, 345:6-11.)  Hammerquist characterized reinstallation as a significant action that

---

[40] These custodians include:  Meng Li, (Regard Report, App. 2 at 3); Huimin Huiang, (*id.* at 6); Dan Tang, (*id.* at 8); Marsyang, (*id.* at 11); Yaning Liang, (*id.* at 15); Justin Ji, (*id.* at 16); Tian Luo, (*id.* at 20); Yun Zhu, (*id.* at 21); Qing Fang, (*id.* at 23); Peng Li, (*id.* at 24), Keith Lee, (*id.* at 30); Alex Huang, (*id.* at 33); Jicai Huang, (*id.* at 34); Leslie Tang, (*id.* at 35); Tao Yang, (*id.* at 37); Junhong Chen, (*id.* at 39); Cody Xie, (*id.* at 40); and Daniel Wang, (*id.* at 43).

replaces configurations, and stated that after a reconfiguration "all previously-installed programs need to be completely reinstalled and configured, previously-used network accounts and passwords cannot be used without additional configuration by network administrative personnel and non-default hardware configurations need to be re-implemented." (Tr. 344:23-345.) Such a reinstallation would not occur spontaneously without knowledge and approval of not only the ePRO custodian but also, based on Hammerquist's list of actions that need to be taken after such a reinstallation, ePRO's information technology staff. In addition, had ePRO been taking appropriate measures to preserve ESI it would have forensically imaged these computers when it retained FTI on or about May of 2013—before OS replacement or reinstallation. (*See* Doc. 170 at 4.) I therefore find that ePRO custodians reinstalled their computer operating systems, which resulted in the deletion of registry information relevant to Klipsch's forensic examination during the Litigation Period and is further circumstantial evidence of ePRO's bad faith.[41]

### 4. Failure to Produce Computers and Deletion of Corporate E-Mail Accounts

ePRO failed to produce computers for seven former employees who left ePRO's employ during the Litigation Period. (8/8 Regard Report ¶ 25, Exs. D, E, J.) At least five of those custodians—Yi Hui, Vincent Shen, Rita Guo, Serena Pang and Liu Fang—performed work that related to ePRO's email direct marketing homepage ("EDM"), where ePRO used emails and affiliates to promote and sell excess inventory and counterfeit products. (Pl.'s Br. 16, 20.) The EDM emails or webpages were never produced. (*Id.*) ePRO also failed to produce Phoebe Li's computer, a current ePRO employee who, among other things, would receive "Supply Chain Reports" and order settlement data for Yisun and RiverSunny—the two suppliers for the

---

[41] Given these findings I need not, and do not, resolve the experts' dispute regarding whether Chow's Macintosh operating system was compromised. (*Compare* Regard Report 10 & App'x 1, p.8, *with* Tr. 270:1-8, 269:11-22.)

Counterfeit Products at issue.  (*Id.*)

ePRO deleted or otherwise failed to provide the corporate email accounts of twelve custodians.  ePRO confirmed that it deleted the email accounts of three custodians from its servers after the Litigation Period:  Candice Liu, Serena Peng and Vincent Shen.  (8/8 Regard Report ¶ 39(d).)  In addition, Regard found evidence on ePRO's server that Yaning Liang and Fen Liu had email accounts at one time that had been deleted by the time of Regard's forensic review.  (8/8 Regard Report ¶ 39(d), Ex. J.))  Regard received devices for the remaining seven custodians, but the corporate email server had no accounts for them and Regard was unable to confirm whether they had corporate email or not.  (8/8 Regard Report ¶ 39(d).)

Based upon the evidence, I find that ePRO deleted the email accounts of three custodians after the Litigation Period.  I also find that ePRO likely deleted the email accounts for two other custodians during the Litigation Period.  ePRO's actions in this regard are further confirmation of Magistrate Judge Dolinger's ruling that ePRO "simply imposed no hold at all," (Spoliation M&O 10), and is also circumstantial evidence of ePRO's bad faith.

### 5.      QQ Messenger and Gmail

ePRO custodians use QQ messenger ("QQ") when conducting business.[42]  ePRO Systems CEO Chow testified that ePRO permits employees to use QQ for business purposes.  (*See* Chow Tr. 66:6-14.)[43]  ePRO custodians include their QQ handle or identifier in their work email signature.  (*See* Pl.'s Br. 22; Doc. 254-1.)  And some of these emails show unnamed senders and recipients of emails, identified by their QQ addresses alone.  (Pl.'s Br. 22.)  Thirty-six ePRO

---

[42] QQ is an instant messaging software service developed by Chinese company Tencent Holdings Limited.  Tencent, http://www.tencent.com/en-us/ps/imservice.shtml (last accessed Sept. 27, 2015).

[43] "Chow Tr." refers to the deposition testimony of Daniel Chow.  (Doc. 254-3.)

custodians had QQ client software installed on their computers, including several of the top executives. Thirty-two of the thirty-six ePRO custodians refused to turn over their QQ access credentials to iDS. Among the individuals who refused to provide this information were: Keith Lee, CFO and the ePRO employee designated with the responsibility to obtain employee compliance with the forensic examination, (*see* Tr. 52:1-13); and Danny Qiu, Head of Marketing and iDS's primary contact during the forensic examination, (12/19 Shuart Decl. ¶ 2; Tr. 52:1-13, 431:11-431:14).

ePRO custodians also use Gmail for business purposes. (*See* Kershaw Tr. 21:21-22:5.)[44] However, three ePRO custodians who utilized Gmail—including Leslie Tang, ePRO Director of Quality Control—refused to provide access to their accounts, (Regard Report ¶ 39(c); *see id.* Ex. J), despite the existence of a protocol formulated to segregate potentially relevant business documents from private documents, (Tr. 51:11-24).

I find that the refusal of thirty-two of the thirty-six ePRO custodians to turn over their QQ access credentials to iDS and refusal of three ePRO custodians to provide access to their Gmail accounts despite being directed to provide access and the existence of a protocol to segregate potentially relevant business documents from private documents is direct evidence of ePRO's bad faith.

### B.    *Structured ESI*

Regard opined that ePRO's transaction databased contained evidence of widespread database deletions of SKU numbers, sales orders, and purchase data. (8/8 Regard Report ¶ 5.) Specifically, Regard identified significant gaps in the sequential numbering of the Sales Orders, SKUs, and Purchase Orders. (*Id.* ¶¶ 18-20.) Regard also indicated that he was unable to

---

[44] "Kershaw Tr." refers to the deposition testimony of Richard Kersaw. (Doc. 157-39.)

investigate the full nature of these suspected compromises because ePRO did not have historical reference points. (*Id.*) Regard equated a gap in the sequence of sales order numbering with a missing sale order. (Tr. 125:8-16.) However, iDS did not ask ePRO why such gaps may be present or conduct any separate analysis regarding the reasons for these gaps. (*Id.* at 109:20-110:5, 124:6-14, 125:24-126:3.)

Jelen determined that the Sales Order numbering gaps are consistent with the functionality of ePRO's sales databases. (Jelen Rebuttal Report 19.) In other words, since ePRO's sales databases are live/in-use systems there are legitimate operational reasons/explanations for such gaps. First, a documented system outage occurred during which customers could not complete orders placed on ePRO's website, resulting in an eight hour gap in Sales Order ID numbers. (Tr. 442:14-443:25; Jelen Rebuttal Report at 20-21 & App. 7.3.) Second, 8,224 of the SKUs that Regard reported as missing were actually located in either the PCM or PSS databases. (Tr. 183:23-184:11.)

Regard questioned the validity of Jelen's findings because 108,900 records listed on the PCM.PM table (a table located within the PCM database) had the SKU number of "0." (12/19 Regard Report ¶ 55.) However, Jelen testified that the PCM.PM and PCM.PA tables[45] were actually related, and when the two tables are linked a SKU number is in fact generated. (Tr. 492:8-493:1.)

Regard contends that ePRO represented to iDS that the PDC database contained the Master SKU List. (Regard Report App. 4, at 22; *see also* 12/19 Shuart Decl. ¶ 7.) But it is undisputed that ePRO identified the PDC, PCM, and PSS databases as containing SKU information to which iDS had access. (Tr. 102:17-103:10.) Regard also admits that since there

---

[45] The PCM.PA table is also located within the PCM database. (*See* Tr. 492:8-493:1.)

were no gaps in the Purchase Order Lines ID numbers, and each Purchase Order Line was linked

to a Parent Purchase Order, the evidence suggests that no Purchase Orders were missing from

ePRO's databases.[46]  (*Id.* at 184:12-18, 186:3-13.)

    The forensic review did not uncover any sales data that demonstrated that ePRO made

additional sales of Counterfeit Products.  No additional SKUs for Counterfeit Products were

discovered and no additional sales under the SKUs previously identified as SKUs for Counterfeit

Products were identified.  In other words, not one piece of Structured ESI collected by Klipsch

showed additional sales of Counterfeit Products.  Therefore, despite Klipsch's use of an

investigator to purchase Counterfeit Products on the internet and its conducting of a forensic

review of ePRO's Unstructured ESI and Structured ESI, the only counterfeit headphones

identified were identified early in the case.  Indeed, Regard's review of the sales data confirmed

what Jelen had found:  Regard testified that "we found that when we looked at the database, it

had substantially the same records of sales of those four SKU numbers as when Jelen examined

the database."  (*Id.* at 57:24-58:1.)

    Regard's opinion is not that ePRO "engaged in a massive deletion and wiping of data

from its sales database" but rather is "that the data in the sales databases has been subject to

editing and there is evidence of data being edited," (*see id.* at 91:13-17), and "the data [is]

unverifiable and, therefore, unreliable," (*id.* at 64:21-22).  Jelen, however, opines that there "is

no evidence indicating that ePro tampered with any of the data produced in this case," and that

"[b]ased on [his] experience interacting with data in the volume that ePro does, any kind of

manual adjustment to remove all traces of certain transactions from numerous modules and

---

[46] Each Purchase Order is comprised of several Purchase Order Lines, which lists the SKU number and quantities
needed from the supplier to fulfill the Purchase Order.  (8/8 Regard Report 4 n.2.)

locations would be a significant undertaking." (Jelen Report 9.) Jelen ultimately concluded that ePRO's sales documents and ePRO's databases contained consistent evidence showing that ePRO shipped a total of 551 units of the Four SKUs globally for approximately $7,889 in gross revenue. (Tr. 493:8-496:8.)

Klipsch is in essence asking me to infer from the fact that ePRO's sales databases could be and were edited that ePRO deleted and wiped data from its sales databases to remove any trace of additional sales of Counterfeit Products. In other words, Klipsch is asking me to reach a conclusion that its own expert was unwilling to reach. I do not believe the evidence presented warrants reaching that conclusion. Based upon the evidence presented, Klipsch has failed to carry its burden of demonstrating by a preponderance of the evidence that ePRO tampered with or destroyed Structured ESI. Stated differently, Klipsch's forensic review of ePRO's Structured ESI has not "unearthed evidence that directly contradicts the defendants' narrative that they made only a handful of infringing sales, which yielded them profits in the three-figure range." (Spoliation M&O 14.) In light of this finding I need not analyze whether Klipsch is entitled to sanctions for ePRO's actions related to its Structured ESI.

III.    **Analysis**

   A.    *Legal Standard*

"'A district court has broad discretion when determining the proper sanction for spoliation to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Slovin v. Target Corp.,* No. 12-CV-863, 2013 WL 840865, at *6 (S.D.N.Y. Mar. 7, 2013) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). When determining the appropriate remedy, a court should "impose the least harsh sanction which would serve as an adequate remedy; the range of sanctions, from the least harsh to the harshest,

30

include further discovery, cost-shifting, fines, special jury instructions, preclusion, entry of

default judgment, and dismissal." *Id.* at *6.

The party seeking sanctions based on the spoliation of evidence must show by a

preponderance of the evidence:

> (1) that the party having control over the evidence had an obligation to preserve it
> at the time it was destroyed; (2) that the records were destroyed with a culpable
> state of mind; and (3) that the destroyed evidence was relevant to the party's claim
> or defense such that a reasonable trier of fact could find that it would support that
> claim or defense.

*Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012) (internal quotation marks

omitted).  As soon as the duty to preserve has attached, a party should institute a litigation hold

and "suspend its routine document retention/destruction policy." *Zubulake v. UBS Warburg

LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003).  Here, Magistrate Judge Dolinger found that ePRO

had a duty to preserve relevant documents and "simply imposed no hold at all."  (Spoliation

M&O 10.)  He also found that the "oral instructions, given seven months later, were inadequate

both in form and in content, and conclude[d] as well that there is evidence that substantial

quantities of potentially relevant corporate documents -- predominantly non-transactional e-mails

-- were not preserved or else simply not produced."  (*Id*. at 10-11.)  However, with regard to

spoliation related to ePRO's Structured ESI, Magistrate Judge Dolinger found the evidence less

compelling.  Therefore, based on all of the evidence before him, Magistrate Judge Dolinger

declined to impose terminating sanctions or an adverse inference jury instruction.  (*Id*. at 14-15.)

As an initial remedy, Magistrate Judge Dolinger ruled that Klipsch was entitled to undertake a

forensic investigation of ePRO's computer systems.  (*Id.* at 16.)  In so doing, Magistrate Judge

Dolinger reserved decision on whether additional sanctions were warranted until the forensic

investigation was complete to enable Klipsch to fully develop the record with regard to:  (1)

ePRO's culpability; (2) the relevance of documents destroyed; and (3) the degree of prejudice

suffered by Klipsch.  (*Id.* at 9, 16-19.)  Based upon my analysis of these three factors, below, I

conclude that additional spoliation sanctions are warranted in this case.

### B.      Culpability

"[T]he culpable state of mind factor is satisfied by a showing that the evidence was

destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently."

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 113 (2d Cir. 2002) (alteration

omitted) (holding that sanctions may be imposed upon a party that has breached a discovery

obligation through ordinary negligence).  "The intentional destruction of relevant records, either

paper or electronic, after the duty to preserve has attached, is willful."  *Sekisui Am. Corp. v. Hart*,

945 F. Supp. 2d 494, 504 (S.D.N.Y. 2013) (internal quotation marks and alteration omitted).

Here, there is no question that the intentional spoliation of evidence was carried out by

employees of ePRO after the duty to preserve had attached.

Six ePRO employees, including its Chief Information Officer ("CIO") and CFO, utilized

data-wiping software during the Litigation Period, and in many instances only days before iDS

arrived onsite at ePRO to begin its forensic review, causing ESI to be deleted.  (*See supra*

Section II.A.2.a.)  Eighteen ePRO employees, again including its CFO, replaced their operating

systems during the Litigation Period, wiping clean the registry information that previously

existed on their computers.  (*See supra* Section II.A.3.)  And 4,596 responsive files and emails

were manually deleted during the Litigation Period.  (*See supra* Section II.A.1.)  All of these

actions require human intent.

With knowledge of the Spoliation M&O and the Forensic Protocol, ePRO permitted its

employees (apparently without any repercussions) to simply refuse to provide access to ESI.

Specifically, thirty-two of the thirty-six ePRO custodians whose computers had QQ client software refused to turn over their QQ access credentials to iDS.  That this defiance was intentional and meant to thwart the collection of ESI is laid bare, in my view, by ePRO's counsel's description during the Hearing of his communications with ePRO management.

ePRO's counsel sat in a room at ePRO in China with a representative of FTI who spoke both Chinese and English and ePRO management, including CFO Keith Lee who was in charge of getting employees to comply with the ESI collection efforts, and ePRO's counsel "ask[ed] them all to provide their QQ log-in, whether or not they said they used it for business purposes." (Tr. 52:1-13.)  The request and instructions could not have been communicated more clearly. CFO Lee who sat face-to-face with ePRO's counsel and heard the request was one of the thirty-two ePRO employees who refused to provide QQ log-in information.  To the extent that ePRO attempts to argue that these thirty-two employees were rogue employees[47], CFO Lee's own conduct belies any such argument, or, for that matter, any argument that ePRO itself cannot be held responsible for denying Klipsch access to ESI.  It also bears noting that Danny Qiu, Head of Marketing and iDS's primary contact during the forensic review, also refused to provide his QQ log-in information.  (*See* 12/19 Shuart Decl. ¶ 2; Tr. 52:1-13, 431:11-431:14).  In addition, even though ePRO custodians use Gmail for business purposes, (*see* Kershaw Tr. 21:21-22:5), three ePRO custodians who utilized Gmail—including Leslie Tang, ePRO Director of Quality Control—refused to provide access to their accounts.  (Regard Report ¶ 39(c); *id.* Ex. J.)

Furthermore, after the issuance of the Spoliation M&O ePRO took no actions to mitigate the risk of spoliation.  It did not issue a written document retention notice.  *See Small v. Univ.*

---

[47] Such an argument is entirely without merit as almost by definition thirty-two out of thirty-six custodians, roughly 88%, cannot be considered rogue.

*Med. Ctr. of S. Nev.*, No. 13-CV-00298, 2014 WL 4079507, at *32 (D. Nev. Aug. 18, 2014)

(finding failure to issue legal hold for nine months after litigation commenced in the face of

repeated orders to preserve ESI "willful and/or in bad faith").[48]  Nor is there any evidence in the

record that ePRO instructed its employees not to use data-wiping software or attempted to

disable data-wiping software from its employees' computers.

      As a consequence, Yun Zhu, Tina Zhang, and Roger Luo all willfully utilized data-

wiping software after the Spoliation M&O, (*see supra* Section II.A.2.a.i-iii).  *See Gutman v.*

*Klein*, No. 03-CV-1570, 2008 WL 4682208, at *10 (E.D.N.Y. Oct. 15, 2008) (finding "bad faith"

spoliation where the defendants used wiping program and reinstalled operating system before

forensic examination), *report and recommendation adopted*, 2008 WL 5084182 (E.D.N.Y. Dec.

2, 2008); *Atl. Recording Corp. v. Howell*, No. 06-CV-2076, 2008 WL 4080008, at *1-3 (D. Ariz.

Aug. 29, 2008) ("timing and character of" the defendant's use of wiping software demonstrated

that it was "deliberately calculated to conceal the truth and that [the defendant] willfully

destroyed evidence to deceive the court").  In fact, Luo ran three separate data-wiping programs

the very day that iDS began its forensic review.  (*See supra* Section II.A.2.a.iii.)  Luo, as ePRO's

CIO and the former vice president of a software development company, undoubtedly has a high

level of sophistication and familiarity with software and computer technology.  (Doc. 252 Ex.

G.)  I find that his running of these data-wiping programs during the midst of a forensic review

was intentional and done with the objective to hinder the collection of Unstructured ESI by

Klipsch.

      Furthermore, in direct violation of Magistrate Judge Dolinger's order that ePRO fully

---

[48] During the Hearing ePRO attempted to place before me potentially privileged documents purported to relate to
some document retention notice.  (Tr. 543:5-544:13.)  I rejected those documents and I do not consider them as
evidence in this matter.  (1/21 Tr. 4-5:3.)

comply with the forensic examination, ePRO failed to turn over relevant sources of information such as former ePRO employee computers, corporate email accounts, QQ messenger access credentials, and Gmail access credentials, (*see supra* Section II.A.4-5).  *Short v. Manhattan Apartments, Inc.*, 286 F.R.D. 248, 254 (S.D.N.Y. 2012) (repeated refusal to turn over relevant documents in violation of court order evidenced bad faith).

All of these actions evidence ePRO's ongoing intent and efforts to destroy discovery material, and its refusal to comply with the forensic review and Forensic Protocol ordered by Magistrate Judge Dolinger in the Spoliation M&O, despite the clear warning that additional sanctions might be forthcoming.  It cannot be ignored that this misconduct occurred in a case involving a history of discovery transgressions, including false and misleading representations. (*See* Spoliation M&O 13.)

Based upon all of the facts, I find that ePRO's destruction and improper withholding of Unstructured ESI was done intentionally and in bad faith.  Klipsch has therefore established ePRO's culpable state of mind.

## C.   *Relevance*

To obtain an adverse inference instruction—or an even harsher sanction—"a party must establish that the unavailable evidence is relevant to its claims or defenses."  *Residential Funding Corp.*, 306 F.3d at 108 (internal quotation marks omitted).  Relevance in this context means that the party must show enough to allow a reasonable trier of fact to infer that "the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction."  *Id.* at 109 (alteration and internal quotation marks omitted).  However, courts do not "hold[ ] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence," because to do so "would subvert the . . . purposes of

the adverse inference, and would allow parties who have intentionally destroyed evidence to

profit from that destruction." *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998).

 Where, as here, a party destroys evidence in bad faith I may infer relevance. *See*

*Residential Funding Corp.*, 306 F.3d at 109; *Sekisui Am. Corp.*, 945 F. Supp. 2d at 504-05. The

burden then shifts to ePRO to demonstrate that the evidence destroyed was not unfavorable. *See*

*Residential Funding*, 306 F.3d at 109 (the "risk that the evidence would have been detrimental

rather than favorable [to the spoliator] should fall on the party responsible for its loss." (internal

quotation marks omitted)). Here, the inference of relevance with regard to ePRO's willful

counterfeiting is further supported by *whose* data was destroyed and/or improperly withheld—

ePRO's CFO, CIO, two Vice Directors, Director of the Supplier Services Department, Director

of the Quality Control Department, and Deputy Controller of the Supplier Services

Department.[49] *See Sekisui Am. Corp.*, 945 F. Supp. 2d at 508 (inferring relevance where data

was destroyed by an individual whose position with the company was directly related to the

claim). ePRO has not put forth any evidence to demonstrate that the destroyed evidence would

not have been favorable to Klipsch.[50] I therefore find that ePRO has not carried its burden of

rebutting the presumption that the Company destroyed Unstructured ESI relevant to the

---

[49] Daniel Wang is the Director of Products and Operations. (Pl.'s Br. 28.) Justin Ji is the current Deputy Controller of the Supplier Services Department. (*Id.* at 29.)

[50] ePRO argues in its proposed findings of fact, without reference to specific custodians, that Klipsch had not previously identified many of the custodians for whom ESI could not be recovered prior to including them as part of the Forensic Protocol and that it had "not demonstrated why such a great number of custodians should reasonably be regarded as likely to have relevant evidence so as to impose a duty to preserve their devices and emails before it applied for the protocol." (Def.'s Br. 60.) I reject this argument. As an initial matter, Magistrate Judge Dolinger did not require as part of the Forensic Protocol that Klipsch make such a showing before making a request for ESI of the custodians. In addition, there is no question that ePRO had a duty to preserve ESI beginning at the time Klipsch filed its lawsuit and that it failed to issue a document hold. As discussed above, I have determined that ePRO's actions were intentional and in bad faith, and I have inferred the relevance of the ESI. ePRO has not put forth any evidence rebutting these determinations. ePRO neither identifies any specific custodians that it believes would not have had relevant information nor argues that certain custodians would not have been subject to an appropriately issued document hold.

willfulness of ePRO's counterfeiting activities.

> **D.**    ***Prejudice and Additional Sanctions***

A sanction should be crafted to:  "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."  *West*, 167 F.3d at 779 (internal quotation marks omitted).

ePRO argues that Klipsch is not entitled to an adverse inference jury instruction because Klipsch made no effort to establish irremediable prejudice.  (Def.'s Opp. 30.)  However, as with relevance, prejudice may be inferred where evidence is destroyed willfully.  *Sekisui Am. Corp.*, 945 F. Supp. 2d at 504-05 ("When evidence is destroyed willfully or through gross negligence, prejudice to the innocent party may be presumed because that party is 'deprived of what [the court] can assume would have been evidence relevant to [the innocent party's claims or defenses].'" (alterations in original) (quoting *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 148 (2d Cir. 2010))); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 467 (S.D.N.Y. 2010) ("Relevance and prejudice may be presumed when the spoliating party acted in bad faith or in a grossly negligent manner") *abrogated on other grounds by Chin*, 685 F.3d 135.

The burden then lies with ePRO, not Klipsch, to demonstrate that ePRO's spoliation of evidence did not prejudice Klipsch in proving its case.  ePRO points out that Magistrate Judge Dolinger found Klipsch's proposed adverse instruction inappropriate absent "clear evidence" that transactional documents were "destroyed or hidden or that [ePRO's] production grossly understates the scope of the infringement and its financial consequences."  (Def.'s Opp. 29.)  I agree with Magistrate Judge Dolinger's conclusion that a mandatory adverse-inference

instruction that ePRO engaged in substantially more infringing sales than they represent and/or terminating sanctions requires evidence that sales records were destroyed, the evidence of which is not present.  Since ePRO has brought forth evidence showing that its sales records exist in proper order—Klipsch's request for terminating sanctions is hereby DENIED.

However, I must also consider whether formulating a sanction will deter others from destroying potentially damaging ESI, in particular in light of the willful nature of ePRO's spoliation and clear disregard for the orders of this court.  *See NHL v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) ("the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent"); *Gutman*, 2008 WL 4682208, at *12 (granting sanctions in order to deter conduct where  the spoliators used computer wiping software).  Here, the operating systems related to eighteen ePRO custodians were replaced during the Litigation Period, destroying critical historical information regarding the computer's usage, and precluding Regard from conducting an accurate forensic review of those devices. And, at least 31 documents were deleted and are unrecoverable.  Although ePRO attempts to minimize the harm done by that destruction it cannot rebut the presumption of prejudice because an unknowable amount of ePRO's Unstructured ESI was permanently destroyed and cannot be retrieved.  *See Sekisui Am. Corp.*, 945 F. Supp. 2d at 509.  ePRO further acted in bad faith by refusing to give iDS log-in information for QQ and Gmail for certain custodians.  *Short*, 286 F.R.D. at 254.

I therefore exercise my discretion in awarding the following sanctions:

(1) Mandatory jury instruction:  the jury will be instructed, as a matter of law, that

relevant Unstructured ESI was destroyed after the duty to preserve arose.

(2) Permissive jury instruction:  the jury will be instructed that it may presume, if it so

chooses, that such lost evidence would have been favorable to Klipsch.[51]

(3) Monetary sanctions:  Klipsch is entitled to an award of reasonable costs and

attorneys' fees associated with this motion beginning with the second round of

depositions taken in Hong Kong in November 2013.  Although the first round of

depositions would have been conducted in the normal course discovery, the second

round of depositions, as Magistrate Judge Dolinger found, were caused by ePRO's

misrepresentations and discovery deficiencies, and this fact, coupled with the

deterrent value, justifies shifting Klipsch's increased attorneys' fees and costs to

ePRO.  *See In re WRT Energy Sec. Litig.*, 246 F.R.D. 185, 201 (S.D.N.Y. 2007).

Klipsch and ePRO are directed to meet and confer concerning a schedule for

submission of Klipsch's fee application and any opposition to the reasonableness of

such application, and submit a joint proposed schedule to me for approval on or

before November 30, 2015.

## IV.    Asset Restraint

Klipsch posits two theories in support of its request to retain the restraint on $5 million of

ePRO's assets:  (1) Klipsch is entitled to an attachment of ePRO's assets under Rule 64 and

Article 62 of the New York Civil Practice Law and Rules ("CPLR") because it is probable that

Klipsch will be awarded statutory damages, (*see* Pl.'s Mem. 16); and (2) the record no longer

supports ePRO's representation that its sales of counterfeit Klipsch Earbuds is minimal, (*see id.*

---

[51] A permissive instruction merely instructs the jury regarding inferences the jury is free to draw.  *Mali v. Fed. Ins. Co.*, 720 F.3d 387, 392 (2d Cir. 2013).  This instruction is not a sanction and a court need not make any predicate findings prior to issuing such an instruction.  *Id.*

at 11-13).  I am unpersuaded by Klipsch's arguments.

"To be successful on a motion for attachment, a plaintiff must demonstrate [1] that there is a cause of action, [2] that it is probable that the plaintiff will succeed on the merits, [3] that one or more grounds for attachment provided in [CPLR] Section 6201 exist, and [4] that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff."  *In re Amaranth Nat. Gas Commodities Litig.*, 711 F. Supp. 2d 301, 305 (S.D.N.Y. 2010) (internal quotation marks omitted)).  Klipsch's burden of proving its right to an attachment is "high."  *Id.*; *Buy This, Inc. v. MCI Worldcom Commc'ns, Inc.*, 178 F. Supp. 2d 380, 383 (S.D.N.Y. 2001) ("[T]he New York attachment statutes are construed strictly against those who seek to invoke the remedy.").

At this stage it is not probable that Klipsch will be awarded statutory damages under Section 1117(c)(2) of the Lanham Act.  (Pl.'s Mem. 18.)  Under the Lanham Act, if use of a mark is willful a court may award statutory damages of "not more than $2,000,000" per use of a "counterfeit mark per type of goods or services sold, offered for sale, or distributed."  15 U.S.C. § 1117(c)(2).  In determining damages under section 1117(c)(2), courts have considered the following factors:

> (1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the [trademark]; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant.

*Kenneth Jay Lane, Inc. v. Heavenly Apparel, Inc.*, No. 03-CV-2132, 2006 WL 728407 at *6 (S.D.N.Y. Mar. 21, 2006) (internal quotation marks omitted).

ePRO correctly argues that where actual profits can be determined to a reasonable certainty, statutory damages are not appropriate.  *See Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 110 (2d Cir. 2012) (Congress passed Section 1117(c) "to ensure that plaintiffs

would receive more than *de minimis* compensation for the injury caused by counterfeiting as a result of the unprovability of actual damages despite the plain inference of damages to the plaintiff from the defendant's unlawful behavior.); *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1127 (2d Cir. 1989) ("Statutory damages are awarded when no actual damages are proven or they are difficult to calculate."); *Union of Orthodox Jewish Congregations of Am. v. Am. Food & Beverage Inc.*, 704 F. Supp. 2d 288, 290 (S.D.N.Y. 2010) ("Subsection 1117(c) provides trademark holders an alternative remedy to actual damages because counterfeiters' records are frequently nonexistent, inadequate, or deceptively kept, making proving actual damages in these cases extremely difficult if not impossible." (internal quotation marks and alteration omitted)).  At this stage, ePRO has demonstrated that its sales records are in existence and they appear to be an adequate representation of its business as it relates to the sale of Counterfeit Products.  Although I find that it is not probable on the record presented to me that Klipsch will be awarded statutory damages, I do not find that Klipsch cannot attempt to prove that ePRO's sales records are in fact inadequate at a later date or at trial.  Therefore, Klipsch's request for an attachment of assets order under Rule 64 and Article 62 of the CPLR is hereby DENIED.

As Judge Nathan explained in her October 11, 2012 decision, (*see* Doc. 67), courts in this district exercise their equitable powers to restrain assets to preserve the return of profits derived from the sale of counterfeit goods and to ensure victims of counterfeiting the accounting to which they are entitled.  *See Balenciaga Am., Inc. v. Dollinger*, No. 10-CV-2912, 2010 WL 3952850, at *7 (S.D.N.Y. Oct. 8, 2010).  Because Klipsch's forensic review of ePRO's Structured ESI has not "unearthed evidence that directly contradicts the defendants' narrative that they made only a handful of infringing sales, which yielded them profits in the three-figure

range," (Spoliation M&O 14), Klipsch is not entitled to an asset restraint of $5 million.  In addition, ePRO's demonstration that its sales records are reliable also precludes Klipsch from showing that the asset restraint of $5 million is necessary to preserve its equitable right to an accounting of profits.  ePRO's expert persuasively opined that ePRO's sales records accurately demonstrated that the Company sales of the four SKUs resulted in global gross sales of $7,889, (Tr. 493:8-496:8).  Judge Nathan previously determined that an asset restraint greater than $20,000 was not necessary to preserve Klipsch's right to an accounting related to global gross sales of $5,744.40.  (*See* Doc. 67.)  I see no reason to deviate from Judge Nathan's thorough and well-reasoned decision that the assets restrained should only be an amount necessary to satisfy an equitable remedy.  Consequently, the amount of the assets presently frozen shall be reduced to $25,000.

V.      <u>**Conclusion**</u>

Klipsch's request for terminating sanctions is hereby DENIED.  Klipsch's request for an asset attachment order of $12 million is hereby DENIED and the amount of ePRO's assets currently restrained is reduced from $5 million to $25,000.  Klipsch is awarded sanctions in the form of a mandatory adverse inference instruction, a permissive adverse inference instruction, and reasonable costs and fees beginning with the second round of depositions taken in Hong Kong in November 2013 until the completion of the briefing related to this motion and Hearing. SO ORDERED.

Dated: November 2, 2015
       New York, New York

Vernon S. Broderick
United States District Judge