USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____  9/30/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                        :

KLIPSCH GROUP, INC.,            :
                        :

              Plaintiff,   :              12-CV-6283 (VSB)
                        :

          -v-              :        **MEMORANDUM & ORDER**
                        :

BIG BOX STORE LTD. *et al.*,   :
                        :

            Defendants.  :
                        :
------------------------------------------------------X

Appearances:

George Pearson Wukoson
Davis Wright Tremaine LLP
New York, New York
*Counsel for Plaintiff*

John Albert Basinger
Saul Ewing LLP
Newark, New Jersey

Hugh Hu Mo
Pedro Medina, Jr
The Law Firm of Hugh H. Mo, P.C.
New York, New York

Laura R. Zimmerman
Baker & McKenzie LLP
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

        Currently pending before me are (1) the motion of Defendant ePRO Ecommerce Limited

("ePRO" or "Defendant") for partial reconsideration of my November 2, 2015 Memorandum &

Order, (Doc. 306);[1] (2) the motion of Plaintiff Klipsch Group Inc. ("Klipsch" or "Plaintiff") for partial reconsideration of that same order, (Doc. 308); (3) the motion of Klipsch for oral argument on the motions for reconsideration, (Doc. 321); (4) the motion of Klipsch to set the amount of the sanctions awarded in my November 2, 2015 Order, (Doc. 326); and (5) the motion of Klipsch for oral argument on the motion to set the amount of sanctions, (Doc. 344).

Because I do not believe that oral argument would be beneficial to my determination of either set of motions, the motions for oral argument, (Docs. 321, 344), are DENIED.  ePRO's motion for reconsideration, (Doc. 306), is GRANTED IN PART AND DENIED IN PART. ePRO's motion is granted in part because upon review of the evidence it appears that my finding with regard to Device A0030 cannot be supported.  However, I reject the balance of ePRO's arguments as not appropriate for a reconsideration motion and adhere to my ultimate conclusion that ePRO engaged in bad faith spoliation and that the sanctions detailed in my 11/2 M&O are appropriate; therefore, ePRO's motion for reconsideration is DENIED in all other respects. Klipsch's motion for reconsideration, (Doc. 308), is GRANTED IN PART AND DENIED IN PART.  Klipsch's motion is granted to the extent that I believe the asset restraint currently in place in this action can be properly increased to include the funds for the attorney's fees and costs granted as a sanction in my 11/2 M&O as such fees would have been available in the courts of equity; however, attorney's fees and costs called for under the Lanham Act would not have been available so I deny that portion of Klipsch's motion.  Klipsch's motion to set the amount of sanctions, (Doc. 326), is GRANTED IN PART AND DENIED IN PART.  Since Klipsch would have needed to complete the first round of depositions, I find that it is not entitled to fees and costs for work undertaken prior to November 2013, and deny the fees requested by Klipsch for

---

[1] My November 2, 2015 Memorandum and Order, (Doc. 294), will be referred to as "11/2 M&O" hereafter.

work from March 2013 until November 2013.  In addition, because Klipsch provided no information regarding the qualifications of Davis Wright Tremaine ("DWT") partner Sharon Schneier I have subtracted any fees requested for work undertaken by attorney Schneier. Klipsch is entitled to all other fees requested in their motion to set sanctions, and I award Klipsch $2,681,406.45 in fees and costs as a sanction for ePRO's bad faith spoliation.

## I.   Factual Background and Procedural History[2]

### A. *Proceedings Before Judge Nathan*

Klipsch is a corporation that owns multiple federally registered trademarks including house mark KLIPSCH®, IMAGE® and S4® (the "KLIPSCH Marks") that are used in connection with headphones and phone headsets.  (Am. Comp. ¶ 25.)[3]  ePRO is a Chinese corporation that lists products for sale on its websites.  (Doc. 243 at 2-3.)  Klipsch initiated this action on August 15, 2012, filing a complaint under seal against ePRO and other defendants for (1) trademark counterfeiting; (2) trademark infringement; (3) unfair competition; (4) false designation of origin; and (5) unlawful deceptive practices.  (Docs. 2, 15.)[4]  At the same time that Klipsch filed its complaint under seal, it filed an ex parte motion seeking a temporary restraining order, seizure order, order to disable certain websites, asset restraining order, expedited discovery order, and order to show cause for a preliminary injunction.  (Doc. 17.)

On August 16, 2012, Judge Alison Nathan granted a Temporary Restraining Order,

---

[2] A more detailed factual background and procedural history are contained in the 11/2 M&O.  I assume familiarity with the facts, findings, and conclusions contained in that decision, and repeat some of those facts where appropriate in this Memorandum & Order.

[3] "Am. Comp." refers to the Amended Complaint filed by Klipsch on December 3, 2013.  (Doc. 152.)  Klipsch filed its Amended Complaint on December 3, 2013, substituting certain defendants and amending the caption.  (Doc. 151.)

[4] The case was initially assigned to Judge Paul A. Engelmayer, and was reassigned to Judge Alison J. Nathan on August 20, 2012.  (Doc. 3.)  It was then reassigned to me on January 30, 2014.  (ECF Entry Jan. 30, 2014.)

Seizure Order, Order to Disable Certain Websites, Asset Restraining Order, Expedited Discovery

Order, and Order to Show Cause for Preliminary Injunction (the "TRO").  Pursuant to the TRO,

Klipsch obtained a freeze of $2 million belonging to ePRO.  (*Id.*)  Judge Nathan subsequently

held a show cause hearing on September 14, 2012, and converted the TRO into a Preliminary

Injunction Order.  (Doc. 18 at 1-3) ("September PI.")  However, she granted ePRO leave to

submit evidence demonstrating that the $2 million in frozen assets were not the proceeds of

counterfeiting activities.  (Doc. 57 at 1.)  Based upon the evidence submitted by ePRO, Judge

Nathan determined that a freeze of not more than $20,000 was necessary to preserve Klipsch's

right to an accounting and to the return of profits from the sale of counterfeit goods.  (Doc. 67 at

4.)

   **B.** *Proceedings Before Magistrate Judge Dolinger*

   Klipsch moved by way of an order to show cause on January 4, 2013, to have ePRO held

in contempt of court for violating Judge Nathan's Preliminary Injunction Order.  (Doc. 95.)  On

February 19, 2013, Judge Nathan referred this case to Magistrate Judge Dolinger for general

pretrial purposes.  (Doc. 110.)  Judge Nathan also referred the motion for an order to show cause

to Magistrate Judge Dolinger on February 22, 2013. (Doc. 112.)

   With regard to the contempt motion, Magistrate Judge Dolinger determined that the

evidence clearly and convincingly demonstrated that ePRO violated the terms of the September

PI.  (Contempt R&R 5.)[5]  However, Magistrate Judge Dolinger recommended that the motion for

contempt be denied because Klipsch failed to sustain its burden of showing by clear and

convincing evidence that ePRO's efforts to comply with the September PI were less than

---

[5] "Contempt R&R" refers to the Report and Recommendation issued on June 24, 2013 by Magistrate Judge Michael H. Dolinger resolving Klipsch's motion for an order of contempt.  (Doc. 126.)

reasonably diligent.  (*Id.* at 18, 22.)  In reaching this conclusion Magistrate Judge Dolinger noted that Klipsch "provided no specific evidence to suggest that [ePRO] has actively attempted to circumvent [the September PI], has dragged its feet in remedying instances of non-compliance once they have been identified, or has otherwise acted in bad faith."  (*Id.* at 19.)  On August 9, 2013, Judge Nathan adopted Magistrate Judge Dolinger's report and recommendation and denied the motion for contempt.  (Doc. 132.)

On December 9, 2013, Klipsch moved for discovery sanctions under Federal Rule of Civil Procedure 37 against ePRO for spoliation of documents and other discovery misconduct. (Doc. 155.)  As remedy or sanction, Klipsch sought "either summary judgment, preclusion of any evidence by defendants pertaining to the volume of their infringing sales or their profits, or, alternatively, a mandatory adverse-inference jury instruction."  (Spoliation M&O at 2.) [6]  On March 4, 2014, Magistrate Judge Dolinger determined that some spoliation of evidence had occurred, but determined that neither terminating sanctions nor an adverse jury instruction were warranted based on the record as it stood before him.  (*Id.* at 14-16.)  In reaching his decision, Judge Dolinger noted that

> plaintiff has not as yet unearthed evidence that directly contradicts the defendants' basic narrative that they made only a handful of infringing sales, which yielded them profits in the three-figure range.  Specifically, the documents now produced, as well as the spreadsheets earlier created, are consistent in reflecting a very small quantity of sales.  Nonetheless, given the discovery history — including a trail of false and misleading representations by defendants — there is evident uncertainty about the plausibility, as well as the accuracy, of the defendants' current factual assertions about the scope of infringing sales and resultant profits.

(*Id.* at 14.)  Magistrate Judge Dolinger found that Klipsch was entitled to undertake a forensic investigation of ePRO's computer systems:

> [I] authorize plaintiff to undertake a forensic investigation into the state of

---

[6] Spoliation M&O" refers to the Memorandum and Order issued on March 4, 2013 by Magistrate Judge Michael H. Dolinger resolving the motion by Klipsch for discovery sanctions. (Doc. 196.)

defendants' computer systems for the purpose of determining, if possible, the likelihood of document destruction since August 2012, the likely nature and volume of any such destroyed documents, whether some or all of those documents may be recovered, the status of the information in the defendants' system of computers, whether any pertinent sales data has been destroyed or simply not produced, the recoverability of any destroyed sales data, and what any recovered sales data pertaining to infringing goods indicates as to volume, revenue and profits.

(*Id.* at 16.)  He reserved decision on additional sanctions pending the results of this examination.

(*Id.* at 18.)  He issued a Forensic Examination Protocol governing Klipsch's forensic search of ePRO's electronically stored information ("ESI") and requiring ePRO to "promptly make available for inspection – including but not limited to forensic imaging, analysis and data recovery by the Expert – any and all sources of potentially relevant ESI (the "ESI Sources"), including [ePRO's] CSM and Go databases and/or ESI created, manipulated, transmitted, or held by [named] custodians."  (Doc. 200 ¶ 4.)  Klipsch retained Daniel Regard II ("Regard") of iDiscovery Solutions ("iDS") as its expert to forensically examine ePRO's ESI, and ePRO did not object to the selection of Regard.  (Doc. 198 at 1.)

   **C.  *Order to Show Cause, Hearing, November 2, 2015 Memorandum & Order, and Subsequent Motions***

   After completing its forensic search, Klipsch filed an ex parte motion on August 14, 2014 for (1) an upward modification of assets restrained from $20,000 to a sum of $5 to $12 million; (2) an asset attachment order; and (3) an Order to Show Cause for additional discovery sanctions in the form of recovery of costs and fees expended by Klipsch relating to its forensic expert and efforts to compel discovery as well as a default judgment.  (Doc. 213.)[7]  On August 14, 2014, I increased the amount of ePRO's assets restrained from $20,000 to $5 million and ordered ePRO

---

[7] On August 14, 2014, Plaintiff also filed a memorandum of law, supporting exhibits, and supporting affidavits under seal.  (*See* Doc. 213 at 7.)  Those documents were subsequently placed on the electronic docket for this case on December 19, 2014.  (*See* Docs. 250-252.)

to show cause as to why Klipsch was not entitled to additional discovery sanctions based on the submissions by Klipsch.  (*Id.*)  ePRO filed its opposition to Klipsch's motion, along with the rebuttal expert report of Erik Hammerquist ("Hammerquist"), (Doc. 235), the expert report of Michael Jelen ("Jelen"), (Doc. 236-1), the rebuttal expert report of Jelen, (Doc. 236-2-3) and the declaration of Danny Qiu, (Doc. 237), on December 8, 2014.  On December 19, 2014, (Doc. 253), Klipsch filed its reply along with a declaration of Kenneth Shuart, (Doc. 255), declaration of Regard, (Doc. 256) and declaration of George P. Wukoson, (Doc. 254), in further support of its request.  Exhibits were submitted with certain of these declarations.  I held a hearing on the motion from January 5-8, 2015.  At the hearing, both parties presented witness testimony by their respective forensic experts:  Regard for Klipsch; Jelen and Hammerquist for ePRO. Hammerquist submitted his second expert report on February 4, 2015.  (Doc. 290.)  Regard provided his third expert report on February 5, 2015, responding to Hammerquist's February 4th report.  (Doc. 282.)  Both parties submitted their proposed findings of fact and conclusions of law for my review on February 5, 2015.  (Docs. 283, 284.)  On February 11, 2015, I heard closing arguments from each party.  (Doc. 291.)

On November 2, 2015, I issued my Memorandum & Order.  (11/2 M&O.)  I found that

(1) Klipsch failed to demonstrate that ePRO destroyed relevant electronically stored information ("ESI"), including sales data from various databases ("Structured ESI") in an effort to conceal sales of counterfeit headphones. Consequently, Klipsch's motion for default judgment is hereby DENIED and the asset restraining order is reduced from $5 million to $25,000;

(2) Because, based upon the record from the submissions of the parties and the Hearing, it is likely that actual profits can be determined to a reasonable certainty, Klipsch has not demonstrated its likelihood of success on the merits with regards to its request for statutory damages under Section 1117(c)(2) of the Lanham Act.  Therefore, Klipsch's request for an asset attachment order of $12 million is hereby DENIED;

> (3) Klipsch demonstrated that ePRO willfully spoliated relevant ESI stored on employees' computers and ePRO's corporate email accounts ("Unstructured ESI"), which has prejudiced Klipsch's litigation of this matter.  Because ePRO did not rebut the presumption that it destroyed documents relevant to the willfulness of its counterfeiting activities, I impose the following sanctions: (a) in any trial of this matter the jury will be instructed that, as a matter of law, ePRO destroyed relevant Unstructured ESI after its duty to preserve such materials arose; (b) the jury will also be instructed that it may presume, if it so chooses, that destroyed relevant ESI would have been favorable to Klipsch; and (c) Klipsch is awarded reasonable costs and attorneys' fees associated with this motion beginning with the second round of depositions that took place in Hong Kong in November 2013.

(*Id.* at 2-3.)  On November 4, 2015, Klipsch requested a conference regarding its proposed motion to stay enforcement of the reduction in the amount of the asset restraining order pending its motion for reconsideration or appeal of the 11/2 M&O.  (Doc. 295.)  On that same day, I granted a temporary stay until the parties could be heard on Klipsch's application.  (*Id.*)  I held a conference on Plaintiff's application on November 10, 2015, (ECF Entry November 10, 2015), and on November 13, I issued an Order continuing the stay pending the resolution of Plaintiff's motion for reconsideration, making the asset restraint in place as the result of the stay $5 million. (Doc. 302.)  I asked that the parties provide me with a briefing schedule for their contemplated motions for reconsideration in a joint letter, and also requested that in that briefing they address: (1) whether I could require the posting of a bond pending final resolution of this matter, and (2) whether prejudgment restraint could be utilized to restrain funds to cover the attorney's fees contemplated in the 11/2 M&O.  (*Id.*)  The parties submitted letters concerning their proposed dates on November 13, 2015.  (Docs. 303, 304.)  On November 23, 2015, I issued an Order directing the parties to file their motions for reconsideration and supporting papers by November 24, 2015, responses by December 11, 2015, and replies by December 21, 2015.  (Doc. 305.)

Klipsch and ePRO submitted their respective motions for reconsideration, (Docs. 308, 306), and a memorandum of law in support of the motion, (Docs. 309, 307), on November 24,

2015.  On December 9, 2015, the parties jointly submitted a letter seeking an extension of their time to file oppositions and replies to the respective motions for reconsideration.  (Doc. 313.) On that same day, I granted the parties' joint request, making opposing papers due on or before December 18, 2015, and reply briefs due on or before January 5, 2016.  (Doc. 315.)  Klipsch filed its opposition to ePRO's motion for reconsideration on December 18, 2015, (Doc. 317), and ePRO filed its opposition to Klipsch's motion for reconsideration on that same date, (Doc. 318). On January 5, 2016, ePRO filed its reply in support of its motion for reconsideration, (Doc. 319), and Klipsch also filed its reply in support of its motion for reconsideration, (Doc. 320).  On January 6, 2016, Klipsch filed a letter motion requesting oral argument on the pending motions for reconsideration.  (Doc. 321.)  I took Klipsch's motion for oral argument under advisement on January 7, 2016.  (Doc. 322.)

On November 30, 2015, the parties submitted a letter with a proposed schedule for Klipsch's fee application and ePRO's opposition.  (Doc. 312.)  On December 11, 2015, I issued an Order directing that Klipsch file its fee application on or before January 13, 2016, ePRO file its opposition on or before February 19, 2016, and Klipsch files its reply on or before March 3, 2016.  (Doc. 316.)  On January 7, 2016, Klipsch submitted a motion for an extension of time to file its fee application, (Doc. 324), and I granted this motion on January 8, 2016, making Klipsch's fee application due on or before January 25, 2016, ePRO's opposition due on or before March 2, 2016, and Klipsch's reply due on or before March 15, 2016, (Doc. 325).  On January 25, 2016, Klipsch submitted its motion to set sanctions, (Doc. 326), a declaration of George Wukoson in support of the application, (Doc. 327), a declaration of Regard in support of the application, (Doc. 328), and a memorandum of law in support of the application, (Doc. 329).  On February 26, 2016, ePRO submitted a letter requesting an extension of its time to submit its

response to Klipsch's fee application, (Doc. 332), and I granted the extension on February 29,

2016, making ePRO's response due on or before March 9, 2016, and Klipsch's reply due on or

before March 22, 2016, (Doc. 333).  On March 9, 2016, ePRO submitted a declaration of

Douglas Tween in opposition to Klipsch's motion, (Doc. 334), a declaration of John Basinger in

opposition to Klipsch's motion, (Doc. 335), a declaration of Thomas Prevas in opposition to

Klipsch's motion, (Doc. 337), and a memorandum of law in opposition to Klipsch's motion,

(Doc. 336).  On March 17, 2016, Klipsch filed a letter motion seeking an extension of its time to

file a reply,  (Doc. 339), and I granted this extension on March 18, 2016, making Klipsch's reply

due on or before April 1, 2016, (Doc. 340).  On April 1, 2016, Klipsch filed a reply

memorandum of law in support of its fee application, (Doc. 341), and a declaration of George

Wukoson in support, (Doc. 342).  Exhibits were submitted with certain of these declarations.  On

April 6, 2016, Klipsch filed a motion requesting oral argument on its motion for a fee award,

(Doc. 344), and ePRO filed a letter joining Klipsch's application on April 7, 2016, (Doc. 345).

On April 8, 2016, I issued an endorsement taking the parties' request for oral argument under

advisement.  (Doc. 347.)

## II.   <u>Legal Standard</u>

### A. *Motions for Reconsideration*

Motions for reconsideration are considered under Local Civil Rule 6.3.  The standard for

reconsideration under Rule 6.3 "is strict, and reconsideration will generally be denied unless the

moving party can point to controlling decisions or data that the court overlooked—matters, in

other words, that might reasonably be expected to alter the conclusion reached by the court."

*Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  A motion for reconsideration is

"neither an occasion for repeating old arguments previously rejected nor an opportunity for

making new arguments that could have been previously advanced." *Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005).  Nor is a motion for reconsideration a time to "advance new facts, issues or arguments not previously presented to the Court." *Polsby v. St. Martin's Press, Inc.*, No. 97-CV-690, 2000 WL 98057, at *1 (S.D.N.Y. Jan. 18, 2000) (internal quotation marks omitted).  Generally, a party seeking reconsideration must show either "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *In re Beacon Assocs. Litig.*, 818 F. Supp. 2d 697, 701-02 (S.D.N.Y. 2011) (quoting *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 154 F. Supp. 2d 696, 701 (S.D.N.Y. 2001)).

### B. Motion for Fee Award

A fee-applicant has the burden of demonstrating the reasonableness of the fee requested. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  I "retain[] discretion to determine what . . . constitutes a reasonable fee," *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 758 (2d Cir. 1998) (internal quotation marks omitted), but "this discretion is not unfettered, and when a prevailing party is entitled to attorneys' fees, [I] must abide by the procedural requirements for calculating those fees articulated by [the Second Circuit] and the Supreme Court." *Millea v. Metro-North R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011).  When exercising this discretion, I am to use the "presumptively reasonable fee" standard. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008).  This is determined with reference to "the rate a paying client would be willing to pay," *id.*, is "the product of a reasonable hourly rate and the reasonable number of hours required by the case," *Millea*, 658 F.3d at 166, and takes into account "the case-specific variables that [the Second Circuit] and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate," *Arbor Hill*

*Concerned Citizens Neighborhood Ass'n*, 522 F.3d at 190.  In calculating the presumptively reasonable fee, I must consider, among other things, the twelve factors articulated in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).  *See Arbor Hill*, 522 F.3d at 190.  Those factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 186-87 n.3.  I am also required to "examine the particular hours expended by counsel with a view to the value of the work product of the specific expenditures to the client's case, and if [I] conclude[] that any expenditure of time was unreasonable, [I] should exclude [those] hours from the calculation of the reasonable fee."  *Konits v. Karahalis*, 409 F. App'x 418, 421 (2d Cir. 2011) (summary order) (quoting *Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997) (internal quotation marks and punctuation omitted)).  Hours may be unreasonable when I determine that, for example, they seem excessive in comparison to the task purportedly completed, *see, e.g.*, *Dajbabic v. Rick's Cafe*, 995 F. Supp. 2d 210, 215 (E.D.N.Y. 2014), or when an attorney was engaged in "less skilled work, like filing and other administrative tasks," *E.S. v. Katonah-Lewisboro School Dist.*, 796 F. Supp. 2d 421, 431 (S.D.N.Y. 2011).  If I find entries excessive or unreasonable, I am entitled to make "across-the-board percentage reductions." *Dajbabic*, 995 F. Supp. 2d at 215 (citing *Luciano*, 109 F.3d at 117).  However, when, as is the case here, "the billing records are voluminous, it is less important that judges attain exactitude, than that they use their experience with the case, as well as their experience with the practice of law, to assess the reasonableness of the hours spent."  *E.S.*, 796 F. Supp. 2d at 431 (quoting *Yea Kim v. 167*

*Nail Plaza, Inc.*, No. 05-CV-8560, 2009 WL 77876, at *4 (S.D.N.Y. Jan. 12, 2009)).

## III.   Discussion

### A.  *ePRO's Motion for Reconsideration*

ePRO moves for reconsideration of the 11/2 M&O on numerous bases.  First, it argues

that I reached my determinations regarding the use of data wiping software, the reinstallations of

operating systems, and the refusal of certain ePRO custodians to provide their access credentials

for QQ and Gmail using clear factual errors.  (11/24 ePRO Mem. at 1-2.)[8]  ePRO also claims that

I improperly relied on Regard's August 8, 2014 report, and December 19, 2014 supplement after

an objection during the hearing to their admission for the truth of the matter asserted and

consented to their admission on the basis that "the report says what it says."  (*Id.* at 2.)  Finally,

ePRO asserts that I should have declined to rely on the August 8, 2014 Regard Report and

February 5, 2015 Regard Report because both Klipsch and Regard repeatedly withheld relevant

information, resulting in a fundamentally unfair process to ePRO.  (*Id.*)  I address each of these

arguments in turn.

#### 1.  Data-Wiping Software

ePRO takes issue with my finding that the use of programs such as CCleaner and IObit

Advanced close in time to the iDS forensic investigation could be suggestive that the software

was used for an anti-forensic purpose.  (*Id.* at 3.)  In this regard, ePRO raises various arguments,

including concerning my evaluation of the evidence related to individual devices,[9] in an effort to

---

[8] "11/24 ePRO Mem." refers to ePRO's November 24, 2015 Memorandum in Support of Motion for
Reconsideration in Part.  (Doc. 307.)  The pages I cite to here refer to the pagination assigned by ePRO in the
memorandum.

[9] I note that ePRO does not challenge my finding that the experts were in agreement concerning the indicia of
software programs on the computers of various ePRO custodians (1) with the ability to delete the remnants of any
files the user previously deleted to prevent their recovery and (2) others that have the ability to target and delete
specific files that were not previously deleted data.  (11/2 M&O at 14-15.)  ePRO also does not dispute my finding
that FileShredder was run on Device A0021—belonging to Yun Zhu—on April 15, 2014, the same day iDS arrived

demonstrate why my findings regarding the use of the software near in time to iDS's

investigation on certain devices was incorrect.

> a.  *Device A0030* — Custodian Keith Lee, Chief Financial Officer
> ("CFO")

ePRO first contests my conclusion that Keith Lee used IOSbit AS on his device, and

notes that in reaching my conclusion I "made a mistake in ascribing to A0030 evidence that

related to other computers." (11/24 ePRO Mem. at 4.)  Specifically, ePRO contends that I

reached the conclusion that IOSbit AS was run based on the entirely empty pre-fetch folder, but

that I cited to evidence concerning different devices for the conclusion that the pre-fetch folder

was empty. (*Id.* at 4-5.)

This is a partial misreading of the 11/2 M&O.  I cited to evidence concerning different

devices for the statement that "[a]n empty pre-fetch folder is highly unusual and inconsistent

with normal computer use because pre-fetch files enable a computer to run faster and more

efficiently." (11/2 M&O at 21.)  However, I cited to Mr. Regard's February 5, 2015 report for

the assertion that A0030's pre-fetch folder was empty.  (Doc. 282 ¶ 6.)  ePRO argues that Mr.

Regard's statement here was clearly a typo, since he was referring to A0035 and identified

evidence that relates to A0035.  (Doc. 282-1 at 5.)  Klipsch persists in arguing that the evidence

relates to device A0030 but does not explain why Exhibit A to Regard's report references A0035

not A0030.  (Doc. 317 at 11.)  ePRO, therefore, appears to be correct, and I can find no other

evidence in the record for the contention that the pre-fetch folder of A0030 was empty.

Therefore, in light of the fact that my finding regarding A0030 was based upon evidence related

to A0035, my finding was in error.  However, since, as discussed below, I do not credit any of

---

at ePRO's offices to begin its forensic review, (*id.* at 17), or that Yun Zhu "willfully utilized data-wiping software
after" Magistrate Judge Dolinger determined that some spoliation of evidence had occurred.  (*Id.* at 8-9.)

ePRO's other arguments and bases for reconsideration, I find that this error does not warrant me altering the conclusion of the 11/2 M&O.

> *b.  Device A0012* — Custodian Tina Zhang

ePRO argues against my conclusion that "K-Cleaner" was run on April 7, 2014 on Device A0012 because it contends that Klipsch has not demonstrated that the K-Cleaner contained on Device A0012 was sanitization software rather than part of an antivirus suite. (11/24 ePRO Mem. at 5.)  This is merely a rehashing of previous arguments made by ePRO, (*see* ePRO Pro. F. ¶¶ 175, 201),[10] and is therefore inappropriate for a motion for reconsideration.  *See Associated Press*, 395 F. Supp. 2d at 19.  ePRO's motion for reconsideration regarding my findings concerning Device A0012 is DENIED.

> *c.  Device A0035* — Custodian Roger Luo, Chief Information Officer
> ("CIO")

ePRO next contends that I incorrectly credited evidence concerning IObit AS on Device A0035, but that I failed to consider its argument that Regard's files were commingled and forensically unreliable.  (11/24 ePRO Mem. at 10-11.)  ePRO also states that Regard did not opine that IObit AS could be used to wipe free disk space, and that I erred in considering Hammerquist's failure to rebut evidence of KCleaner and Disk Cleaner Portable.  (*Id.*)  Each of these contentions is incorrect.

First, arguments concerning my decision to credit Regard's testimony despite Hammerquist's testimony regarding commingling do not demonstrate clear error, *In re Beacon Assocs. Litig.*, 818 F. Supp. 2d at 701-02, but rather go to the credibility and weight I chose to assign to various witnesses and conflicting evidence, and are hence inappropriate on

---

[10] "ePRO Pro. F." refers to ePRO's Proposed Findings of Fact and Conclusions of Law in Opposition to Plaintiff's Ex Parte Motion for an Asset Restraining Order, Asset Attachment Order and Order to Show Cause for Default Judgment and Recovery of Costs and Attorney's Fees.  (Doc. 283.)

reconsideration.  *See Flood v. Carlson Restaurants Inc.*, No. 14-CV-2740, 2015 WL 6870490, at

*2 (S.D.N.Y. Nov. 9, 2015) ("[A] motion for reconsideration is not a motion to reargue those

issues already considered when a party does not like the way the original motion was resolved.")

(quoting *Davey v. Dolan*, 496 F. Supp. 2d 387, 389 (S.D.N.Y. 2007)).  Hammerquist's testimony

was contested, and he also stated during his testimony that information he interpreted as indicia

of commingling of data could also indicate shared data among computers.  (Doc. 273 at 393:3-9.)

He further admitted that he did not check for such identical data on the computers at issue.  (*Id.*

at 10-12.)  In the end, as I pointed out in the 11/2 M&O, Hammerquist agreed that IObit AS was

run on A0035.  I explicitly considered Hammerquist's statements in his report and during his

testimony concerning commingling, (11/2 M&O at 18-19), and concluded that they did not alter

my conclusion that I did not "find Hammerquist's opinion persuasive and credit[ed] Regard's

conclusion that these programs were run on April 17, 2014; two days after the arrival of iDS at

ePRO's offices and on the very day this computer was imaged."  (11/2 M&O at 19.)  Therefore,

ePRO's arguments amount to merely an assertion that ePRO would give more credit to its

expert's testimony than I did in the 11/2 M&O.  Arguments regarding credibility are also

inappropriate on a motion for reconsideration.  *Bennett v. Watson Wyatt & Co.*, 156 F. Supp. 2d

270, 272 (S.D.N.Y. 2001) ("Rather than pointing to factual matters or legal decisions the Court

overlooked, plaintiff argues that the Court improperly weighed the facts, wrongly resolved

conflicting facts in defendant's favor, and made impermissible credibility determinations.  Such

arguments are appropriate on appeal but not on a motion for reconsideration.").

Second, contrary to ePRO's assertions, Regard's August 8, 2014 declaration asserted

unequivocally that "IObit is an application that sanitizes ("wipes") system files, temporary files,

previously deleted files and files marked for deletion."  (Doc. 251 at 25.)  Regard did in fact

make a statement concerning IObit's capabilities.

Finally, I find ePRO's arguments regarding KCleaner and Disk Cleaner Portable irrelevant as I specifically stated in the 11/2 M&O that "I d[id] not consider the presence of KCleaner and Disk Cleaner Portable on this computer in reaching my finding with regard to the use of data-wiping programs by certain of ePRO's custodians." (11/2 M&O at 15 n.33.) I did not cite this evidence as a basis for my finding regarding A0035 and therefore ePRO's arguments regarding this evidence are unrelated to my findings regarding this device.

For these reasons, ePRO's motions for reconsideration regarding my determinations about Device A0035 is DENIED.

### d. *Device A0004* — Custodian Chen Sicheng

ePRO's contentions regarding my findings on Device A0004 regard the weight I gave to certain evidence provided by Regard and Hammerquist, as well as arguments concerning the import I gave to the lack of files in the pre-fetch folder for Device A0004. (11/24 ePRO Mem. at 7-11.) These are all yet again simply disagreements which ePRO has with how I chose to weigh contested evidence and the weight I chose to give to competing considerations, and are inappropriate for a motion for reconsideration. *Bennett*, 156 F. Supp. 2d at 272; *Flood*, 2015 WL 6870490, at *2. ePRO's motion for reconsideration concerning my conclusions about Device A0004 is DENIED.

### e. *Device A0006* — Custodian Liu Fen

ePRO also disputes my finding that CCleaner was "more likely than not run on A0006 on March 28, 2014—less than a month before iDS began its forensic review at ePRO," (11/2 M&O at 20)—because (i) Hammerquist disputed Regard's findings, (ii) ePRO believes I assigned undue weight to the fact that the pre-fetch folder on A0006 was empty, and (iii) I incorrectly

determined that Hammerquist's testimony on A0006 "deserve[d] little weight."[11]  (11/24 ePRO

Mem. at 11-13.)  These are all simply disputes with my weighing of the evidence and credibility

determinations, and are therefore not appropriate to consider on a motion for reconsideration.

*Bennett*, 156 F. Supp. 2d at 272; *Flood*, 2015 WL 6870490, at *2.  ePRO's motion for

reconsideration concerning my conclusions about Device A0006 is DENIED.

### 2.  Operating System Reinstallation

ePRO also contests my finding that operating system ("OS") reinstallations were

evidence of bad faith on ePRO's part.  (11/24 ePRO Mem. at 13.)  ePRO does so by stating that I

overlooked the fact that none of the OS reinstallations were close in time to the ESI

investigation, since those of the senior staff took place in July and September of 2013.  (*Id.*)

Their argument is that ePRO's reinstallation of operating systems could not have been anti-

forensic given that they occurred months before Klipsch first sought an investigation in

connection with its sanctions motion before Judge Dolinger in December 2013.  (*Id.* at 13-14.)

As an initial matter, ePRO ignores the context in which these reinstallations took place.

These reinstallations occurred after the law suit was filed in August 2012—during the so-called

"Litigation Period."  (11/2 M&O at 13.)  Indeed, these reinstallations occurred after Magistrate

Judge Dolinger determined that ePRO "failed to comply with their obligations to ensure the

preservation of potentially relevant materials once the lawsuit was filed" and held that ePRO

"simply imposed no hold at all."  (Doc. 196 at 2.)  As I found in the 11/2 M&O, the

reinstallations were done on the computers of members of ePRO's senior staff, (11/2 M&O at

24), and could not have been accomplished without the knowledge and assistance of the ePRO

custodian and ePRO's information technology staff, (*id.* at 25.)  Therefore, at a time when ePRO

---

[11] ePRO does not dispute that CCleaner was run on Device A0006 on July 2, 2013.

should have taken some steps to preserve information—such as a moratorium on reinstallations for senior staff or making forensic copies of computers—ePRO essentially did nothing.  It is with that backdrop in mind that I was considering the import of the reinstallations.

In any event, putting aside the context within which these reinstallations occurred, this is again an inappropriate argument for a motion for reconsideration.  ePRO is seeking to relitigate my determination that it violated its "duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request."  *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 409 (S.D.N.Y. 2010).  ePRO argues that until Klipsch sought an investigation in connection with its sanctions motion in December 2013 it could not have reasonably known that registry or similar files would be relevant in any way.  (11/24 ePRO Mem. at 13-14.)  ePRO misses the point:  it should have been aware that such files would or could contain relevant information as soon as or soon after this litigation commenced in August 2012.  Therefore if ePRO was truly attempting to appropriately preserve ESI, "it would have forensically imaged these computers when it retained FTI on or about May of 2013—before OS replacement or reinstallation."  (11/2 M&O at 25.)  Because ePRO points to no case law or facts I overlooked in making this determination, its motion for reconsideration regarding my conclusions about operating system reinstallations is DENIED.

### 3.   Deleted Files

ePRO also disputes my finding concerning Regard's conclusion that 4,596 files and emails containing keywords selected by Klipsch were deleted after August 15, 2012.  Specifically, ePRO argues that I failed to hold Klipsch to their burden to demonstrate assistive relevance with regards to these emails.  (11/24 ePRO Mem. at 16.)  This argument cites to no

new case law or facts which I overlooked, and therefore again could be dismissed as inappropriate for a motion for reconsideration.  Moreover, ePRO would have me review each of its transgressions in a vacuum and in isolation, and therefore overlooks my finding that based on its history of ongoing and repeated efforts to destroy discovery and the history in this case of discovery transgressions, its "destruction and improper withholding of Unstructured ESI was done intentionally and in bad faith."  (11/2 M&O at 35.)  A finding of bad faith alone permits me to infer assistive relevance.  *See Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 438-39 (S.D.N.Y. 2010)  ("When evidence is destroyed in bad faith, that fact alone is sufficient to support an inference that the missing evidence would have been favorable to the party seeking sanctions: that it would have been of assistive relevance.")  Indeed, that is what I did here; I inferred the relevance of the deleted ESI.  ePRO's motion for reconsideration regarding my finding concerning the deleted files is DENIED.

### 4.  Access to QQ and Gmail Not Provided

ePRO disputes my reliance on the fact that CFO Keith Lee used QQ, stating that I never cited any evidence that CFO Lee used QQ.  (11/24 ePRO Mem. at 17.)  Keith Lee—ePRO's CFO and executive designated with the responsibility to obtain employee compliance with the forensic examination—was required to provide his access credentials for QQ and he did not.  (11/2 M&O at 27.)  ePRO's argument focuses on contesting the evidence—or lack thereof—of CFO Lee's use of QQ on his computer, but one very simple way to affirmatively demonstrate that CFO Lee did or did not use QQ would have been for him to provide his login.  This was precisely my point in the 11/2 M&O where I recounted that thirty-two of the thirty-six ePRO custodians refused to turn over their QQ access credentials to iDS.  Similarly, three ePRO custodians—including Leslie Tang, ePRO Director of Quality Control—refused to provide

access to their Gmail accounts, (11/2 M&O at 27), even though a protocol existed to segregate potentially relevant business documents from private documents, (*id*.)

The relevance of QQ and Gmail to my determinations in the 11/2 M&O were that numerous ePRO employees, including CFO Lee, withheld their login information, and that their "refusal despite being directed to provide access and the existence of a protocol to segregate potentially relevant business documents from private documents is direct evidence of ePRO's bad faith." (*Id.* at 26-27.) ePRO has not disputed that any of these individuals withheld their data, but rather argues that I should not have inferred bad faith from their decision to withhold this data. (11/24 ePRO Mem. at 17.) I disagree. ePRO's motion for reconsideration regarding the withholding access credentials for QQ and Gmail is DENIED.

### 5. Improper Reliance on Certain Evidence

#### a. *8/8 Regard Report and 12/19 Regard Supplement*

ePRO argues that I incorrectly relied on Regard's August 8, 2014 report, and December 19, 2014 supplement despite having ruled at the conference that they were not admitted for the truth of the matter asserted, citing to the transcript for this assertion:

> Mr. Basinger: We object as to the admission to the truth of the matter asserted, but I note that the report says what it says, and for limited purposes don't object.

> The Court: Right. That's fine. It is admitted for those purposes. Thank you.

(*Id.* at 18.) First, ePRO claims its objection and my sustaining of the objection made clear that the reports were not admitted due to hearsay objections; I do not agree. As an initial matter, I did not sustain the objection and counsel permitted the documents to be admitted in evidence saying "the report says what it says." (*Id.*) In addition, ePRO did not object to the admission of Regard as an expert on Unstructured Data, (Doc. 269 at 8:4-10:16), and Regard testified that both his August 8, 2014 report and his December 19, 2014 supplement were true and correct to his

knowledge and contained factual details supporting his opinions.  (*Id.* at 13:2-15:4, 15:16-16:11.)

Regard also declared under perjury that the contents were both true and correct, and the

evidentiary details were used with the express purpose of forming the basis of Regard's opinions

so the hearsay concerns are without merit since experts are permitted to rely on hearsay.  *See*

Fed. R. Evid. 702, 703; *Floyd v. City of N.Y.*, No. 08-CV-1034, 2013 WL 1955683, at *2

(S.D.N.Y. May 13, 2013) ("An expert witness may rely on hearsay evidence while reliably

applying expertise to that hearsay evidence, but may not rely on hearsay for any other aspect of

his testimony.") (quoting *United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 2003)).

Accordingly, ePRO's argument for reconsideration on the basis that I improperly considered

hearsay evidence is DENIED.

### b.   Reliance on Untimely Reports and Other Documents

ePRO believes I exceeded my authority in accepting and relying on the August 8, 2014

Regard Report and February 5, 2015 Regard Report because of the alleged serial withholding of

data and information by Klipsch and Regard.  (11/24 ePRO Mem. at 24-26.)  As an initial matter,

I have broad discretion to decide what evidence I deem admissible and what evidence I find

reliable.  *See, e.g.*, *Warren v. Pataki*, 823 F.3d 125, 138 (2d Cir. 2016) (noting that appellate

courts grant district courts "wide latitude" in deciding what evidence it admissible).  This issue

was also one I previously directed ePRO to raise through a motion if they believed such a motion

was appropriate.  (Doc. 231 at 17:20-18:12.)  They failed to do so, and seeking to raise this on

reconsideration rather than through a timely motion is not appropriate.  *See Salveson v. JP*

*Morgan Chase*, No. 14-CV-3529, 2016 WL 740432, at *2 (E.D.N.Y. Feb. 24, 2016) ("A motion

for reconsideration is 'neither an occasion for repeating old arguments previously rejected nor an

opportunity for making new arguments that could have previously been made.'") (quoting *Simon*

*v. Smith & Nephew, Inc.*, 18 F. Supp. 3d 423, 425 (S.D.N.Y. 2014)).  I also find ePRO's

assertion somewhat ironic given the reason for the proceedings before Magistrate Judge

Dolinger, the forensic examination conducted by iDS, the three day hearing before me, and

subsequent post-hearing submissions.  ePRO's motion for reconsideration regarding my reliance

on untimely reports and other documents is therefore rejected.

### 6.  Conclusion

For the reasons stated here, ePRO's motion for reconsideration is DENIED IN PART

AND GRANTED IN PART.  While I agree with ePRO that my findings regarding Device

A0030 were in error, this error did not affect my overall determination that ePRO engaged in bad

faith spoliation and therefore sanctions are appropriate.  I also do not credit any of the other

arguments ePRO made for reconsideration because they fail to point to any new facts or legal

authorities I overlooked.  ePRO's motion for reconsideration on all other issues is DENIED.

### B.  *Klipsch's Motion for Reconsideration*

Klipsch also argues for partial reconsideration of my 11/2 M&O.  Specifically, Klipsch

requests that I reconsider my conclusions regarding Structured ESI and the amount of the asset

restraint.  In response to my inquiry, Klipsch argues that my award of fees and costs as a sanction

for ePRO's actions can be considered in calculating the amount of the asset restraint.  (11/24

Klipsch Mem. at 1-2.)[12]  I consider each of these arguments in turn.

### 1.  Structured ESI

Klipsch's principal argument on reconsideration concerns my determination in the 11/2

M&O that spoliation had not occurred with regard to the Structured ESI and sanctions were not

---

[12] "11/24 Klipsch Mem." refers to Klipsch's November 24, 2015 Memorandum of Law in Support of its Motion for Partial Reconsideration of This Court's November 2, 2015 Memorandum & Order and in Response to Two Issues Stated in This Court's November 13, 2015 Order.  (Doc. 309.)  The page numbers are the pagination assigned by Klipsch.

appropriate for ePRO's conduct with regards to the Structured ESI.  (*Id.*)  Specifically, Klipsch

argues that I overlooked ePRO's legal obligation to preserve Structured ESI, (*id.* at 7-10), certain

facts and law showing ePRO's culpability with respect to Structured ESI, (*id.* at 10-13), and case

law that places the risk of error on the party creating the risk, (*id.* at 13-16).  Based on these

considerations, Klipsch argues that I erred by not finding spoliation and sanctioning ePRO with

regard to its conduct concerning Structured ESI, (*id.* at 17-18).

I find all of Klipsch's arguments unavailing.  First, Klipsch argues that I overlooked

ePRO's legal obligation to preserve structured ESI, (11/24 Klipsch Mem. at 7), referring to

ePRO's failure to retain historical backups of its databases, (*id.* at 8-10).  I considered this

evidence in my review, and Klipsch's citations to cases outside of this jurisdiction, (*id.* at 8-9),

do not demonstrate that I overlooked "controlling decisions," *Shrader*, 70 F.3d at 257, in my

determination.  Further, the fact that Klipsch's citations essentially mirror those it submitted in

its briefing prior to the 11/2 M&O, (*see* Doc. 284 ¶ 106), demonstrates that Klipsch is seeking to

inappropriately use this motion for reconsideration to have a "second bite of the apple."

*Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012).

Klipsch points to a single document, entitled "Management Policy for Database System"

as the basis for their argument that ePRO failed to abide by its retention policies.  (*See generally*

11/24 Klipsch Mem. at 2-12.)  ePRO argues that it did not violate any of its own policies, and

that the sole documentary evidence—the document entitled "Management Policy for Database

System"—was created after the litigation began and does not appear on its face to be a retention

policy.  (12/18 ePRO Mem. at 14-15; *see* Doc. 284 ¶ 22.)[13]

---

[13] "12/18 ePRO Mem." refers to Defendant ePRO Limited's Memorandum of Law in Opposition to Plaintiff Klipsch
Group Inc.'s Motion for Partial Reconsideration.  (Doc. 318.)  The pagination refers to the pagination assigned by
ePRO.

As an initial matter, Klipsch cited to this document in its Proposed Findings of Fact and Conclusions of Law, (Doc. 284 ¶ 22), which was submitted following the hearing before me. This does not constitute "newly available" evidence such as to be appropriate for reconsideration. *Space Hunters, Inc. v. United States*, 500 F. App'x 76, 81 (2d Cir. 2012) (summary order) (internal quotation marks omitted) (noting that for evidence to be considered "newly available," it must be "evidence that was truly newly discovered or could not have been found by due diligence"). In fact, the meaning and relevance of this document was a subject of dispute between the parties. (*Compare* Doc. 284 ¶ 22 *with* Doc. 283 ¶¶ 265, 266; 12/18 ePRO Mem. at 14-15.) Therefore, there is no question that this document and arguments concerning its relevance and import were before me and it is not newly discovered.

In any event, Klipsch appears to agree that historical sales data is preserved and contained in ePRO's active databases, even if it disputes the reliability of that data or whether ePRO should have kept snapshots or copies of the databases after this litigation began. (*See* 01/05 Klipsch Mem. at 8-9.)[14]  Therefore, Klipsch's theory is that ePRO engaged in a massive alteration of data across multiple databases and that backup tapes would show sales data for counterfeit headphones that had existed but was later deleted from ePRO's active databases. The flaw in this theory continues to be that, other than pointing out that ePRO had the ability to modify data in its active databases and that Klipsch's experts were unable to verify the data in the active databases and therefore opined that it was unreliable, Klipsch has not identified evidence that sales data related to any counterfeit products was deleted. Moreover, there was testimony during the hearing that the tapes that were recycled after 30 days were for disaster

---

[14] "01/05 Klipsch Mem." refers to Klipsch Group Inc.'s Reply Memorandum of Law in Support of its Motion for Partial Reconsideration of this Court's November 2, 2015 Memorandum & Order and in Response to Two Issues Stated in this Court's November 13, 2015 Order. (Doc. 320.)

recovery.  (Doc. 275 at 526-27.)  There is case law that suggests that ePRO would not have been required to retain and search such tapes even if they existed.  *See Zubulake v. UBS Warbug LLC,* 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("[A] litigation hold does not apply to inaccessible backup tapes (*e.g.*, those typically maintained solely for the purpose of disaster recovery), which may continue to be recycled on the schedule set forth in the company's policy.").  Klipsch's argument for reconsideration on this basis is DENIED.

Klipsch also asserts that I overlooked key law putting the risk of error on the party creating the risk.  (11/24 Klipsch Mem. at 13.)  Klipsch is wrong.  I considered the case law cited by Klipsch.  Klipsch cites to *Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 183-84 (S.D.N.Y. 2014), quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999), a Second Circuit case that I cited in the 11/2 M&O.  (*Compare* 11/24 Klipsch Mem. at 13 (citing *Dorchester Fin. Holdings Corp.*, 304 F.R.D. at 183-84 (quoting *West*, 167 F.3d at 779 *with* 11/2 M&O at 30 (citing *West*), 37 (same)).  This observation alone demonstrates that I did not overlook this law.  Moreover, the proposition for which Klipsch cites *Dorchester* and *West* relates to a court's determination of what an appropriate sanction is after a finding of spoliation, not before such a finding is made.  *See Dorchester,* 304 F.R.D. at 183-94; *West*, 167 F.3d at 779.  Neither *West* or *Dorchester* creates a presumption of spoliation—which is apparently what Klipsch is advocating here—rather they stand for the proposition that once spoliation has been found by a preponderance of the evidence "the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine" and therefore should be designed to "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful

destruction of evidence by the opposing party." *West*, 167 F.3d at 779.  Here, I did not find spoliation with regard to ePRO's Structured ESI; therefore, the spoliation doctrine is inapplicable.  Klipsch's motion for reconsideration on the basis that I overlooked the spoliation doctrine referenced in *West* and *Dorchester* is therefore DENIED.

In the end, Klipsch is asking me to revisit my analysis of the evidence presented and the expert opinions placed before me to come to a different decision concerning the Structured ESI, and an appropriate sanction, without pointing me to facts or law that I overlooked.  The bottom line is that Regard's opinion was not that ePRO "engaged in a massive deletion and wiping of data from its sales database" but rather "that the data in the sales databases has been subject to editing and there is evidence of data being edited," (11/2 M&O at 29), and "the data [is] unverifiable and, therefore, unreliable," (*id*.).  Further, while Regard testified that he believed the Structured ESI had been edited, (Doc. 269 at 59:10-16), he admitted on cross-examination that he could not state that this was evidence of tampering or hiding of records.  (*Id.* 120:7-14.)  In other words, based upon all of the information he gathered from the forensic review he could not opine that there had been any tampering, deleting, or wiping, or even the indicia or tell-tale signs of such conduct, related to the Structured ESI.  In this respect, Regard's opinion is consistent with Jelen's that there "is no evidence indicating that ePRO tampered with any of the data produced in this case."  (11/2 M&O at 29.)  I weighed the opinions of both Regard and Jelen in reaching my decision that Klipsch had not met its burden with regard demonstrating spoliation of the Structured ESI.  Klipsch disagrees with my conclusion, but that is not an appropriate basis for reconsideration.  *See Flood*, 2015 WL 6870490, at *2.

### 2.  Asset Restraint

In connection with Klipsch's motion for reconsideration, I asked both parties to also brief

the issues of (1) whether prejudgment restraint can be utilized to restrain funds to cover

attorney's fees contemplated by the 11/2 M&O, and (2) whether I could require Defendant to

post a bond pending the final resolution of this matter.  (Doc. 302.)  I now consider each of these

issues.

### a.   Fees as Part of the Asset Restraint

Klipsch contends that I have the authority to restrain ePRO's assets in order to satisfy

both its contemplated attorney's fees under the Lanham Act, as well as the attorney's fees

contemplated in the 11/2 M&O.  (11/24 Klipsch Mem. at 18-27.)  As detailed by the Second

Circuit in *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 131 (2d Cir. 2014), the

appropriateness of this use of a prejudgment asset freeze is subject to the Supreme Court's ruling

in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999):

> Pursuant to *Grupo Mexicano,* then, district courts have no authority to issue a
> prejudgment asset freeze pursuant to Rule 65 where such relief was not
> "traditionally accorded by courts of equity." . . .  But they maintain the equitable
> power to do so where such relief *was* traditionally available:  where the plaintiff is
> pursuing a claim for final equitable relief . . . and the preliminary injunction is
> ancillary to the final relief.

*Gucci Am. Inc.*, 768 F.3d at 131.  Therefore, the question here is whether attorney's fees are an

appropriate use of my equitable authority such that I can consider such fee awards in determining

the amount of the prejudgment asset freeze.  It was on the basis of her reading of *Grupo*

*Mexicano* that Judge Nathan previously reduced the asset restraint in this case to restrain assets

only sufficient to satisfy an award of counterfeiting profits, and not a judgment for statutory

damages.  (Doc. 86 at 15-16.)

I first consider whether the imposition of attorney's fees in the 11/2 M&O can be

considered an action in equity.  The Supreme Court explained in *Chambers v. NASCO, Inc.*, 501

U.S. 32, 49 (1991), that a sanction of attorney's fees for violation of a discovery order may be

available "under both Federal Rule of Civil Procedure 37 and the court's inherent power, while recognizing that invocation of the inherent power would require a finding of bad faith."  As noted in the 11/2 M&O, I determined here "that ePRO's destruction and improper withholding of Unstructured ESI was done intentionally and in bad faith."  (11/2 M&O at 35.)  The Supreme Court in *Hall v. Cole*, 412 U.S. 1, 4-5 (1973), held that:

> Although the traditional American rule ordinarily disfavors the allowance of attorneys' fees in the absence of statutory or contractual authorization, federal courts, in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require.  Indeed, the power to award such fees "is part of the original authority of the chancellor to do equity in a particular situation," and federal courts do not hesitate to exercise this inherent equitable power whenever "overriding considerations indicate the need for such a recovery."
>
> Thus, it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons."  In this class of cases, the underlying rationale of "fee shifting" is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of "bad faith" on the part of the unsuccessful litigant.

Here, I found bad faith with regard to the Unstructured ESI.  Therefore, I find that the fees authorized in the 11/2 M&O are appropriate for an asset restraint, as such a remedy would be available in the courts of equity.  As detailed below, I will therefore factor in the amount of the fees awarded to Klipsch as a result of ePRO's spoliation and my 11/2 M&O.

I reach the opposite conclusion concerning attorney's fees under the Lanham Act.  While Klipsch cites to the language of the Lanham Act for the principle that Lanham Act fees are "subject to the principles of equity," (11/24 Klipsch Mem. at 20 (quoting 15 U.S.C. § 1117 (a))), this language alone does not make them an equitable remedy.  As an initial matter, being "subject to the principles of equity" does not mean that an action was recognized in equity.  As the Second Circuit stated in *S.E.C. v. Cavanagh*, 445 F.3d 105, 118 (2006), "the question here [of] whether the District Court acted beyond its equitable powers requires an inquiry into

whether the remedies available at chancery in 1789" included the remedy sought by Plaintiff.  In this case, the question is whether attorney's fees for success in a trademark infringement action would be available as an equitable remedy at chancery in 1789.  As Judge Nathan found previously, statutory damages for trademark violations under the Lanham Act are a remedy at law.  (Doc. 86 at 13.)  Similarly here, attorney's fees under the Lanham Act are, by their very nature, only available because of the existence of the Lanham Act provides a statutory authorization for their awarding.  Otherwise, they would not be appropriate under the traditional American rule disfavoring shifting of fees.  *See Hall v. Cole*, 412 U.S. at 4-5.  As with the Lanham Act statutory damages which Klipsch sought to include in the asset restraint previously in this litigation, possible attorney's fees under the Lanham Act are not appropriate for inclusion in any asset restraint.  Klipsch has not identified and I have not found a case where a court imposed an asset restraint to satisfy attorney's fees in the context of the Lanham Act.  Therefore, Klipsch's motion regarding the inclusion of assets for possible Lanham Act attorney's fees in an asset restraint is DENIED.

ePRO continues to argue that Klipsch has not made the showing necessary to demonstrate the need for an asset restraint.  (12/18 ePRO Mem. at 21-23.)  Its argument focuses on the notion that an asset restraint is not appropriate in this case based on the previous determinations of Judge Nathan and Magistrate Judge Dolinger, as well as its conduct throughout this litigation where it claims that it has consistently had funds available to increase the asset restraint. (*Id.* at 21-24.)

In order to restrain assets, a plaintiff must demonstrate (1) a likelihood of success on the merits; (2) immediate and irreparable harm to plaintiff as a result of the defendant's counterfeiting activities; and (3) that the defendants will likely dissipate their ill-gotten funds if assets are not frozen.  *Reebok Int'l Ltd. v. Marnatech Enters.*, 737 F. Supp. 1521, 1527 (S.D. Cal. 1989), *aff'd* 970

F.2d 552 (9th Cir. 1992).  ePRO's arguments go to the third prong, which is that their conduct throughout, i.e. not changing their payment schemes to divert funds out of the United Sates, and their ability to quickly satisfy a $5 million asset restraint, demonstrate that they are not likely to dissipate their ill-gotten funds.

However, ePRO's recitation of its conduct throughout this litigation ignores the fact that it has repeatedly failed to comply with court orders and engaged in efforts to destroy discovery material.  This history suggests ePRO may be likely to continue to flaunt court orders, such as a judgment in Klipsch's favor, and counsels in favor of continuing to restrain its assets.  *See Pashaian v. Eccleston Props., Ltd.*, 88 F.3d 77, 86-87 (2d Cir. 1996); *Gelfand v. Stone*, 727 F. Supp. 98, 100-01 (S.D.N.Y. 1989).  In addition, there is evidence in the record that ePRO has ignored the instructions of its own attorneys.  ePRO's counsel met in China with various ePRO executives—including Keith Lee, ePRO's CFO and executive designated with the responsibility to obtain employee compliance with the forensic examination—instructing them to "provide their QQ log-in, whether or not they said they used it for business purposes."  (Doc. 269 at 52.)  According to ePRO's counsel many of the employees simply said "I'm not going to give you my password." (*Id*.)  There was no legitimate basis for this refusal since there was a "protocol to segregate potentially relevant business documents from private documents," and this "is direct evidence of ePRO's bad faith."  (11/2 M&O at 26-27.)

Moreover, I note that Magistrate Judge Dolinger and Judge Nathan were not ruling with the backdrop of the bad faith spoliation I found in my 11/2 M&O.  I also note that Judge Nathan did not determine that an asset restraint was not appropriate, she merely just reduced the amount based upon her determination that $20,000.00 was sufficient "to preserve Plaintiff's right to an accounting and to the return of profits from the sale of counterfeit goods through Defendant's website."  (Doc. 67 at 4.) As Klipsch notes, the continuation of the asset restraint is also supported by the fact that ePRO is

located in China and had no permanent ties to the United States.  (11/24 Klipsch Mem. at 22-23.)

Accordingly, I believe a continued asset restraint is justified here and reject ePRO's arguments to the

contrary.

> b.   Bond

Klipsch argues that I have the authority to require ePRO to post a bond under Local Civil

Rule 54.2, which states that "[t]he Court, on motion or on its own initiative, may order any party to

file an original bond for costs or additional security for costs in such an amount and so conditioned as

it may designate."  I may consider the following factors when determining whether to require a

bond under Rule 54.2:

> (1) the financial condition and ability to pay of the party who would post the bond,
> (2) whether the party is a non-resident or foreign corporation, (3) the merits of the
> underlying claims, (4) the extent and scope of discovery, (5) the legal costs
> expected to be incurred, and (6) compliance with past court orders.

*RLS Assocs., LLC v. United Bank of Kuwait PLC*, 464 F. Supp. 2d 206, 220 (S.D.N.Y. 2006)

(internal quotation marks and citations omitted).  As noted by Klipsch, there is precedent for

requiring a bond for spoliation sanctions under Rule 37.  *Joza v. WW JFK LLC*, No. 07-CV-4153,

2010 WL 3619547, at *5 (E.D.N.Y. Sept. 10, 2010).  I may require ePRO to post a bond in order for

Klipsch to secure costs and fees under the Lanham Act, *Johnson v. Kassovitz*, No. 97-CV-5789, 1998

WL 655534, at *1-2 (S.D.N.Y. Sept. 24, 1998) ("Under Rule 54.2, security for costs may include

security for attorney's fees when a party is potentially entitled to attorney's fees by statute."), and

there is ample precedent for requiring the posting of a bond in a trademark infringement matter, *see*

*Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*, 207 F.R.D. 23, 25 (E.D.N.Y. 2001) (citing *Johnson*,

1998 WL 655534, at *1, and *Beverly Hills Design Studio (N.Y.) Inc. v. Morris*, 126 F.R.D. 33, 36

(S.D.N.Y. 1989).

ePRO does not contest that, if an asset restraint were appropriate, I would have the authority

to consider a bond in lieu of an asset restraint.  (12/18 ePRO Mem. at 24.)  It asks that, if I am

inclined to consider a bond, "the bond be optional and that any remaining asset restraint be reduced

by the amount of the bond, if ePRO is able to secure a bond on terms that make commercial sense."

(*Id.*)  Klipsch does not object to this so long as ePRO intends to stipulate to the restraint of its assets

in the same amount in lieu of a bond.  (01/05 Klipsch Mem. at 20.)

      Given the parties' representations, I believe that a bond is appropriate and that I possess the

authority to order ePRO to post a bond here.  As noted above, ePRO is located in China and has no

permanent ties to the United States, (11/24 Klipsch Mem. at 22-23); there has been some discovery

and there is no dispute that ePRO has engaged in at least some counterfeiting violations; and ePRO

has repeatedly violated court orders throughout the course of this litigation.  Further, given the

Second Circuit's holding that "the plain language of Section 117(b) mandates the imposition of treble

damages and attorneys' fees for the 'intentional[]' and 'knowing' use of a counterfeit mark," *Koon*

*Chun Hing Kee Soy & Sauce Factory, Ltd.*, 409 F. App'x 389, 390 (2d Cir. 2010) (summary order), I

believe holding funds to cover such fees and expenses in a bond is appropriate.  My review of the

facts and record produced thus far by the parties, including fee and expense estimates submitted by

Klipsch, suggest that—between the asset restraint and a bond, and as further detailed below—the

total amount held from ePRO in this matter should remain $5 million.  However, given ePRO's

request that any bond be optional, I will leave it to the parties to determine whether the $5 million

should be held in a restraint, a bond, or some combination thereof.

      Accordingly, the stay in place as a result of my November 13, 2015 Order, (Doc. 302), will

remain, and the amount held will remain at $5 million.  The parties are directed to meet and confer

and submit a joint letter within fourteen days of the issuance of this Order regarding whether the total

amount will remain as an asset restraint, or whether some or all of that amount will be posted in a

bond.  If the parties are unable to come to an agreement, I will schedule a conference to resolve this

issue.

### 3.  Conclusion

For the reasons set forth above, Klipsch's motion for reconsideration is GRANTED IN PART AND DENIED IN PART.  Klipsch's motion for reconsideration of my decision regarding Structured ESI is DENIED.  However, Klipsch's motion for reconsideration of my decision reducing the asset restraint to $25,000 is GRANTED.  The stay put in place as a result of my November 13, 2015 Order, (Doc. 302), will remain in place, and the parties are directed to meet and confer and submit a joint letter within fourteen days of this Order regarding how the $5 million currently held will be divided between an asset restraint and a bond.

### C.  *Klipsch's Application for a Fee Award*

#### 1.  Klipsch's Fee Application

I now turn to Klipsch's application for a fee award.  (Doc. 326.)  This motion is made in relation to my awarding of fees in the 11/2 M&O for "reasonable costs and fees beginning with the second round of depositions taken in Hong Kong in November 2013 until the completion of the briefing related to this motion and Hearing."  Klipsch contends that the presumptively reasonable fees and costs in this matter, based on the lodestar approach, total $3,032,431.26.[15] Klipsch arrives at this total using the lodestar approach for attorney's hours, which involves calculating the product of the hours reasonably expended by attorneys at a reasonable hourly

---

[15] In Klipsch's initial Memorandum of Law in Support of its Motion to Set Sanctions Award, it states this total as $3,110,859.66.  (Doc. 329.)  However, following ePRO's opposition Klipsch noted that it agreed with one of ePRO's arguments, and that it had also miscalculated one figure.  Klipsch acknowledges on Reply that the amount of fees Klipsch requested from ePRO for DWT's December 11, 2013 invoice was incorrectly stated in Exhibit A of George Wukoson's January 25, 2016 Declaration, (Doc. 327), as $396,845.62 when it should have been $113,884.275.  (Doc. 342 ¶ 4.)  Given that Klipsch acknowledges this error, I need not and do not consider ePRO's arguments regarding this error.  Further, Klipsch states on reply that the correct amount for the January 22, 2015 invoice listed in Exhibit A should have been $147,302.45, rather than $151,820.20.  With those exclusions, Klipsch's bill from DWT through the filing of Klipsch's Reply Memorandum of Law and accompanying papers on April 1, 2016 totals $1,812,370.24, with $124,336.76 of expenses.  (Doc. 342 Ex. B.)  The total fees and expenses charged by iDS through April 1, 2016 are $1,038,781.50 in fees, with $56,942.76 in expenses.  (*Id.* Ex. D.)  Adding those four figures together yields the total fees requested in this motion  ($1,812,370.24 + $124,336.76 + $1,038,781.50 + $56,942.76 = $3,032,431.26).

rate. *City of Burlington v. Dague*, 505 U.S. 557, 559 (1992). While the 11/2 M&O stated

Klipsch was entitled to "reasonable costs and fees beginning with the second round of

depositions taken in Hong Kong in November 2013 until the completion of the briefing related to

this motion and Hearing," (11/2 M&O at 43), Klipsch argues for a scope that begins earlier and

ends later than my plain language. It argues it should be entitled to receive fees beginning with

its efforts to get discovery after the first round of depositions in this case, and continuing through

its filing of papers on reply in its sanctions motion. (1/25 Klipsh Mem. at 16-17.)[16] In support of

its fee calculations, Klipsch submits extensive records of contemporaneous time records that

show "for each attorney, the date, the hours expended, and the nature of the work done." *N.Y.*

*State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). These

records are contained in Exhibit C of the January 25, 2016 Declaration of Wukoson in Support of

Klipsch's sanctions motion, (Doc. 327 Ex. C),[17] and Exhibit A of the April 1, 2016 Declaration

of Wukoson in Support of Klipsch's sanctions motion, (Doc. 342 Ex. A). Klipsch has also

submitted detailed records of the time and rates for each task completed by iDS in furtherance of

its forensic search, (Doc. 327 Ex. D, Doc. 342 Ex. C). Klipsch's fee award also requests

reasonable costs, which include

> payments for translation of documents produced by ePRO in Chinese, payments to
> court reporters for deposition transcripts and videography, payments to litigation
> support service personnel to load voluminous discovery productions, expenses for
> travel to the second round of depositions in Hong Kong (discounted in the case of
> the travel expenses) and costs for online legal research.

(1/25 Klipsch Mem. at 24.) Klipsch argues that all of these expenses are reasonable and were

necessitated by ePRO's actions. (*Id*.)

---

[16] "1/25 Klipsch Mem." refers to Klipsch's Memorandum of Law in Support of its Motion to Set Sanctions Award.
(Doc. 326.)

[17] Going forward this document will be referred to as "1/25 Wukoson Dec."

### 2. ePRO's Objections

ePRO's objects to Klipsch's fee request because (1) the request is grossly disproportionate to the amount at issue here, (2) the requested discovery did not develop any new information that was contrary to ePRO's earlier representations, (3) the requested fees are unreasonably punitive in nature, and (4) the fees are excessive given the "multiple settlement offers and Rule 68 Offers of Judgment" which ePRO has made to Klipsch. (3/9 ePRO Mem. at 1.)[18] In addition, ePRO also argues that the requested fees (1) seek to recover for matters not authorized by this Court, (2) seek to recover over $1 million that ePRO argues Klipsch has not yet paid, (3) attempt to charge ePRO for fees not reflected in Klipsch's bills, (4) attempt to charge ePRO for work that would have been undertaken absent spoliation, and (5) should not be given to Klipsch because of unclean hands. (*Id.*)

### 3. Analysis

#### a. *DWT Award*

In order to analyze Klipsch's fee request related to the work done by DWT, I first calculate a reasonable lodestar as the failure to do so "as a starting point is legal error." *Millea*, 658 F.3d at 166. While I need not provide a detailed explanation of the lodestar calculation, the "Supreme Court's directive that fee award calculations be 'objective and reviewable,' implies the district court should at least provide the number of hours and hourly rate it used to produce the lodestar figure." *Id.* at 166-67.

However, before calculating the lodestar the first question is when the calculation should begin. Klipsch provides invoices beginning in April 2013, arguing that it should be compensated

---

[18] "3/9 ePRO Mem." refers to ePRO's March 9, 2016 Memorandum of Law in Opposition to Klipsch's Application for Fees and Costs. (Doc. 336.)

for its efforts to get discovery from the first round of depositions forward because this is in

keeping with "the language and remedial purpose of [the 11/2 M&O]."  (4/1 Klipsch Mem. at 6.)

I disagree.  Klipsch would have incurred the costs associated with the first round of depositions

whether or not ePRO violated its discovery obligations.  As Magistrate Judge Dolinger found,

the second round of depositions "were caused by ePRO's misrepresentations and discovery

deficiencies."  (11/2 M&O at 39.)  Therefore, the calculation of the lodestar should be from

November 2013—when Klipsch took the second round of depositions—forward.

 Klipsch supplied the rates for DWT attorneys who worked on this matter from November

2013 forward as follows:  (1) Roxanne Ellings, a partner in DWT's New York office with 29

years' experience in trademark and copyright litigation, billed at $650 an hour for all the relevant

years, (1/25 Wukoson Dec. ¶¶ 4, 5, 7); (2) Sharon Schneier, a partner about whom Klipsch

provides no information in its submissions, billed at $660 an hour during 2014, the only year

during which she worked on this matter, (*id.* ¶ 4); (3) Lisa Keith, a New York associate who

began at DWT in 2012 and graduated law school in 2009, billed at $390 an hour during 2013,

$415 an hour during 2014, and $440 an hour during 2015, (*id.* ¶¶ 4, 10); (4) Danielle Toaltoan, a

New York associate who began at DWT in 2015 and graduated law school in 2011, billed at

$415 an hour during 2015, and $440 an hour during 2016, (*id.* ¶¶ 4, 11; 4/1 Wukoson Dec. Ex. A

at 10);[19] (5) Micah Ratner, a Washington D.C. associate who began at DWT in 2010 and

graduated law school in 2009, billed at $415 an hour during 2015, (1/25 Wukoson Dec. ¶¶ 4, 12);

(6) George Wukoson, a New York associate who began at DWT in 2012 and graduated law

school in 2008, billed at $405 an hour during 2013, $425 an hour during 2014, $460 an hour

---

[19] "4/1 Wukoson Dec." refers to the April 1, 2016 Declaration of George P. Wukoson in Support of Plaintiff Klipsch
Group Inc.'s Motion to Set Sanctions Award.  (Doc. 342.)

during $2015, and $500 an hour during 2016, (*id.* ¶¶ 4, 13; 4/1 Wukoson Dec. Ex. A. at 10); (7)

Charles Legrand, of counsel at DWT and a 1997 law school graduate, billed at $580 an hour for

all of the relevant years he worked on this matter, (1/25 Wukoson Dec. ¶¶ 4, 9); (9) John

Arweiler, a paralegal at DWT's New York office with nine years' experience in 2015, billed at

$190 an hour for 2015, the only year in which he worked on this matter, (*id.* ¶¶ 4, 19); (10)

Marni Shapiro, a paralegal in DWT's Washington D.C. office with 30 years' experience, billed

at $305 an hour for 2015, the only year in which she worked on this matter, (*id.* ¶¶ 4, 15); (11)

Omar Johnny, a paralegal in DWT's New York office with 10 years' experience, billed at $150

an hour during 2014, $160 an hour during 2015, and $170 an hour during 2016, (*id.* ¶¶ 4, 20; 4/1

Wukoson Dec. Ex. A. at 10); and (12) Megan Duffy, a paralegal in DWT's New York office

with 18 years' experience, billed at $240 for her work on this matter during 2014, (1/25

Wukoson Dec. ¶¶ 4, 17).

Determining whether these rates are reasonable involves using the prevailing market rates

in the relevant community.  *Blum v. Stenson*, 465 U.S. 886, 895 (1984); *see also Simmons v.

N.Y.C. Transit Auth.*, 575 F.3d 170, 173 (2d Cir. 2009).  Here, the rates given by Klipsch for

DWT average out to $655 an hour for partners, $432 an hour for associates, $580 an hour for of

counsel, and $225.63 an hour for paralegals.  While slightly on the high end for associates and

paralegals, these are certainly reasonable market rates when the 15 percent courtesy discount—

which DWT applied for all months other than January 2014 and March 2016,[20] (4/1 Wukoson

Dec. Ex. B)—is taken into account.  *See, e.g.*, *Broadcast Music, Inc. v. Pamdh Enters., Inc.*, No.

---

[20] Based on Klipsch's invoices, this discount is applied by calculating the total monthly billing for all attorneys based on the rate provided and the hours worked, and then subtracting 15 percent from that amount.  (*See, e.g.*, 1/25 Wukoson Dec. Ex. C at 8.)  Klipsch's records indicate that this discount was applied for all relevant months except for the invoices on January 27, 2014 and March 4, 2016.  (4/1 Wukoson Dec. Ex. B at 1).  Therefore, the individual attorneys' billing rates are not discounted.

13-CV-2255, 2014 WL 2781846, at *6 (S.D.N.Y. June 19, 2014) (hourly rate of $570 was

reasonable for a copyright litigator with 15 years of experience and hourly rate of $160 was

reasonable for paralegal with two years of experience); *Sub-Zero, Inc. v. Sub Zero NY*

*Refrigeration & Appliances Servs.*, Inc., No. 13-CV-2548, 2014 WL 1303434, at *9 (S.D.N.Y.

Apr. 1, 2014) ($200 an hour paralegal rate is reasonable and in line with the prevailing market

rate); *OZ Mgmt. LP v. Ozdeal Inv. Consultants, Inc.*, No. 09-CV-8665, 2010 WL 5538552, at *3-

4 (S.D.N.Y. Dec. 6, 2010), *report and recommendation adopted*, 2011 WL 43459 (S.D.N.Y. Jan.

5, 2011) (finding a $730 hourly rate for partners, discounted by 10%, reasonable and a $400

discount associate rate reasonable); *Therapy Prods., Inc. v. Bissoon*, No. 07-CV-8696, 2010 WL

2404317, at *5 (S.D.N.Y. Mar. 31, 2010), *report and recommendation adopted*, 2010 WL

2541235 (S.D.N.Y. June 15, 2010) (finding rates of $295 to $430 for junior and mid-level

associates and $170 to $200 for paralegal are commensurate with New York professionals of

comparable experience in intellectual property cases); *Malletier v. Artex Creative Int'l Corp.*,

687 F. Supp. 2d 347, 361-62 (S.D.N.Y. 2010) (finding discounted rate of $390.10 reasonable for

intellectual property associate at mid-sized law firm); *Union of Orthodox Jewish Congregations*

*of Am. v. Royal Food Distribs. Ltd. Liab. Co.*, 665 F. Supp. 2d 434, 437 (S.D.N.Y. 2009)

(associate rate of $445 an hour is reasonable).

Based on the rates and hours provided by Klipsch for work done by DWT lawyers, I have

undertaken my own calculation of the lodestar as provided in Exhibit A attached to this

Memorandum & Order.  However, given that Klipsch failed to include any information

concerning the qualifications of DWT partner Sharon Schneier, I have not included in my

lodestar calculation fees for any work done by Ms. Schneier.  Based on the reasonable hours and

rates provided by Klipsch for work done by DWT attorneys, and factoring in the 15 percent

courtesy discount, I find that the lodestar for the work done by DWT for Klipsch from November 13, 2013 forward would be $1,461,345.43.

My review of ePRO's specific objections, as well as the twelve factors listed in *Johnson*, does not suggest that this is an unreasonable fee. ePRO broadly points to the difficulty of determining which hours were expended on specific tasks based on DWT's block billing, (3/9 ePRO Mem. at 24), but I believe based on my review of the record, familiarity with the case, and review of DWT's billing records that the vast majority of DWT's hours post-November 2013 were spent on work that would not have to have been done absent ePRO's bad faith conduct throughout discovery and ePRO's spoliation. I also do not credit ePRO's arguments regarding the punitive nature of these fees, and that they should be reduced based on Klipsch's failure to agree to ePRO's settlement offers and Rule 68 offers of judgment. (*Id.* at 18-22.)

First I consider the argument that these fees are punitive in nature. The attorney's fees here are not analogous to punitive damages as ePRO suggests and therefore the ratio at issue in *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003) (finding ratio of punitive damages to actual damages greater than 9:1 violative of the 14th Amendment's Due Process Clause), and *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559 (1996) (striking down $2 million in punitive damages where compensatory award was $4,000), is inapplicable. While the fees are being imposed, in part, to punish ePRO for its spoliation, they also serve the important remedial purpose of making sure that Klipsch is made whole for work for which it would not have had to do absent ePRO's spoliation. *In re WRT Energy Se. Litig.*, 246 F.R.D. 185, 201 (S.D.N.Y. 2007). As detailed in the 11/2 M&O, this sanction is both "just" and specifically related to the particular "claim" which was at issue in the order to provide discovery. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982).

40

Second, the fact that ePRO made Rule 68 offers of judgment to Klipsch here is completely irrelevant.  I am not, nor should I be, constrained by the strategic decisions and litigation strategies of the parties related to Rule 68 offers or settlement offers.  If Klipsch seeks attorney's fees at the conclusion of this matter for work beyond the work which it had DWT and iDS undertake due to ePRO's spoliation, the fact that it rejected numerous Rule 68 offers of judgment might become relevant to the consideration of those fees.  However, here the sanction and fees are for work which would not have been undertaken absent ePRO's spoliation and violation of court orders, and the fact that ePRO made offers of settlement to Klipsch does not factor into that determination.

I will also describe why a review of the *Johnson* factors cause me to believe the lodestar here is reasonable.[21]  Regarding the first two *Johnson* factors, investigating and analyzing ePRO's ESI and computer systems for spoliation was a heavily fact and hours-intensive undertaking involving difficult technical questions, trips to Hong Kong for depositions, and a three-day hearing before this court, suggesting that these factors justify a substantial award here.  The technical nature of this case also required a high degree of legal skill, making the third *Johnson* factor weigh in favor of a substantial award as well.  Concerning the fourth factor, given the long but reasonable hours these attorneys worked, their work on this matter undoubtedly precluded them from spending significant time on other actions.  As to the fifth, sixth, and ninth factors, the DWT lawyers involved charged hourly rates which seem reasonable given their work

---

[21] Again, these factors are (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *Arbor Hill*, 522 F.3d at 186-87 n.3.

histories, reputation, and the prevailing market rates, and these rates were for fixed fees rather

than contingent.  I do not believe that there are any relevant time constraints to consider in this

award for the seventh *Johnson* factor.  With regard to the result—the eighth *Johnson* factor—

Klipsch's efforts resulted in a determination that ePRO had engaged in bad faith spoliation of

Unstructured ESI, and the fact that this case may not result in substantial damages for Klipsch is

not an adequate justification for me to reduce what appears to be an otherwise reasonable

lodestar figure.  *See Small v. N.Y.C. Transit Auth.*, No. 03-CV-2139, 2014 WL 1236619, at *15

(E.D.N.Y. Mar. 25, 2014) (citing *Millea*, 658 F.3d at 169, for the proposition that "[a] court may

not reduce an attorneys' fee award simply because the fee award would be disproportionate to

the damages awarded").  I do not believe the tenth *Johnson* factor—the "undesireability" of the

case—is relevant to my consideration here.  Regarding the eleventh factor—the nature and

professional relationship with the client—I note that DWT is responsible for Klipsch's

enforcement program,[22] demonstrating a significant and longstanding professional relationship.

Finally, this award is similar to the amounts awarded for similar spoliation sanctions.  *See, e.g.*,

*E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, No. 09-CV-58, 2013 WL 458532, at *2

(E.D. Va. Feb. 6, 2013) (awarding $4.5 million in attorney's fees and costs as spoliation

sanction); *Qualcomm Inc. v. Broadcom Corp.*, No. 05-CV-1985, 2008 WL 66932, at *9-11, 17

(S.D. Cal. Jan. 7, 2008) (awarding $8.5 million in attorney's fees and costs as sanction for

discovery failure by Qualcomm), *vacated in* part, 2008 WL 638108 (S.D. Cal. Mar. 5, 2008)

(order final as to Qualcomm).  A consideration of these factors leads me to believe that the

lodestar I have calculated here is reasonable.

---

[22] Davis Wright Tremaine, Experience,
http://www.dwt.com/experience/uniEntity.aspx?xpST=ExperienceDetail&experience=11095 (last visited Sept. 28,
2016).

I have also reviewed the costs requested by Klipsch for work done by DWT and find that the costs are reasonable.  Those costs include costs for

> payments for translation of documents produced by ePRO in Chinese, payments to court reporters for deposition transcripts and videography, payments to litigation support service personnel to load voluminous discovery productions, expenses for travel to the second round of depositions in Hong Kong (discounted in the case of the travel expenses) and costs for online legal research . . . .

(1/25 Klipsch Mem. at 24.)  Courts have approved similar costs as part of fee awards.  *See*, *e.g.*, *Themis Capital v. Democratic Republic of Congo*, No. 09-CV-1652, 2014 WL 4379100, at *12 (S.D.N.Y. Sep. 4, 2014) (awarding costs including translation services, on-line research, travel accommodations, and photocopying expenses); *Harley v. Nesby*, No. 08-CV-5791, 2012 WL 1537881, at *14 (S.D.N.Y. May 2, 2012) (finding expenses for travel and online legal research, such as Westlaw research, are "routine costs typically awarded to a party seeking attorneys' fees and costs").  Klipsch is therefore awarded $124,336.76 in costs for work done by DWT.

Based on these considerations, Klipsch is awarded $1,461,345.43 in fees and $124,336.76 in costs for the work done by DWT, for a total award of $1,585,682.19 for work done by DWT.

### b.  iDS Award

Klipsch also seeks fees and costs for the work done by iDS related to the forensic search of ePRO's databases.  I assess the reasonableness of an expert's fees using the same lodestar method I used for attorney's fees:  by multiplying a reasonable hourly rate by the reasonable number of hours expended.  *Themis Capital*, 2014 WL 4379100, at *9.  Klipsch bears the burden of proving the reasonableness of its expert's fees.  *Id.*  "In assessing the reasonableness of an expert witness's fees, the court should look to such factors as the expert's area of expertise and education; the prevailing rates for comparable experts; and the nature and complexity of the

issues about which the expert's insight was sought." *St. Paul Mercury Ins. Co. v. M & T Bank. Corp.*, No. 12-CV-6322, 2014 WL 1468452, at *2 (S.D.N.Y. Apr. 11, 2014).

Klipsch has provided extensive details regarding the hours spent on iDS personnel concerning iDS's work in this matter, (1/25 Wukoson Dec. Ex. D; 4/1 Wukoson Dec. Ex. C), as well as documentation regarding the qualifications of the iDS personnel who worked on this matter, (1/25 Regard Dec. Exs. A-J).[23]  The hours iDS expended seem reasonable based on the complicated nature of the task involved, and ePRO did not raise any challenges to any hours expended by iDS.  Klipsch also provided the hourly rates charged by these experts, (Wukoson Dec. ¶ 26), which appear reasonable based on their qualifications and compare favorably to the hours which FTI charged ePRO for similar tasks in this matter.  (1/25 Klipsch Mem. at 23.) ePRO also raises no challenge to these rates.

ePRO's sole argument is that the bills indicate that Klipsch has not yet fully paid iDS for all of the work done.  (3/9 ePRO Mem. at 22-23.)  However, ePRO does not offer any case law that demonstrates that this is a consideration I should take into account in evaluating the reasonableness of the award, and ePRO's argument does not persuade me otherwise. Accordingly, I find that Klipsch is entitled to the full $1,038,781.50 requested in fees for services provided by iDS, as well as the full $56,942.76 requested in costs for services provided by iDS. Klipsch is therefore awarded a total of $1,095,724.26 for iDS's services.

### 4.  Conclusion

Klipsch's motion to set sanctions, (Doc. 326), is GRANTED IN PART AND DENIED IN PART.  Klipsch is awarded a total of $2,681,406.45 in fees and costs as a sanction for

---

[23] "1/25 Regard Dec." refers to the January 25, 2016 Declaration of Daniel L. Regard, II in Support of Plaintiff Klipsch Group Inc.'s Motion to Set Sanctions Award.  (Doc. 328.)

ePRO's bad faith spoliation.

## IV.   **Conclusion**

For the reasons stated herein, the motions for oral argument, (Docs. 321, 344) are

DENIED.  ePRO's motion for reconsideration, (Doc. 306), is GRANTED IN PART AND

DENIED IN PART.  Klipsch's motion for reconsideration, (Doc. 308), is GRANTED IN PART

AND DENIED IN PART.  Klipsch's motion to set sanctions, (Doc. 326), is GRANTED IN

PART AND DENIED IN PART.  Klipsch is awarded $2,681,406.45 in fees and costs as a

sanction for ePRO's bad faith spoliation.  I also find the Klipsch is entitled to have a bond posted

to cover future attorney's fees and costs, and based upon my review of the facts and record

produced thus far by the parties, including fee and expense estimates submitted by Klipsch, I believe

that—between the asset restraint and a bond, and as further detailed below—the total amount held

from ePRO in this matter should remain $5 million.  The stay put in place by this Court on

November 3, 2015, (Doc. 295), related to the reduction of the asset restraint contained in this

Court's Memorandum & Order of November 2, 2015, (Doc. 294), shall remain in place until the

Court receives a joint letter from the parties within fourteen days of the issuance of this Order

regarding whether a portion or all of the amount restrained will instead be placed in a bond.

The parties are directed to meet and confer and, within fourteen days of the issuance of this Order, file a joint letter concerning whether the $5 million currently restrained will remain as an asset restraint, or whether some portion or all of the $5 million will instead be put up as a bond.  The Clerk of Court is respectfully directed to close the pending motions, (Docs. 306, 308, 321, 326, and 344).


SO ORDERED.

Dated: September 30, 2016
       New York, New York

Vernon S. Broderick
United States District Judge

# EXHIBIT A

| Hours | Elings | Keith | Toaltoan | Ratner | Wukoson | Legrand | Arweiler | Shapiro | Johnny | Duffy |
|---|---|---|---|---|---|---|---|---|---|---|
| Dec. 2013 | 131.8 | 112.2 | | | 121 | 1.6 | | | | |
| Jan. 2014 | 39.4 | 85.6 | | | 143.4 | | | | | |
| Feb. 2014 | 91.2 | 18.1 | | | 125.1 | | | | | |
| Mar. 2014 | 5.9 | 0 | | | 27.9 | | | | | |
| May. 2014 | 16.4 | 31.3 | | | 17.1 | | | | | |
| Jun. 2014 | 15.8 | 13.3 | | | 9 | | | | | |
| Aug. 2014 | 10 | | | | 35.2 | | | | | |
| Sep. 2014 | 63.1 | | | | 92.2 | | | | 28.2 | |
| Nov. 2014 | 85.6 | 1.8 | | | 113.5 | | | | 19.3 | |
| Dec. 2014 | 72.5 | 2.4 | | | 105.3 | | | | 25.9 | |
| Jan. 2015 | 111.1 | 13 | | | 148.4 | 16.6 | | | 12.1 | 0.5 |
| Feb. 2015 | 111.2 | 33.1 | | 16.9 | 186.1 | 69.1 | 32 | | 7.6 | |
| Mar. 2015 | 99.4 | 5 | | 11 | 101.4 | 44.7 | | | | |
| Dec. 2015 | 140 | 1 | 64.7 | | 145.7 | | 6.3 | 8.6 | | |
| Feb. 2016 | 61.8 | | 44.7 | | 88.8 | | | | 4.4 | |
| Mar. 2016 | 32 | | 26 | | 83.6 | | | 21.2 | 3.6 | 0.7 |
| **Total** | 1087.2 | 316.8 | 135.4 | 27.9 | 1543.7 | 132 | 38.3 | 29.8 | 101.1 | 1.2 |
| | | | | | | | | | | |
| **Rate By Year** | | | | | | | | | | |
| Rate 2013 | $650 | $390 | | | $405 | $580 | | | | |
| Rate 2014 | $650 | $415 | | | $425 | $580 | | | $150 | $240 |
| Rate 2015 | $650 | $440 | $415 | $415 | $460 | $580 | $190 | $305 | $160 | |
| Rate 2016 | $650 | | $450 | | $500 | | | $325 | $170 | $265 |
| | | | | | | | | | | |
| **Hours By Year** | | | | | | | | | | |
| Hours 2013 | 171.2 | 197.8 | 0 | 0 | 264.4 | 1.6 | 0 | 0 | 0 | 0 |
| Hours 2014 | 471.6 | 79.9 | 0 | 0 | 673.7 | 16.6 | 0 | 0 | 85.5 | 0.5 |
| Hours 2015 | 350.6 | 39.1 | 64.7 | 27.9 | 433.2 | 113.8 | 38.3 | 8.6 | 7.6 | 0 |
| Hours 2016 | 93.8 | 0 | 70.7 | 0 | 172.4 | 0 | 0 | 21.2 | 8 | 0.7 |
| **Overall Total Hours** | 1087.2 | 316.8 | 135.4 | 27.9 | 1543.7 | 132 | 38.3 | 29.8 | 101.1 | 1.2 |
| | | | | | | | | | | |
| **Fees By Year** | | | | | | | | | | |
| 2013 | $111,280 | $77,142 | $0 | $0 | $107,082 | $928 | $0 | $0 | $0 | $0 |
| 2014 | $306,540 | $33,159 | $0 | $0 | $286,323 | $9,628 | $0 | $0 | $12,825 | $120 |
| 2015 | $227,890 | $17,204 | $26,851 | $11,579 | $199,272 | $66,004 | $7,277 | $2,623 | $1,216 | $0 |
| 2016 | $60,970 | $0 | $31,815 | $0 | $86,200 | $0 | $0 | $6,890 | $1,360 | $186 |
| **Overall Total Fee** | | $706,680 | $127,505 | $58,666 | $11,579 | $678,877 | $76,560 | $7,277 | $9,513 | $15,401 | $306 |
| | | | | | | | | | | |
| **Total Fee for Hours Worked** | $1,692,362 | | | | | | | | | |
| **Courtesy Discount** | $231,016.07 | | | | | | | | | |
| **Total Fee less courtesy discount** | $1,461,345.43 | | | | | | | | | |
| **Costs** | $124,336.76 | | | | | | | | | |
| **Total Fees and Costs Awarded for DWT Work** | $1,585,682.19 | | | | | | | | | |